**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

JUAN A. KINLEY, :

Petitioner,

Case No. 3:03-cv-127

-vs-

District Judge Michael A. Watson
Magistrate Judge Michael R. Merz

MARGARET BRADSHAW,
Warden,

Respondent. :

---

**REPORT AND RECOMMENDATIONS**

---

This is a habeas corpus action brought by Petitioner Juan Kinley pursuant to 28 U.S.C. § 2254 and seeking relief from both his conviction for aggravated murder with death specifications and his resulting death sentence.

Mr. Kinley is represented in this proceeding by appointed counsel who did not represent him in any direct appeal proceedings.

**Statement of Facts**

The Supreme Court of Ohio described the facts and circumstances leading to Mr. Kinley's indictment, trial, convictions, and adjudged sentence of death as follows:

> In August 1988, Juan Antonio Lamar Kinley, appellant, began dating Thelma Miller. Throughout the course of their relationship, appellant physically beat Thelma and regularly threatened to kill her. In August, 1988, appellant beat Thelma for attending a movie with another man. In October 1988, appellant assaulted Thelma and threatened to kill her. In mid-December 1988, appellant physically beat Thelma at a restaurant where appellant and Thelma were employed. At that time, appellant told Thelma, "That's it, you've had

it." Later that month, in December 1988, appellant threatened to kill Thelma if he ever caught her with another man.

Thelma began dating Ronald Hildenbrand in December 1988 or January 1989. On January 8, 1989, Hildenbrand and Thelma were at Thelma's apartment. Appellant barged into the apartment, shoved Thelma, and threatened that he was going to "get" Thelma and her two sons, David and Daniel Miller. During the altercation, Daniel Miller called "911" to report the incident to police. The telephone call was recorded, and appellant could be heard in the background shouting that Thelma was a "bitch" and a "fucking whore." Appellant could also be heard saying, "I'm going to fuck you up, Misty (Thelma) ...."

The following day, on January 9, 1989, appellant mentioned to a friend that he (appellant) felt like killing Thelma because Thelma had been seeing another man. Another witness heard appellant say, "Well, if I can't have her (Thelma), no one will." On January 9, Thelma called Project Woman, a crisis-intervention agency for battered women. Thelma made an appointment with the agency for January 10, at 2:00 p.m.

Elaine Szulewski and her husband, Richard Szulewski, lived at 6780 North River Road in Clark County, Ohio. Thelma occasionally worked for the Szulewskis as a housekeeper. On the morning of January 10, 1989, Thelma arrived at the Szulewski residence to begin her scheduled cleaning duties. Elaine Szulewski telephoned Thelma at the residence and spoke with her at approximately 10:00 a.m. Szulewski again called Thelma at approximately 1:00 p.m., but no one answered the phone at the Szulewski residence.

On January 10, 1989, at approximately 5:00 p.m. Elaine Szulewski returned home from work and found Thelma's body and the body of Thelma's youngest child, David, lying in a pool of blood in the Szulewski's garage. The victims had been brutally hacked to death. Each victim had suffered multiple lacerations and cut wounds to their heads and bodies. The victims' wounds had been inflicted with great force and intensity. A number of the blows had penetrated deeply into (or completely through) the victims' bones. Several of Thelma's appendages had been severed from her body. The nature of David's wounds indicated that he had probably survived for a period of time following the attack.

Police quickly responded to the scene. Bloody shoe prints were

found in the garage, but no blood was found in the Szulewski residence. Thelma's car was parked in the driveway, but the car keys were nowhere to be found. Thelma's purse was missing from the Szulewski's home, along with $121 she had been carrying in a flowered bank envelope a day or two before the murders. Approximately $300 in cash was missing from a dresser in the Szulewski's bedroom. Also missing was $25 that Elaine Szulewski had placed underneath a tissue box for payment of Thelma's cleaning services. Additionally, Richard Szulewski's machete was missing from the garage.

Victor Bishop was with appellant on the morning of January 10, 1989. Appellant arrived at Bishop's house at approximately 9:45 a.m. However, appellant left Bishop's house at approximately 10:45 a.m. Appellant then returned approximately one hour later with a large [ ] sum of money in a flowered bank envelope. Upon appellant's return, Bishop noticed that appellant had a set of car keys that appellant had not been carrying earlier that day.

On the evening of January 10, 1989, police spoke with appellant and informed him that Thelma had been murdered. According to police, appellant became very excited and said, "Well, is David dead? Is David dead, too?" Appellant informed police that Thelma and David had visited appellant's home that morning, at approximately 9:30 a.m. Appellant claimed that Thelma had dropped off $40 to enable appellant to pay a $31 court fine. Appellant denied having even been to the Szulewski residence.

On January 10, 1989, at approximately noon, Randy Maggard was driving on Selma Road near the vicinity of the murder scene. After passing the intersection of Selma and North River Road, Maggard noticed a white and gold 1981 Plymouth automobile being driven erratically and at a high rate of speed. The driver of the Plymouth, an African-American male, tailgated Maggard's vehicle for some distance. Another witness also saw the 1981 Plymouth in the vicinity of the murder scene at approximately noon on January 10. Both witnesses later identified appellant's mother's automobile as the vehicle they had seen in the vicinity of the murders.

On January 12, 1989, appellant was once again questioned by police. Appellant was confronted with the fact that the witnesses had seen him near the scene of the killings. During questioning, appellant admitted that he had been to the Szulewski residence the day of the murders. Appellant gave differing accounts of his visit to the

> residence, but steadfastly denied killing Thelma and David Miller. Appellant repeatedly lied during his interview with police.
>
> The bloody shoe prints found at the murder scene were made by size ten shoes similar to the type of shoes appellant had been wearing prior to the killings. Bloodstains were detected on appellant's jacket. The bloodstained jacket had been seized by police without a warrant. DNA analysis revealed that it was highly probable that the blood had come from David Miller. A forensic expert found blood in several areas of appellant's mother's 1981 Plymouth automobile–the automobile that appellant had been driving on the day of the murders. Human blood was found on the steering wheel. A floormat was missing from the driver's side of the vehicle. On January 12, 1989, police executed a search warrant at appellant's residence and found $291.50 in cash and approximately $30 to $50 worth of marijuana.
>
> In the latter part of January 1989, appellant admitted to his friend, Donald A. Merriman, that he had killed Thelma and David Miller. Appellant told Merriman that he (appellant) had "fucked them up."
>
> In April 1989, police recovered a machete similar to the one that had been missing from the Szulewskis' garage. The bloodstained machete was found in an alley behind appellant's house. Richard Szulewski identified that machete as belonging to him. The coroner testified that the victim's wounds were consistent with having been caused by the weapon recovered by police.

*State v. Kinley*, 72 Ohio St.3d 491, 491-93 (1995).

**<u>State Court Proceedings</u>**

On or about March 13, 1989, in Case 89-CR-65, the Clark County Grand Jury indicted Mr. Kinley for aggravated murder (four counts), with a specification, and aggravated robbery. Appendix (hereinafter "App.") Vol. I at 16-17. On March 16, 1989, Mr. Kinley entered a plea of not guilty to the Indictment. Transcript of Proceedings (hereinafter "Tr.") Vol. I, Tab 1 at 1. The court appointed Noel Edward Kaech of the Clark County Public Defender's Office and attorney John R. Butz to represent Mr. Kinley. *Id.* Subsequently, the court appointed attorney James A. Doughty to represent Mr. Kinley and granted Mr. Kaech leave to withdraw as Mr. Kinley's

counsel[1]. *Id.* at 4, 5.

On February 19, 1991, Mr. Kinley waived his jury trial right and elected to be tried by a three-judge panel. App. Vol 1. at 275; Tr. Vol. I, Tab 12 at 2-11 The guilt phase of Mr. Kinley's trial to the panel began on March 4, 1991. Tr. Vol. III at 19. On March 19, 1991, the panel found Mr. Kinley: (1) guilty as charged in Count I of the Indictment (that he purposely caused the death of Thelma Miller while committing or fleeing after committing aggravated robbery); (2) guilty as charged in Count II of the Indictment (that he purposely caused the death of David Miller while committing or fleeing after committing aggravated robbery); (3) guilty of the specification in Count II (that this offense was part of conduct involving the purposeful killing of two persons); (4) not guilty as charged in Count III of the Indictment (aggravated murder with prior calculation and design in causing the death of Thelma Miller) but guilty of the lesser included offense of murder; (5) not guilty as charged in Count IV of the Indictment (aggravated murder with prior calculation and design in causing the death of David Miller) but guilty of the lesser included offense of murder; and (5) guilty as charged in Count V of the Indictment (aggravated robbery). Tr. XI at 1485-87.

Following the mitigation phase of Mr. Kinley's trial which was held on May 1, 1991, the panel sentenced Mr. Kinley to death on Counts I and II of the Indictment and to a term of ten years to a maximum term of twenty-five years on Count V of the indictment. Tr. XII at 186. The panel also merged Counts III and IV with Counts I and II. *Id.* The court entered judgment on May 6, 1991, App. Vol. I at 426-27, and on May 9, 1991, the court issued its sentencing opinion. *Id.* at 434-45.

Mr. Kinley filed a notice of appeal to the Clark County Court of Appeals on June 7,

[1] The court permitted Mr. Kaech to appear on behalf of Mr. Kinley during trial for the limited purpose of examining and cross-examining expert witnesses regarding DNA evidence. Tr. Vol. III at 224-25.

1991. App. Vol II at 5. Mr. Kinley filed his merit brief on October 28, 1993, and raised the following assignments of error:

**ASSIGNMENT OF ERROR NO. 1**

Appellant Kinley's conviction should be reversed for the reason that the testing procedures used by Cellmark Laboratory were not conducted properly.

A. The procedures used by Cellmark Laboratory in this case are not generally accepted by the scientific community and are not capable of producing reliable results.

B. The statistical method used by Cellmark Laboratory to estimate the frequency of the DNA print in the relevant population was not reliable.

C. After discovery has been provided, a pretrial hearing should be conducted to determine the reliability of the DNA evidence.

**ASSIGNMENT OF ERROR NO. II**

Due process and equal protection require that the same standards for assessing the impact of wrongly admitted evidence and argument be applied in all capital trials. A presumption that three judge panels do not consider such evidence and argument denies the defendant these rights. Rights infringed by this unequal standard and presumption are guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO. III**

The trial court erred in denying appellant's motion to suppress evidence. Said error deprived Mr. Kinley of his rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 9, 14, and 16 Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO. IV**

The trial court erred in denying Appellant Kinley's motion to suppress all statements involuntarily made by him to law enforcement officers. Said error deprived Appellant Kinley of his rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 9, 10, and 16, Article I of the

Ohio Constitution.

**ASSIGNMENT OF ERROR NO. V**

Evidence obtained through a pretextual arrest must be excluded from trial pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9, 14, and 16, Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO. VI**

The colloquy conducted by the trial court with Appellant Kinley, concerning the waiver of his right to trial by jury, was insufficient to guarantee that Appellant Kinley made an intelligent, voluntary, and knowing waiver of that right as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9, and 16, Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO. VII**

A judge should disqualify himself when his impartiality might reasonably be questioned.

**ASSIGNMENT OF ERROR NO. VIII**

The admission into evidence of the 911 tape violated Appellant Kinley's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 9, 10, and 16, Article I of the Ohio Constitution, and Evid. R. 403, 801, 802, 803, and 805.

**ASSIGNMENT OF ERROR NO. IX**

The trial court erred by allowing the admission of irrelevant, cumulative, and prejudicial shoe print evidence in violation of Mr. Kinley's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 2., 9, 10, and 16, Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO. X**

Where the trial court errs in admitting numerous exhibits that are irrelevant, prejudicial, confusing, and misleading, it violated that defendant's rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the Untied States Constitution, Sections 9 and 16, Article I of the Ohio Constitution, and Evid. R. 401, 402, and 403.

**ASSIGNMENT OF ERROR NO. XI**

Evidence of other criminal acts is admissible to show identity only if

the evidence tends to show by substantial proof that because of a unique, identifiable plan of criminal activity there is a strong likelihood that the person who committed the other acts also committed the acts charged. The standard for admissibility is strict. Thus, where evidence of other acts fails to show by substantial proof either a unique, identifiable plan of criminal activity, or that the person charged committed the other act, or that the person charged committed the act charged, that evidence is inadmissible.

**ASSIGNMENT OF ERROR NO. XII**

The victim impact testimony admitted against Appellant Kinley at his capital trial violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

**ASSIGNMENT OF ERROR NO XIII**

The trial court abused its discretion by limiting defense counsel's questioning of Sergeant Loney at the suppression hearing, in violation of Mr. Kinley's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 9, 10, 14 and 16, Article I of the Ohio Constitution, and Evid. R. 101(C)(1) and 104(A).

**ASSIGNMENT OF ERROR NO. XIV**

Forensic criminalist Shepherd's testimony, containing both irrelevant, unfairly prejudicial matter and matter improperly admitted, violated Mr. Kinley's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 9, 10, and 16, Article I of the Ohio Constitution, and Evid. R. 401, 402, 612, 801, and 802.

**ASSIGNMENT OF ERROR NO. XV**

It violates due process for the state to recall witnesses without having given advanced warning it intended to recall them.

**ASSIGNMENT OF ERROR NO. XVI**

The trial court abused its discretion when it overruled defense counsel's continuance request to investigate the state's untimely disclosed discoverable evidence, in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 9, 10, and 16, Article I of the Ohio Constitution, and Crim R. 16.

**ASSIGNMENT OF ERROR NO. XVII**

Doctor Smith's testimony on the alleged instrument that caused death was too uncertain to be competent.

**ASSIGNMENT OF ERROR NO. XVIII**

A capital defendant is denied his rights to a fair trial, due process, and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution, where gruesome and prejudicial photographs are admitted into evidence when their prejudicial effect outweighs their probative value.

**ASSIGNMENT OF ERROR NO. XIX**

The prosecutor's misconduct denied Mr. Kinley his due process right to a fair trial as well as his constitutional protection against cruel and unusual punishment.

**ASSIGNMENT OF ERROR NO. XX**

The ineffective assistance of counsel provided to Appellant Kinley violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

1. Failure to litigate at a pretrial hearing the reliability and admissibility of DNA evidence (See Assignment of Error No, I)

2. Failure to object to the admission of the money found in Mr. Kinley's house, State's Exhibit 79, as being the fruit of an illegal pretextual arrest. (See Assignment of Error No. V)

3. Failure to insure a proper jury waiver colloquy with the trial court. (See Assignment of Error No. VI)

4. Failure to object to the victim impact testimony at Tr. 48-56 (excepting the witness's testimony, at Tr. 53-54, that Thelma Miller said now Mr. Mr. Kinley was in trouble, because now she had witnesses to his striking her; and the witness's testimony, at Tr. 56, that Thelma Miller wanted to see her children, both of which statements were objected to). (See Assignment of Error No. XII)

5. Failure to object to Forensic Criminalist Shepherd's

testimony on irrelevant, unfairly prejudicial matter and failure to object to the improper "refreshing" of Mr. Shepherd's memory. (See Assignment of Error No. XIV)

6. Failure to object to the admission of the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30. (See Assignment of Error No. XVII)

7. Failure to object to prosecutorial misconduct at Tr. 1428-1429, 1441; Mit. Tr. 169-174. (See Assignment of Error No. XIX)

**ASSIGNMENT OF ERROR NO. XXI**

The state failed to introduce sufficient evidence to prove all the elements of aggravated robbery beyond a reasonable doubt. Appellant was deprived of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

**ASSIGNMENT OF ERROR NO. XXII**

The sentence of death imposed on Appellant Kinley was unreliable and inappropriate. The death sentence in his case violates the Eighth and Fourteenth Amendments to the United States Constitution, Sections 9 and 16, Article I of the Ohio Constitution, and R.C. 2929.05.

**ASSIGNMENT OF ERROR NO. XXIII**

In a capital case, a trial court must comply with the dictates of R.C. 2929.03 in filing its opinion imposing the death sentence.

**ASSIGNMENT OF ERROR NO. XXIV**

The "proportionality review" required by R.C. 2929.05 must meet the requirements of due process as required by the Fifth and Fourteenth Amendments to the United States Constitution. The present method of proportionality review conducted by this court does not meet those requirements.

**ASSIGNMENT OF ERROR NO. XXV**

The Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution, and Ohio Revised Code Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio is fatally flawed, thereby denying Appellant Kinley the above rights.

**ASSIGNMENT OF ERROR NO. XXVI**

> The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in Revised Code 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2020.04, and 2929.05, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied to Appellant Kinley.

App. Vol. II at 57-175.

On June 24, 1993, the court of appeals issued its decision rejecting Mr. Kinley's assignments of error and affirming the trial court. *State v. Kinley*, No. 2826, 1993 WL 224496 (Ohio App. 2nd Dist., June 25, 1993)(unreported); see also, App. Vol III at 239-308.

Mr. Kinley filed an application for reconsideration challenging the appellate court's decision "affirming an objectively unreasonable pretextual arrest" as conflicting with that court's previous holdings. *Id.* at 309-18. On July 22, 1993, the court of appeals issued a decision denying Mr. Kinley's motion for rehearing. *Id.* at 326-28.

Mr. Kinley filed his timely Notice of Appeal to the Supreme Court of Ohio. *Id.* at 329-31. On June 27, 1994, Mr. Kinley filed his brief in which he raised the following propositions of law:

**PROPOSITION OF LAW NO. I**

> When DNA testing procedures are unreliable and the probability statistics of a match do not comply with current standards used in the scientific community, the admission of DNA evidence violates the defendant's rights guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution and Ohio R.Evid. 401, 402, 403, and 702.

**PROPOSITION OF LAW NO. II**

> When a trial court errors [sic] in denying a motion to suppress evidence, said error deprives the defendant of his rights guaranteed

by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 9, 14, and 16, Article I of the Ohio Constitution.

**PROPOSITION OF LAW NO. III**

When involuntary statements are not suppressed and are admitted into evidence, said error deprives an appellant of his rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

**PROPOSITION OF LAW NO. IV**

Evidence obtained through a pretextual arrest must be excluded from trial pursuant to the Fourth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 14, 16, and 20 of the Ohio Constitution.

**PROPOSITION OF LAW NO. V**

The colloquy conducted by the trial court with Appellant Kinley, concerning the waiver of his right to trial by jury, was insufficient to guarantee that Appellant Kinley made an intelligent, voluntary, and knowing waiver of that right as guaranteed by the Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 16, and 20, of the Ohio Constitution.

**PROPOSITION OF LAW NO. VI**

The admission into evidence of the 911 tape violated Appellant's Kinley's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution, and Ohio R. Evid. 403.

**PROPOSITION OF LAW NO. VII**

The admission of irrelevant, cumulative, and prejudicial evidence which confuses and misleads the trier of fact violates that defendant's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution, Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution, and Ohio R.Evid. 401, 402, and 403.

**PROPOSITION OF LAW NO. VIII**

Where evidence of other acts fails to show by substantial proof that because of a unique identifiable plan of criminal activity there is a strong likelihood that the person who committed the other acts also committed the acts charged, the admission of other acts evidence is

in violation of the rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

**PROPOSITION OF LAW NO. IX**

Admission of victim impact testimony at a capital trial violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 16, and 20 of the Ohio Constitution.

**PROPOSITION OF LAW NO. X**

When a trial court abused its discretion by limiting questioning at a suppression hearing, it violated a defendant's right as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, Article I. Sections 9, 10, 14, and 16 of the Ohio Constitution, and Ohio R.Evid. 101(C)(1) and 104(A).

**PROPOSITION OF LAW NO. XI**

Testimony containing both irrelevant, unfairly prejudicial matter and matter improperly admitted violates the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution, and Ohio R.S. [sic] Evid. 401, 402, 403, 612, 801, and 802.

**PROPOSITION OF LAW NO. XII**

It violates due process for the state to recall witnesses without having given advanced warning it intended to recall them.

**PROPOSITION OF LAW XIII**

A trial court abuses its discretion when it overrules a defendant's continuance request to investigate the state's untimely disclosed discoverable evidence, in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10, and 16 of the Ohio Constitution, and Crim.R. 16.

**PROPOSITION OF LAW NO. XIV**

An expert witness must testify to a reasonable degree of scientific certainty, which is a probability not a possibility.

**PROPOSITION OF LAW NO. XV**

A capital defendant is denied his rights to a fair trial, due process, and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the

United States Constitution and Article I, Sections 1, 10, 16, and 20 of the Ohio Constitution , where gruesome and prejudicial photographs are admitted into evidence when their prejudicial effect outweighs their probative value.

**PROPOSITION OF LAW NO. XVI**

Prosecutorial misconduct denies a capital defendant his due process right to a fair trial as well as his constitutional protections against cruel and unusual punishment.

**PROPOSITION OF LAW NO. XVII**

The ineffective assistance of counsel provided to Appellant Kinley violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 10, 16, and 20 of the Ohio Constitution.

1. Failure to litigate at a pretrial hearing the reliability and admissibility of the DNA evidence. (*See* Proposition of Law I)

2. Failure to object to the admission of the money found in Mr. Kinley's house, State's Exhibit 79, as being the fruit of an illegal pretextual arrest. (*See* Proposition of Law IV)

3. Failure to insure a proper jury waiver colloquy with the trial court. (*See* Proposition of Law V)

4. Failure to object to the victim impact testimony at Tr. 48-46 (excepting the witnesses testimony, at Tr. 53-54, that Thelma Miller said now Mr. Kinley was in trouble, because now she had witnesses to his striking her; and the witness's testimony, at Tr. 56, that Thelma Miller wanted to see her children, both of which statements were objected to). (*See* Proposition of Law IX)

5. Failure to object to Forensic Criminalist Shepherd's testimony on irrelevant, unfairly prejudicial matter and failure to object to the improper "refreshing" of Mr. Shepherd's memory. (*See* Proposition of Law XI)

6. Failure to object to the admission of the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30. (*See* Proposition of Law XV)

7. Failure to object to prosecutorial misconduct at Tr. 1428-1429, 1441; Mit. Tr. 169-74. (*See* Proposition of Law XVI)

**PROPOSITION OF LAW NO. XVIII**

Due process and equal protection require that the same standards for assessing the impact of wrongly admitted evidence and argument be applied in all capital trials. A presumption that three judge panels do not consider such evidence and argument denies the defendant these rights. Rights infringed by this unequal standard and presumption are guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Sections 5, 9, 10, and 16. Article I of the Ohio Constitution.

**PROPOSITION OF LAW NO. XIX**

A judge should disqualify himself when his impartiality might reasonably be questioned.

**PROPOSITION OF LAW NO. XX**

The state must introduce sufficient evidence to prove all the elements of aggravated robbery beyond a reasonable doubt. The failure to do so deprived appellant of his right to due process of law under the Ninth and Fourteenth Amendments to the United States Constitution.

**PROPOSITION OF LAW NO. XXI**

The death sentence is unreliable and inappropriate in Appellant Kinley's case, in violation of the Eighth and Fourteenth Amendments of the United States Constitution; Article I, Sections 9 and 16 of the Ohio Constitution; and Ohio Rev. Code Ann. Section 2929.05.

**PROPOSITION OF LAW XXII**

In a capital case, a trial court must comply with the dictates of Ohio Rev. Code Ann. Section 2929.03 in filing it opinion imposition the death sentence.

**PROPOSITION OF LAW NO. XXIII**

The "proportionality review" required by Ohio Rev. Code Ann. Section 2929.05 must meet the requirements of due process as required by the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, The present method of proportionality review conducted by this court does not meet those requirements since all capitally charged cases are not included in the comparison.

**PROPOSITION OF LAW NO. XXIV**

The Fifth, Eighth, Ninth, and Fourteenth Amendments to the United

States Constitution, Article I Sections 1, 10, 16, and 20 of the Ohio Constitution and Ohio Revised Code Ann. Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. the statutorily mandated proportionality process in Ohio is fatally flawed, thereby denying Appellant Kinley the above rights since trial courts have failed to file written opinions in jury cases where the jury has returned life verdicts.

**PROPOSITION OF LAW NO. XXV**

The Fifth, Sixth, Eight, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 20 of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed requirements and thus are unconstitutional, both on their fact and as applied to Appellant Kinley.

*Kinley*, 72 Ohio St.3d at 500-02; App. Vol. IV at 67-290.

On July 19, 1995, the Ohio Supreme Court issued its decision rejecting Mr. Kinley's propositions of law and finding, after independent review, that the aggravating circumstances outweighed the mitigating factors and that his death sentence was proportionate. *Kinley*, 72 Ohio St.3d 491; App. Vol. V at 188-98. Mr. Kinley filed a Motion for Reconsideration on July 31, 1995, *Id.* at 212-20, which the Ohio Supreme Court denied on September 20, 1995. *Id.* at 230; *State v. Kinley*, 73 Ohio St.3d 1454 (1995)(table). On March 25, 1996, the United States Supreme Court denied *certiorari*. *Kinley v. Ohio*, 517 U.S. 1106 (1996); App. Vol. V at 242.

On September 21, 1996, Mr. Kinley filed his petition for post-conviction relief pursuant to O.R.C. § 2953.21 and he subsequently amended his petition. During post-conviction proceedings, Mr. Kinley raised the following claims for relief:

**FIRST CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because petitioner's right to trial by jury was compromised

by a deal whereby petitioner waived his right to a jury in return for funding to hire a mental health expert for the mitigation phase of trial. Exhibit A; Exhibit B.

**SECOND CLAIM FOR RELIEF**

Petitioner's convictions and sentences are void and/or voidable because a material witness for the State of Ohio, Donald Merriman, gave false and/or inaccurate testimony against petitioner as follows:

1. Donald Merriman testified that he had a conversation with Petitioner Kinley in the latter part of January, 1989 on Clifton Avenue in the back of the green house across from Springfield South High School, and that they were drinking. Tr. 623-624. This testimony was false. Exhibit D, Para. 5.

2. Merriman further testified that during this conversation with petitioner in January of 1989, the petitioner asked him if he had ever killed anyone. Tr. 624. This testimony was false. Exhibit D, Para. 5.

3. Merriman testified then that petitioner told him that he had killed his girlfriend and her son, Thelma and David Miller. Tr. 625. This testimony was false. Exhibit D, Para. 5.

4. Donald Merriman has admitted by way of an affidavit that he never had *any* conversation with Petitioner Kinley in January of 1989. Exhibit D, Para. 5. In his affidavit, Merriman admits that he had not even seen Petitioner Kinley in years. Merriman states in his affidavit that the first time Merriman saw Kinley was when the two of them were both in jail in March of 1989. Exhibit D, Para. 5.

**THIRD CLAIM FOR RELIEF**

Petitioner's convictions and sentences are void and/or voidable because the State of Ohio elicited false testimony at the trial. (Donald Merriman).

**FOURTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because a conflict existed in his representation. (Clark County Public Defender's Office).

**FIFTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or

voidable because evidence that should have been adduced at trial and is material to petitioner's case was not presented. (Blood spatter evidence).

**SIXTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because his trial counsel were ineffective in their representation of petitioner. (Failure to employ blood spatter expert).

**SEVENTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because the alleged murder weapon, trial exhibit number thirty-nine (39) (hereafter referred to as the "machete"), has been lost by the state courts, thus depriving petitioner of the opportunity to have testing performed on the item.

**EIGHTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because his trial counsel were ineffective in their representation of petitioner. (Failure to request testing of the machete).

**NINTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because he was denied the effective assistance of counsel. (Failure to investigate, prepare, and present testimony favorable to petitioner from Dawn Mitchell).

**TENTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because false testimony was admitted into his trial. (Victor Bishop's testimony regarding bank envelopes).

**ELEVENTH CLAIM FOR RELIEF**

Petitioner Kinely's convictions and sentences are void and/or voidable because his trial attorneys were ineffective in their representation of him. (Failure to investigate, prepare, and present testimony from Richard Howard).

**TWELFTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and sentences are void and/or voidable because he did not knowingly, voluntarily, and intelligently waive his right to a jury trial.

**THIRTEENTH CLAIM FOR RELIEF**

Petitioner's convictions and sentences are void and/or voidable because Judge Lorig apparently slept either once or several times while petitioner's trial was ongoing. Exhibit A, Para. 5; Exhibit B, Para 4.

**FOURTEENTH CLAIM FOR RELIEF**

Petitioner's convictions and sentences are void and/or voidable because trial counsel, before advising petitioner to waive the right to a trial by jury, failed to insure that there was an "escape clause", whereby, if the three-judge panel imposed death, the jury waiver would be revoked.

> A jury should only be waived if counsel has received sufficient assurances that a three judge panel will in fact spare the accused's life and there is an escape clause, that should the three judge panel decide that it will impose the death penalty, the jury waiver may be revoked. To waive a jury without sufficient ... assurances that the accused's life will be spared does not meet the prevailing standards of practice for capital defense attorneys.

Exhibit U, Para. 17

**FIFTEENTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and/or sentences are void or voidable because the death penalty is applied in a racially discriminatory manner in Clark County, Ohio. Consideration of race in the administration of capital punishment is a violation of the Constitution.

**SIXTEENTH CLAIM FOR RELIEF**

Petitioner Kinley's convictions and/or sentences are void or voidable because death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain and diminishes the dignity of man.

**SEVENTEENTH CLAIM FOR RELIEF**

[T]he state courts did not afford petitioner a fair proportionality review that extends beyond mere "lip service". Petitioner will never know whether his death sentence is indeed proportionate or disproportionate to the penalty received by others committing similar crimes. Petitioner may someday be executed without receiving any meaningful proportionality review even though the Ohio legislature

> intended such. The denial of a right promised him by Ohio law operated as a violation of the guarantees afforded by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
>
> **EIGHTEENTH CLAIM FOR RELIEF**
>
> Petitioner's convictions and sentences are void and/or voidable because his trial counsel were ineffective in failing to discover and present important mitigating evidence. *See, e.g.*, Exhibits FF-JJ
>
> **NINETEENTH CLAIM FOR RELIEF**
>
> Petitioner Kinley's convictions and sentences are void or voidable because of the cumulative effect of the errors and omissions as presented in this petition in paragraphs one (1) through two hundred twelve (212). These errors have been prejudicial to the petitioner and have denied the petitioner his rights as secured by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 9, 10, 14, and 16, Article I of the Ohio constitution and Section 39, Article II of the Ohio Constitution.

App. Vol. VI at 7-263.

Mr. Kinley's post-conviction petition was eventually assigned to a judge who was not on the panel that tried Mr. Kinley. App. Vol. VI at 300; App. Vol. VII at 73-74. On January 21, 1999, the post-conviction court issued its decision denying Mr. Kinley's petition. App. Vol. VII at 81-82; 84-85. However, the court failed to provide findings of fact and conclusions of law as O.R.C. § 2953.21(G) requires. On February 2, 1999, the state moved the court to make factual findings and conclusions of law in support of its judgment and it submitted to the court proposed findings and conclusions. *Id.* at 86-93. Over Mr. Kinley's objection, *Id.* at 94-95, the court adopted the state's proposed findings of fact and conclusions of law their entirety. *Id.* at 97-103.

Mr. Kinley appealed the trial court's decision and raised the following assignments of error:

> **FIRST ASSIGNMENT OF ERROR**
>
> The trial court erred in granting summary judgment against Appellant

Kinley and dismissing his post-conviction action in violation of appellant's rights under Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

1. Appellant's waiver of a jury trial was not knowing, intelligent, and voluntary because he was coerced into trading his right to a jury for funding of a mental health expert for the mitigation phase of the trial. Appellant's attorneys were ineffective because they did not apprise him of all the risks of waiving a jury, including the increased risk of being sentenced to death and the diminished opportunity of reversal on appeal.

2. The state knowingly offered false testimony at trial from Donald Merriman and Victor Bishop, both of whom now admit that their testimony was false.

3. Appellant's attorneys were ineffective in that they did not request funds for a blood spatter expert or a metallurgist to testify on his behalf at trial.

4. Trial counsel were ineffective in failing to call Dawn Mitchell and Richard Howard on behalf of the defense, both of whom could have testified that they had seen Thelma Miller with another man the day of her murder. Counsel were also ineffective because they failed to adequately discover, develop, and present mitigating information at the mitigation phase of his trial.

5. Appellant's due process rights were violated by the state's failure to preserve potentially exculpatory evidence, relating to the machete that was introduced at trial but was subsequently lose, thereby depriving Kinley of an opportunity to test the alleged murder weapon in there postconviction proceedings.

6. Appellant did not knowingly, voluntarily, and intelligently waive the conflict of interest that was created by the Clark County Public Defender's representation of him and Merriman, who allegedly received a plea bargain in exchange for his testimony against Kinley.

7. Appellant's constitutional rights were violated because the Clark County prosecutor intentionally applied the death

penalty in a racially discriminatory manner.

**SECOND ASSIGNMENT OF ERROR**

The trial court erred in denying Appellant Kinley discovery on his post-conviction claims in violation of his constitutional rights, as guaranteed by the United States and Ohio Constitutions.

**THIRD ASSIGNMENT OF ERROR**

The trial court erred in issuing insufficient findings of fact and conclusions of law regarding appellant's petition for post-conviction relief.

App. Vol. VIII at 44-112

On November 12, 1999, the court of appeals issued a decision reversing and remanding the judgment of the trial court. *State v. Kinley*, 136 Ohio App.3d 1 (2nd Dist. 1999); App. Vol VIII at 222-48. Specifically, the appellate court reversed and remanded for a hearing on Mr. Kinley's claim that he waived his jury trial right in exchange for expert testimony and on his claim that two witnesses had committed perjury. *Id.* The appeals court affirmed the trial court in all other respects. *Id.*

Mr. Kinley appealed to the Ohio Supreme Court that portion of the appellate court's affirming the trial court's judgment and the state cross-appealed. *Id.* at 249-51; 252-53. In his December 27, 1999, memorandum in support of jurisdiction, Mr. Kinley raised the following propositions of law:

**PROPOSITION OF LAW NO. 1**

The trial court erred in denying appellant's claims of ineffective assistance of counsel. (Petitioner's sixth, eighth, ninth, eleventh, twelfth, fourteenth, and eighteenth claims for relief). The failure by counsel to obtain necessary experts and present available trial and mitigating evidence violated appellant's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

**PROPOSITION OF LAW NO. 2**

The trial court erred when it denied Mr. Kinley an evidentiary hearing on claims contained in his petition for post-conviction relief, thus violating his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution and Article I. Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.

**PROPOSITION OF LAW NO. 3**

The trial court erred in dismissing Mr. Kinley's petition for post-conviction relief without granting his motion for discovery to support his post-conviction claims in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 9, 10, 16, and 20 of the Ohio Constitution, and Ohio R.Civ.P 16.

**PROPOSITION OF LAW NO. 4**

The trial court erred in denying Mr. Kinley's petition to vacate or set aside sentence in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 9, 10, and 16 of the Ohio Constitution.

**PROPOSITION OF LAW NO. 5**

The trial court erred in issuing insufficient findings of fact and conclusions of law regarding appellant's petition for post-conviction relief.

App. Vol. IX at 8-38.

The state filed a cross appeal challenging the appellate court's decision remanding Mr. Kinley's case for an evidentiary hearing. *Id.* at 67-93. On March 15, 2000, the Ohio Supreme Court issued its entry summarily declining to accept jurisdiction over either appeal. *Id.* at 139; *State v. Kinley*, 88 Ohio St.3d 1444 (2000)(table). Mr. Kinley filed a motion for reconsideration on March 24, 2000, *Id.* at 140-45, which the Ohio Supreme Court denied on May 3, 2000. App. Vol IX at 169; *State v. Kinley,* 88 Ohio St.3d 1540 (2000)(table).

On remand to the trial court, following a period of discovery the court held an evidentiary hearing. In his April 13, 2001, post-hearing memorandum, Mr. Kinley raised the

following arguments:

A. The state placed an unconstitutional condition on Juan Kinley when it opposed the funding of a psychologist until he waived his Sixth Amendment right to a jury trial.

    1. The court did not approve the funding of a psychologist for the sentencing phase of petitioner's trial until he waived his constitutional right to be tried by a jury.

        a. The state admits that a deal was made.

        b. Prosecutor Schumaker's reason for preferring a jury trial is untenable.

        c. When considered with overwhelming evidence to the contrary, a minor reference to the psychologist report in the February 20, 1991 entry is not persuasive.

    2. Reports that John Butz and James Doughty said they waived a jury because of the gruesomeness of the case are unbelievable and unpersuasive.

        a. Alleged statements by John Butz

          I. Assistant Prosecutor Collins' allegation.
          ii. Bailiff Gibson's allegation.

        b. David Smith's allegations regarding remarks by James Doughty.

    3. The presiding judge neglected his responsibilities to prevent constitutional violations and to decide motions in a fair and impartial manner.

        a. At the very least, Judge Lorig was present for the discussions of the jury waiver and psychologist funding but said nothing.

        b. Judge Lorig only approved the funding of the psychologist after the prosecution ceased opposing it.

B. The state's primary witness committed perjury when he testified

against Juan Kinley in his capital case.

1. Merriman received leniency in exchange for his testimony.

a. The 1989 forgery charges were reduced.

b. Merriman was sentenced to only 60 days on the 1990 felony charge.

c. Merriman remained on the lam after testifying against Kinley.

2. Merriman lied again to Clark County Prosecutors in January 1997.

a. By signing the affidavits, Merriman made himself liable for perjury charges and gained no benefits.

b. The prosecutors never asked Merriman about the handwritten portions of his affidavits.

c. Merriman tried to benefit himself again by trying to testify in another capital case.

App. Vol VII at 375-406.

On May 21, 2001, the trial court issued its judgment denying Mr. Kinley's' claims and dismissing his post-conviction petition. *Id.* at 497-501.

Mr. Kinley appealed the denial of his post-conviction petition to the court of appeals and in his November 19, 2001, brief, he raised the following assignment of error:

**ASSIGNMENT OF ERROR**

The trial court erred in dismissing the remaining portion of the appellant's first ground for relief when it failed to render an accurate fact finding and based its dismissal on unsupported and flawed legal analysis.

**Issue Presented for Review**

The trial court erred in its analysis of the hearing evidence and improperly dismissed the remaining portion of appellant's first ground for relief.

App. Vol VIII at 316-56.

On April 12, 2002, the court of appeals issued its decision affirming the trial court. *Id.* at 419-29; *State v. Kinley*, No. 2001 CA 38, 2002 WL 538894 (Ohio App. 2nd Dist. Apr. 12, 2002). Mr. Kinley appealed to the Supreme Court of Ohio on May 24, 2002, App. Vol. VIII at 436-38, and in his memorandum in support of jurisdiction he raised the following proposition of law:

> **PROPOSITION OF LAW NO. 1**
>
> The trial court erred in dismissing the remaining portion of appellant's first ground for relief when it failed to render an accurate fact finding in violation of appellant's rights to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th Amendments to the United States Constitution.
>
> A. Appellant presented credible evidence that the state placed an unconstitutional condition on Juan Kinley to induce him to waive his Sixth Amendment right to a jury trial.
>
> 1. The Court did not approve the funding of a psychologist until a trade was made and appellant waived his right to a jury trial.
>
> B. State's alternative reasons for jury waiver are unbelievable and unpersuasive.
>
> C. The presiding trial judge neglected his responsibilities to prevent constitutional violations and decide motions in a fair and impartial manner.
>
> 1. Judge Lorig was present for the discussions of the jury waiver and psychologist funding but said nothing.
>
> 2. Judge Lorig only approved the funding of the psychologist after the prosecution ceased opposing it.
>
> D. The trial court erred by not granting relief on the claim of Donald Merriman's perjury.
>
> 1. Merriman received leniency in exchange for his testimony.

2. Credible affidavits that Merriman's affidavits were valid.

App. Vol. IX at 207-35.

On September 11, 2002, the Ohio Supreme Court declined to accept jurisdiction.

App. Vol VIII at 439; *State v. Kinley*, 96 Ohio St.3d 1492 (2002)(table).

**Proceedings in this Court**

On April 11, 2003, Mr. Kinley filed his Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus in which he raised the following claims:

**FIRST GROUND FOR RELIEF**

When DNA testing procedures are unreliable and the probability statistics of a match do not comply with current standards used in the scientific community, the admission of DNA evidence violates the defendant's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**SECOND GROUND FOR RELIEF**

Kinley filed various motions to suppress all tangible evidence seized from the automobile, his residence, and his jacket. Suppression hearings were held on August 31, 1990 and November 6, 1990. The trial court denied Mr. Kinley's motion in its entirety. This issue is limited to the trial court's error in denying Juan Kinley's motion to suppress and warrantless seizure and illegal search of his jacket on January 12, 1989, and the DNA evidence derived therefrom in violation of his rights as guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

**THIRD GROUND FOR RELIEF**

When involuntary statements are not suppressed and are admitted into evidence, the error deprived Juan Kinley of his rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio constitution.

**FOURTH GROUND FOR RELIEF**

Evidence obtained through a pretextual arrest must be excluded from trial pursuant to the Fourth, Eighth, and Fourteenth Amendments to

the United States Constitution.

**FIFTH GROUND FOR RELIEF**

The colloquy conducted by the trial court with Mr. Kinley concerning the waiver of his right to a trial by jury was insufficient to guarantee that Kinley made an intelligent, voluntary, and knowing waiver of that right as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**SIXTH GROUND FOR RELIEF**
**Withdrawn (PageID 52)**

**SEVENTH GROUND FOR RELIEF**

The trial court erred in admitting into evidence several irrelevant, misleading, cumulative, and prejudicial exhibits, over defense counsel's objections, as follows:

A. State's Exhibit 31—the couch seat that contained the machete. The couch seat had been in a general dumping area for over six years. Tr. 564. It took two men to lift the couch seat. Tr. 577. No one has any idea how long the machete had been in the couch seat. Tr. 579. Reddish stain taken from the foam rubber of the couch seat did not reveal the presence of blood. Tr. 674. Mr. Szulewski testified that the machete he had purchased was bought from a general surplus store in Dayton where a number of the same or similar machetes could be purchased. Tr. 599-621. Mr. Szulewski testified that the machete (State's Exhibit 39) found in the couch seat was approximately the same length as the one he purchased. Tr. 615. However, Exhibit 29 lacked the identifying decal that was on the machete he purchased. Tr. 604.

B. State's Exhibits 69, 70, 85, 86, 87, 88—photos of State's Exhibit 31, the couch seat. Defense counsel's objection to these Exhibits was the same argument advanced for State's Exhibit 31, being that they were misleading. Tr. 1131, 1141. The trial court overruled defense counsel's objection and admitted the Exhibits into evidence. Tr. 1131, 1141.

C. Waived (PageID 277);

D. State's Exhibits 44 and 45—photos of David Neil's shoe. Nelson Smith testified that the soles of Mr. Neil's shoes had a similar pattern to the foot print found at the scene of the

crime, Tr. 298, but that these shoes could not have caused those print marks. Tr. 299.

State's witness Vernon Fisher testified that Exhibits 44 and 45 somewhat resembled shoes he had seen Mr. Kinley wear. The resemblance was limited to the fact that Mr. Kinley wore and the photos depicted, black high-tops. Tr. 362, 364. Mr. Fisher testified that Mr. Kinley wore name brand shoes, Nike or Reeboks, and that Exhibits 44 and 45 were not the brand of black high-tops that he had seen Mr. Kinley wear. Tr. 359-364. State's witness Homer Franklin Roberts, Jr. essentially testified the same as Mr. Fisher in that he had seen Mr. Kinley wear black high-top Reeboks, Tr. 375, 378, and that State's Exhibits 44 and 45 only resembled what he had seen Mr. Kinley wear, being black high-tops. Tr. 372-76.

Defense counsel objected that David Neil's shoes were not relevant to Mr. Kinley's case, and contrary to the State's position, witnesses did not identify Exhibits 44 and 45 as the type of shoe Mr. Kinley work. Exhibits 44 and 45 resembled the style of shoe Mr. Kinley wore, black high-tops.

The trial court overruled defense counsel's objection because witnesses had referred to Exhibits 44 and 45 in their testimony.

E. State's Exhibit 71—enlargement of State's Exhibit 22, a footprint at the scene of the crime. Tr. 309. The State described Exhibit 71 as a photo enlarged to scale, depicting a size 10 footprint. Tr. 1132-33. Officer Priest testified that Exhibit 71 was only "approximately to scale." Tr. 310, 311. Officer Priest testified that he compared his own size 10 shoe, and a size 10 shoe from Reco Sporting Goods, and both shoes "approximately fit on this scale." Tr. 312.

Defense counsel objected that this Exhibit was not probative and Officer Priest was not qualified to render an opinion that the photos matched a shoe size. Tr. 1133. The trial court found that Officer Priest was not qualified as an expert, and could only issue a lay opinion. Tr. 318. The trial court summarily overruled defense counsel's objection and admitted Exhibit 71 into evidence. Tr. 1133.

F. State's Exhibit 72—a size 10 Converse tennis shoe.

During Officer Priest's testimony on Exhibit 71 (the enlarged photograph of a size 10 footprint), the State submitted Exhibit 72. The size 10 Converse tennis shoe had just been secured from a sporting goods store and was being used by the State for demonstrative purposes. Tr. 319.

The State had Officer Priest place Exhibit 72 over the outline of the footprint in Exhibit 71. Tr. 320. Officer Priest testified that Exhibit 72 approximately lined up with Exhibit 71. Tr. 321. Officer Priest testified that he did not know if all size 10 shoes were the same length and width. Tr. 322.

Defense counsel objected to Exhibit 72 at trial, as an exhibit that had not been disclosed in discovery. Tr. 319. The trial court overruled defense counsel's objection. Tr. 320.

Defense counsel also objected to Exhibit 72 because it was confusing and misleading. Officer Priest was unable to testify whether Exhibit 72 was a standard size 10 shoe. Tr. 1134. The trial court ruled that defense counsel's argument went to weight, not admissibility, and admitted Exhibit 72. Tr. 1134.

G. State's Exhibit 80—student validation ticket. Lieutenant Sullivan testified that during the search of the Kinley residence on January 12, 1989, Detective Fisher found Exhibit 80, a student validation card, in the name of Juan Kinley laying on the back of the bed. Tr. 467. Defense counsel objected to the relevancy of this exhibit. Tr. 1129. The State countered that Exhibit 80 was offered to show that Exhibit 79 (money and change purse) were found in Mr. Kinley's bedroom. The trial court found that defense counsel's objection went to weight, not admissibility, and admitted Exhibit 80. Tr. 1139.

H. Waived (PageID 282);

In addition to these exhibits to which counsel objected, counsel should have objected to and the court should have excluded the following:

> A. State's Exhibits 9, 10, 11, 12, 13, 22, 23, 24, 25, 26, 27, 28—all being the cumulative photos of the shoe prints found at the scene.

B. State's Exhibits 81 and 82—photos taken of shoes found at Picway, which had a different sole pattern from the print at the scene. Tr. 471-476, 504-511.

C. State's Exhibit 46—a diagram reflecting the sole pattern found at the scene. Tr. 294.

**EIGHTH GROUND FOR RELIEF**

Where evidence of other acts fails to show by substantial proof that because of a unique identifiable plan of criminal activity there is a strong likelihood that the person who committed the other acts also committed the acts charged, the admission of the other acts evidence is in violation of the rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**NINTH GROUND FOR RELIEF**

During the trial phase of Appellant [sic] Kinley's capital case, the prosecutor elicited victim impact evidence from State's witness Darlene McKeachie. The use of such evidence violated Mr. Kinley's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The character of Thelma Miller, one of the two victims in the case, was introduced through Ms. McKeachie's testimony on direct that Ms. Miller had been "a real nice person" [Tr. 41]. "really mild ...easy to talk to" [Tr. 52].

**TENTH GROUND FOR RELIEF**

Forensic Criminalist Timothy C. Shepherd testified for the State in its case-in-chief during the trial phase of Mr. Kinley's capital case. However, his testimony—containing both irrelevant, unfairly prejudicial matter and improperly admitted matter—violated Mr. Kinley's rights under the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

**ELEVENTH GROUND FOR RELIEF**

The state did not timely disclose its witness, Victor Bishop, to the defense, until 4:00 p.m. the afternoon before he testified. [Tr. 692]. Defense counsel timely objected, [Tr. 692], and pursuant to Ohio R. Crim P.16(E)(3) requested a continuance in order for them to talk to Mr. Bishop on the matters about which the state was now indicating he would be testifying, so that they might prepare for his cross-examination. [Tr. 694, 695]. The trial court overruled defense counsel's objection. [Tr. 695].

**TWELFTH GROUND FOR RELIEF**

In Juan Kinley's capital case, the prosecutor failed to conform his conduct to the requirements of the law. These errors both singularly and cumulatively rendered Mr. Kinley's convictions and sentences illegitimate, as they were obtained in violation of Mr. Kinley's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

**THIRTEENTH GROUND FOR RELIEF**

Mr. Kinley's trial counsel provided ineffective assistance during Mr. Kinley's capital case. The following is a list of issues that should have been raised by Mr. Kinley's former trial counsel.

A. Failure to litigate at a pretrial hearing the reliability and admissibility of the DNA evidence.

B. Failure to object to the admission of the money found in Mr. Kinley's house, State's Exhibit 79, as being the fruit of an illegal pretextual arrest.

C. Failure to insure a proper jury waiver colloquy with the trial court.

D. Failure to object to the victim impact testimony at Tr. 48-56 (excepting the witness's testimony, at Tr. 53-54, that Thelma Miller said now Mr. Kinley was in trouble, because now she had witnesses to his striking her; and the witness's testimony, at Tr. 56, that Thelma Miller wanted to see her children, both of which statements were objected to).

E. Failure to object to Forensic Criminalist Shepherd's testimony on irrelevant, unfairly prejudicial matter and failure to object to the improper "refreshing" of Mr. Shepherd's memory.

F. Failure to object to the admission of the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30.

G. Failure to object to prosecutorial misconduct at Tr. 1428-1429, 1441; Mit. Tr. 169-174.

**FOURTEENTH GROUND FOR RELIEF**

The Constitution prohibits the criminal conviction of any person

except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). Further, a conviction based upon evidence which is not sufficient to prove guilt beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979).

**FIFTEENTH GROUND FOR RELIEF**

Petitioner's constitutional right to trial by jury was compromised by a deal whereby petitioner waived his right to a jury in return for funding to hire a mental health expert for the mitigation phase of trial.

**SIXTEENTH GROUND FOR RELIEF**

Petitioner' rights to due process and a fair trial were violated because a material witness for the State of Ohio, Donald Merriman, gave false and/or inaccurate testimony against petitioner as follows:

1. Donald Merriman testified that he had a conversation with Petitioner Kinley in the latter part of January, 1989 on Clifton Avenue in the back of the green house across from Springfield South High School, and that they were drinking. Tr. 623-623. This testimony was false. P.C. Ex. D, Para. 5.

2. Merriman further testified that during this conversation with petitioner in January of 1989, that petitioner asked him if he had ever killed anyone. Tr. 624. This testimony was false. P.C. Ex. D, Para. 5.

3. Merriman testified then that petitioner told him that he had killed his girlfriend and her son, Thelma and David Miller. Tr. 625. This testimony was false. P.C. Ex. D, Para. 5.

4. Donald Merriman has admitted by way of an affidavit that he never had *any* conversation with Petitioner Kinley in January of 1989. P.C. Ex. D., Para. 5. In his affidavit, Merriman admits that he had not even seen Petitioner Kinley in years. Merriman states in his affidavit that the first time Merriman saw Kinley was when the two of them were both in jail in March of 1989. P.C. Ex. D, Para. 5.

**SEVENTEENTH GROUND FOR RELIEF**

Petitioner's convictions and sentences are unreliable and in violation of his rights to due process and a fair trial because the State of Ohio elicited false testimony at the trial. (Donald Merriman).

**EIGHTEENTH GROUND FOR RELIEF**

Petitioner Kinley was denied his right to a fair trial and due process because a conflict existed in his representation.

> Petitioner Kinley was indicted on Aggravate Murder charges on March 16, 1989. Petitioner Kinley was represented by the Clark County Public Defender's Office. At the same time, Donald Merriman was being represented by the Clark County Public Defender's Office on case number 87-CR-100. On March 10, 1989, the court allowed the Clark County Public Defender's Office to withdraw from representing Merriman because Merriman was a potential material witness against Petitioner Kinley. P.C. Ex. F. However, according to Merriman, the Clark County Public Defender's Office remained in contact with Merriman throughout his case and in fact worked out the deal whereby Merriman would testify against Petitioner Kinley in exchange for receiving a reduced sentence. P.C. Ex. E, Paras. 4, 9.

**NINETEENTH GROUND FOR RELIEF**

Petitioner Kinley's trial attorneys rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution because evidence that should have been adduced at trial and is material to petitioner's case was not presented. (blood spatter evidence).

**TWENTIETH GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to due process, a fair trial, and the effective assistance of counsel were violated by his trial counsel's failure to seek the services of a blood spatter expert.

**TWENTY-FIRST GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to due process and a fair trial were violated because the alleged murder weapon, Trial Ex. Number thirty-nine (39)(hereinafter referred to as the "machete"), has been lost by the state courts, thus depriving petitioner of the opportunity to have testing performed on the item.

**TWENTY-SECOND GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to the effective assistance of counsel, due process, and a fair trial were violated by his trial counsel's failure to have an expert test the alleged murder weapon.

**TWENTY-THIRD GROUND FOR RELIEF**

> Petitioner Kinley's trial counsel were ineffective by the failure to investigate, prepare for, and present testimony favorable to petitioner in violation of his constitutional rights to due process, a fair trial, and the effective assistance of counsel. (Dawn Mitchell)
>
> **TWENTY-FOURTH GROUND FOR RELIEF**
> **Withdrawn (PageID 52)**
>
> **TWENTY-FIFTH GROUND FOR RELIEF**
> Petitioner Kinley's constitutional rights to a fair trial, due process, and the effective assistance of counsel were violated because his trial attorneys were ineffective in their representation of him. (Richard Howard)
>
> **TWENTY-SIXTH GROUND FOR RELIEF**
> Petitioner's constitutional right to due process was violated because he did not knowingly, voluntarily, and intelligently waive his right to a jury trial.
>
> **TWENTY-SEVENTH GROUND FOR RELIEF**
> **Withdrawn (PageID 52)**
>
> **TWENTY-EIGHTH GROUND FOR RELIEF**
> **Withdrawn (PageID 52)**
>
> **TWENTY-NINTH GROUND FOR RELIEF**
> Petitioner Kinley's constitutional rights to due process, equal protection, and a fair trial were violated because the death penalty is applied in a racially discriminatory manner in Clark County, Ohio. Consideration of race in the administration of capital punishment is a violation of the Constitution.

(Doc. 2)(emphasis in original).

On November 17, 2003, Respondent filed a Motion to Dismiss Procedurally Defaulted Claims. (Doc. 15). In support, Respondent argued that Petitioner's Fourth, Sixth, Twenty-Four, Twenty-Seventh, and Twenty-Eighth Grounds for Relief are procedurally defaulted. *Id.* In his Memorandum in Opposition, in addition to arguing that the Fourth Ground for Relief is not procedurally defaulted, Mr. Kinley withdrew his Sixth, Twenty-Fourth, Twenty-Seventh, and

Twenty-Eighth Grounds. (Doc. 20; PageID 52). On July 30, 2004, the Court denied Respondent's Motion to Dismiss. (Doc. 22).

Mr. Kinley filed a Motion for Discovery on September 22, 2004, seeking to conduct discovery related to his claims as to the prosecution's alleged use of false testimony from Mr. Merriman which claims he raises in his Sixteenth and Seventeenth Grounds. (Doc. 40). On March 29, 2006, the Court granted Mr. Kinley's Motion. (Doc. 40). Mr. Kinley filed a Motion to Supplement/Expand the Record to include Mr. Merriman's deposition on July 27, 2006, (Doc. 42), which the Court granted on September 13, 2006. (Doc. 43). Mr. Kinley filed Mr. Merriman's May 24, 2006, deposition on September 14, 2006. (Doc. 44). On May 7, 2007, Mr. Kinley filed his Merit Brief Part I and on May 25, 2007, he filed Part II. (Doc. 50, 54). The Respondent filed her Return of Writ on June 29, 2007, (Doc. 55), and Mr. Kinley filed his Traverse/Reply on September 17, 2007. (Doc. 59). On May 4, 2010, this Court issued a Status Confirmation Entry. (Doc. 64). In that Entry, the Court noted that referral of the matter had been recently transferred, that it appeared to the Court that the matter was ripe, and that counsel should advise the Court if counsel's understanding of the status of the case was different. *Id.* Neither party has advised of any different understanding and the case is therefore ripe for decision.

**Standard of Review**

**I. Antiterrorism and Effective Death Penalty Act of 1996**

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 24, 1996. *Herbert v. Billy,* 160 F.3d 1131 (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997). Since Mr. Kinley filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C.

§ 2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides:

> ...
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

The AEDPA also provides that a factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conclude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). A state

court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407-08. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Williams*, 529 U.S. at 407, 409. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410 (emphasis in original). In sum, Section 2254(d)(1) places a new constraint on the power of a federal court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer*, 537 U.S. 3 (2002). Indeed, "contrary to" analysis does not even require awareness of Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. *Id.* at 8. The AEDPA prohibits the overturning of state decisions simply because the federal court believes that the state courts incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2254(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an

unreasonable determination of the facts".

*Id.* at 11.

The AEDPA standard of review applies only to "any claim that was adjudicated on the merits in State court proceedings." *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006). A state court's failure to articulate reasons to support its decision is not grounds for reversal under the AEDPA. *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006), *citing*, *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001). Where the state court fails to adjudicate a claim on the merits, the habeas court conducts an independent review of a petitioner's claims. *Williams, supra*. That independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Williams, supra*.

For each claim adjudicated on the merits in the state courts, the decision the federal courts review is that of "the last state court to issue a reasoned opinion on the issue." *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006), citing *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005), *cert. denied*, 548 U.S. 908 (2006); see also, *e.g.*, *Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("[A] federal court reviewing a habeas petition should examine the decision of the last state court to rule on the merits of the issue."); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) ("This court . . . must look to the last reasoned decision of the state court as the basis of the state court's judgment."); *Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter." (internal quotation marks omitted)), *cert. dismissed*, 531 U.S. 1134 (2001).

## II. Procedural Default

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); see also, *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F. 3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986); *Engle*, 456 U.S. at 107; *Wainwright*, 433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining whether a habeas claim is barred by procedural default. *Reynolds v. Berry*, 146 F. 3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001), *cert. denied*, 534 U.S. 1147 (2002).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture

> is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,*785 F. 2d at 138.

**Merits of the Petition**

**FIRST GROUND FOR RELIEF**

> When DNA testing procedures are unreliable and the probability statistics of a match do not comply with current standards used in the scientific community, the admission of DNA evidence violates the defendant's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Mr. Kinley alleges in his First Ground for relief that the DNA evidence which was admitted at trial was unreliable. Mr. Kinley's position is that the procedures used by Cellmark, the laboratory which performed the DNA testing in his case, were unreliable and therefore the admission of that evidence violated his federal constitutional rights. Respondent argues that the issue of admissibility of the DNA evidence is a matter of state law and is not cognizable in federal habeas. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley raised this claim as Proposition of Law No. I on direct appeal to the Ohio Supreme Court. *Kinley*, 72 Ohio St.3d at 500. The Ohio Supreme Court summarily rejected Mr. Kinley's DNA evidence claim without explanation. *Id.* at 494. Accordingly, this Court looks to the court of appeals' disposition of Mr. Kinley's DNA claim. *Joseph*, 469 F.3d at 450.

Mr. Kinley raised this DNA claim on direct appeal to the court of appeals as Assignment of Error No. 1. *Kinley*, 1993 WL 224496 at *4; App. Vol II at 57-175. The court of

appeals rejected the claim stating:

> In his first assignment, he contends his conviction should be reversed because the testing procedures used by Cellmark Laboratory are not generally accepted in the scientific community and the statistical method used by Cellmark to estimate the frequency of the DNA print in the relevant population was not reliable.
>
> In *State v. Pierce* (1992) 64 Ohio St.3d 490, the Ohio Supreme Court held that the questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than to its admissibility. The appellant in *Pierce* challenged the reliability of the procedures and analysis of results utilized by Cellmark.
>
> The Supreme Court noted that the fact that other laboratories and experts may use different criteria for determining whether there is a match does not itself mean that the test results are unreliable. The Court also found that the trial court did not abuse its discretion in admitting the statistical frequency of the occurrence of the same DNA and it was for the jury to determine what weight to give such evidence.
>
> In this case the appellant presented the expert testimony of two witnesses who attacked the reliability of Cellmark's procedures and statistical methodology. The trier of fact was thus given a critical examination of Cellmark's methods and it was for them to determine what weight they wished to give to this evidence. The appellant's first assignment is overruled.

*Kinley*, 1993 WL 224496 at *5.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida*, 463 U.S. 939 (1983). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Thus "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions ." *Id*. at 67-68. As a result, "errors in application of state law, especially with regard to the admissibility of evidence, are usually

not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.), *cert. denied sub nom., Marshall v. Walker*, 464 U.S. 951 (1983); see also, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.), *cert. denied*, 534 U.S. 977 (2001) (recognizing that a federal habeas court does not rule on "errors in the application of state law, especially rulings regarding the admission or exclusion of evidence"). Otherwise stated, a state court's violation of its own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may grant habeas relief. See, e.g., *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.2003). Under this very deferential standard, due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." *Id.*

The question of whether the trial court violated Ohio laws with respect to the admission of the DNA evidence is not before this Court. The only issue before this Court is whether the admission of that evidence was "so egregious that it resulted in a denial of fundamental fairness." *Bugh, supra.*

During its case-in-chief, the state presented Tony McNeil's testimony. Tr. Vol. VI at 712-34. During the time relevant to Mr. Kinley's case, Mr. McNeil was employed by Cellmark Laboratories ("Cellmark") as a staff molecular biologist and was responsible for performing the DNA testing of the blood samples in this case. *Id.* Mr. McNeil testified about the protocol he followed while performing the relevant DNA tests. *Id.*; *Id.* at 735-875.

The state also presented Dr. Lisa Forman's testimony. *Id.* at 876-945. Dr. Forman testified that she is a Ph.D. scientist and she worked for Cellmark as a population geneticist. *Id.* As did Mr. McNeil, Dr. Forman testified about the protocol Cellmark had in place for DNA testing. *Id.* Additionally, Dr. Forman testified that the DNA banding pattern in the blood found on Mr.

Kinley's jacket matched the DNA banding pattern in a sample of David Miller's blood. *Id.* Dr. Forman testified further that the odds of a random individual other than David Miller being the donor of the blood sample taken from Mr. Kinley's jacket were one in 2.6 million. *Id.*

On cross-examination, Dr. Forman testified that since performing the DNA testing in Mr. Kinley's case, Cellmark had changed its DNA testing protocol. *Id.* at 946-1106. Dr. Forman explained that Cellmark changed its protocol for purposes of its paternity cases to make it easier to determine how the control was working in those cases. *Id.*

In his case-in-chief, Mr. Kinley presented testimony from Dr. Jeffrey Saffer, a molecular biologist. Tr. Vol. VII at 1152-1201. Dr. Saffer criticized the reliability of the DNA testing Cellmark performed. *Id.* In addition, Mr. Kinley presented testimony from Dr. Laurence Mueller, a professor of ecology and evolutionary biology. Tr. Vol. IX at 1210-60. Dr. Mueller attacked the reliability of the statistical method Cellmark used to estimate the frequency of a DNA pattern occurring. *Id.*

Finally, on rebuttal, the state presented testimony from Dr. Michael Conneally, a professor of medical genetics and neurology. Tr. Vol. X at 1282-1335. Dr. Conneally essentially testified that the procedures and statistical methods Cellmark used were reliable. *Id.* As with the state's other DNA-related witnesses, at the completion of Dr. Conneally's direct testimony, Mr. Kinley's counsel cross-examined Dr. Conneally. *Id.* at 1336-1404.

As noted, Mr. Kinley's counsel had ample opportunity to cross-examine each of the state's witnesses. In addition, Mr. Kinley presented testimony from his own expert witnesses in an effort to challenge the reliability of the state's evidence. The trier of fact, in this case, a three-judge panel, heard not only the state's expert witnesses' testimony, but also Mr. Kinley's challenges to

that evidence not only by way of cross-examination of the state's witnesses but also by way of Mr. Kinley's own experts' testimony. The admission of the DNA evidence was not so egregious that it denied Mr. Kinley his right to a fundamentally fair trial.

To the extent that Mr. Kinley has raised a challenge to the Ohio courts' application of state law, that claim is not cognizable in federal habeas. To the extent that Mr. Kinley has challenged the admission of the DNA evidence on federal due process grounds, Mr. Kinley's claim fails. Therefore, the First Ground for Relief is without merit.

Mr. Kinley's Second and Fourth Grounds for Relief are related and the Court will address them together.

**SECOND GROUND FOR RELIEF**

Kinley filed various motions to suppress all tangible evidence seized from the automobile, his residence, and his jacket. Suppression hearings were held on August 31, 1990 and November 6, 1990. The trial court denied Mr. Kinley's motion in its entirety. This issue is limited to the trial court's error in denying Juan Kinley's motion to suppress and warrantless seizure and illegal search of his jacket on January 12, 1989, and the DNA evidence derived therefrom in violation of his rights as guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

**FOURTH GROUND FOR RELIEF**

Evidence obtained through a pretextual arrest must be excluded from trial pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

In his Second and Fourth Grounds for Relief, Mr. Kinley argues that the trial court violated his Fourth Amendment right against unreasonable search and seizure. Mr. Kinley's position is that the court should have suppressed his jacket and, in turn, the blood sample taken from the jacket. Respondent argues that Mr. Kinley's claims in his Second and Fourth Grounds for Relief are foreclosed by *Stone v. Powell*, 428 U.S. 465 (1976). Mr. Kinley has not countered the

Respondent's argument.

> Where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Stone,* 428 U.S. at 481-82. Stated differently, full and fair litigation by the state courts of a Fourth Amendment claim based on alleged unconstitutional search and seizure precludes federal habeas corpus review of that claim. *Kuhlmann v. Wilson,* 477 U.S. 436, 446 (1986).

The Sixth Circuit has set forth two distinct inquiries a court must make when determining whether a petitioner may raise a Fourth Amendment claim in a habeas action. *Machacek v. Hofbauer,* 213 F.3d 947, 952 (6th Cir. 2000), *cert. denied,* 531 U.S. 1089 (2001). First, the habeas court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a Fourth Amendment claim. *Id.* Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *Id.*

As to the first factor, the Sixth Circuit has held that Ohio, by providing for the filing of pretrial motions to suppress and the opportunity to take a direct appeal from any ruling denying a motion to suppress, has in place a state procedural mechanism that presents the opportunity for full and fair litigation of a Fourth Amendment claim. *Riley v. Gray,* 674 F.2d 522, 526 (6th Cir.), *cert. denied,* 459 U.S. 948 (1982).

This Court, then, turns to the second *Machacek* factor; that is, whether presentation of Mr. Kinley's claim was in fact frustrated because of a failure of Ohio's mechanism.

Mr. Kinley filed a pretrial motion to suppress in which he raised essentially the same arguments that are the bases of his Second and Fourth Grounds for Relief. App. Vol. I at 108-09.

As Mr. Kinley acknowledges, the trial court conducted hearings on August 31, 1990, and November 6, 1990 ( Tr. Vol. II, Tab 1 at 1-202; Tab 2 at 1-63; Tab 3 at 1-14) and subsequently denied the motion. App. Vol. I at 181-82. Mr. Kinley raised his Fourth Amendment claim on direct appeal challenging the trial court's ruling denying his motion to suppress and not the process itself. *Kinley*, 1993 WL 224496 at * 5-9; see also, App. Vol II at 57-175 (direct appeal to court of appeals); *Kinley*, 72 Ohio St.3d at 500; see also, App. Vol. IV at 67-290 (direct appeal to the Ohio Supreme Court). Both the court of appeals and the Ohio Supreme Court considered Mr. Kinley's Fourth Amendment claims at length. *Kinley,* 1993 WL 224496 at * 5-9; *Kinley,* 72 Ohio St.3d at 423-24.

The foregoing makes it clear that Mr. Kinley had an opportunity to fully and fairly litigate his Fourth Amendment claim. Therefore, review by this Court of Mr. Kinley's Second and Fourth Grounds for Relief is barred by *Stone, supra.*

Assuming *arguendo* that *Stone* did not apply in this matter, for the following reasons, the Court concludes that the state court's findings and decision as to Mr. Kinley's Second and Fourth Grounds for Relief are not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley raised these claims on direct appeal and the Ohio Supreme Court rejected them stating:

> Prior to trial, appellant moved to suppress the bloodstained jacket and the DNA evidence derived therefrom on the basis that the jacket had been seized without a warrant. The motion was denied. In his second proposition of law, appellant contends that the trial court committed reversible error in denying the motion. We disagree.
>
> The facts surrounding the seizure of appellant's jacket are not in dispute. On January 12, 1989, appellant voluntarily submitted to a polygraph test at a crime lab in London, Ohio. The results of the test indicated that appellant was being deceptive. Appellant was arrested

at the crime lab on outstanding traffic warrants. Appellant was then transported to the Detective Bureau at the Clark County Sheriff's Department, which is located in the same building as the county jail. Appellant was permitted to use the restroom at the Detective Bureau. Appellant removed his jacket and placed it on a chair before entering the restroom. At that time, Sergeant (now Lieutenant) Patrick Sullivan of the Clark County Sheriff's Department noticed what appeared to be blood on appellant's jacket. Sullivan had interviewed appellant on January 10, 1989, and knew that appellant had been wearing the jacket on the day of the murders. Sullivan seized the jacket while appellant was in the restroom. Appellant was then escorted to jail where he was booked and processed on the outstanding traffic warrants. Subsequent DNA analysis of the bloodstained jacket revealed that it was highly probable that a bloodstain on the jacket had come from David Miller.

The trial court denied appellant's motion to suppress the evidence derived from the jacket on the basis that the jacket had been properly seized pursuant to the “plain view” exception to the Fourth Amendment warrant requirement. We find no abuse of discretion in this regard.

In *State v. Waddy* (1992), 63 Ohio St.3d 424, 442, 588 N.E.2d 819, 833, this court held that:

“Under [the plain view] doctrine, an officer may seize an item without a warrant if the initial intrusion leading to the item's discovery was lawful and it was ‘immediately apparent’ that the item was incriminating.”

With respect to the first requirement, a lawful initial intrusion, it is clear from the record that appellant was in custody pursuant to a lawful arrest at the time the jacket was seized. The police had every right to be where they were at the time the evidence was seized. Thus, there is no question that the first requirement of the test has been satisfied. Further, the record of the suppression hearing supports the trial court's determination with respect to the second requirement-that the incriminating nature of the stains on appellant's jacket was immediately apparent to the seizing authorities. Sullivan was the chief investigator of the two homicides. Sullivan knew the abusive nature of appellant and Thelma's relationship. Sullivan knew that appellant had repeatedly lied concerning his (appellant's) whereabouts at the time of the murders. Sullivan also knew that appellant was at or near the scene of the murders at the approximate

time of the killings. Sullivan had viewed the crime scene and the tremendous amount of blood in the Szulewskis' garage. He had seen appellant wearing the jacket on the day of the murders, and he knew that the stains on the jacket appeared to be blood. Under these circumstances, it is clear that the trial court had a legitimate factual basis to conclude that Sullivan was immediately aware of the incriminating nature of the bloodstained jacket at the time the item was seized. FN1

FN1. According to appellant, Sullivan testified at trial that the stains Sullivan had seen on the jacket "could have been any number of things." Appellant also claims that Sullivan testified at trial that it was not readily apparent what was on the jacket at the time the item was seized. We note, however, that the trial court denied the motion to suppress based upon the evidence adduced at the suppression hearing-not based upon the evidence adduced at trial. Thus, the trial testimony has no bearing on the issue whether the trial court abused its discretion in denying the motion to suppress.

In any event, even if we were to assume that Sullivan had no right to seize the bloodstained jacket at the precise moment that item was taken, it is clear that the jacket would inevitably have come within the exclusive possession and control of the police when appellant was properly booked and processed at the jail. Thus, the inevitable discovery exception to the exclusionary rule seems applicable on the facts of this case. See, generally, *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763.

The court of appeals determined that no warrant was required for the seizure of the jacket since the item was seized as an incident to a lawful arrest. In support of this conclusion, the court of appeals relied on the United States Supreme Court's decision in *United States v. Edwards* (1974), 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed. 771. We need not specifically address this issue since we find that the trial court did not abuse its discretion in holding that the warrantless seizure of appellant's jacket was justified pursuant to the plain view exception to the Fourth Amendment warrant requirement.

Accordingly, we reject appellant's second proposition of law.

*Kinley*, 72 Ohio St.3d at 495-96.

Once an officer discovers an outstanding warrant for an individual, he has probable

cause to arrest that individual. See *United States v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006), *cert. denied*, 552 U.S. 947 (2007).

The Fourth Amendment imposes a per se requirement that police officers obtain a warrant prior to conducting a search. *United States v. Galaviz*, ___ F.3d.___, 2011 WL 1707185 at *4 (6th Cir. May 6, 2011), citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). One exception to this requirement is for objects in plain view. See *Galaviz, supra,* citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, (1993). Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Galaviz*, 2011 WL 1707185 at *5, quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir .2007) (quoting *Dickerson*, 508 U.S. at 375(quotation marks omitted). Another exception to the warrant requirement is for items police seize incident to a lawful arrest. *United States v. Edwards*, 415 U.S. 800 (1974).

As noted, the trial court held a hearing on Mr. Kinley's motion to suppress. Detective Sullivan testified at the hearing as follows. Detective Sullivan interviewed Mr. Kinley on January 10, 1989, at which time Mr. Kinley agreed to take a polygraph test with the understanding that the results could not be used at trial but that its purpose was as an investigative tool. Tr. Vol. II, Tab 1 at 72. On January 12, 1989, Detectives Sullivan and Rude transported Mr. Kinley to the Bureau of Criminal Investigation in London, Ohio, where Mr. Kinley was advised of his rights and underwent a polygraph test. *Id.* at 85; 87-88; 90; 91. Detective Rude had an outstanding warrant for Mr. Kinley's arrest that was related to a traffic offense which he served after Mr. Kinley had completed the polygraph test. Tr. Vol. II, Tab 2 at 52-53. Detective Rude transported Mr. Kinley back to the Clark County Sheriff's Department. *Id.*

When Mr. Kinley returned to the sheriff's department, he wanted to use the restroom. *Id.* at 55. Before leaving the interview room to go to the restroom, Mr. Kinley took off his jacket and laid on the back of a chair. *Id.* Detective Sullivan noticed that the jacket had some specks on it which appeared to him to be blood. *Id.* Detective Sullivan took possession of Mr. Kinley's jacket because he thought the speck looked like blood. *Id.* at 56-57; 58-59. At that time, Mr. Kinley was under arrest on the outstanding warrant and if he was going to go to jail on that warrant, he would have been put in jail clothes and the police would have inventoried his personal belongings. *Id.* at 58.

There was nothing pretextual about Mr. Kinley's arrest on January 12, 1989. Detective Rude had in his possession a warrant for Mr. Kinley's arrest which had been outstanding and related to a traffic offense. While the warrant was apparently for a minor offense, it was, nevertheless, an active warrant. Detective Rude had probable cause to arrest Mr. Kinley. *Ellison*, 462 F.3d at 563.

Detective Sullivan was lawfully present in the interview room at the sheriff's office where detectives had taken Mr. Kinley. Mr. Kinley took off his jacket and left it on a chair before he left the room. Detective Sullivan saw the jacket, noticed specks on it, and thought the specks were blood. Detective Sullivan, who had been investigating the Ms. Miller's and David Miller's killings, had been to the crime scene, see, *infra*, and was aware of the amount of blood at the scene. Because Mr. Kinley's jacket and the suspicious specks were in plain view, Detective Sullivan was not required to obtain a warrant to seize the jacket. *Dickerson*, 508 U.S. at 375.

Mr. Kinley's Second and Fourth Grounds for Relief are without merit and should be dismissed.

**THIRD GROUND FOR RELIEF**

> When involuntary statements are not suppressed and are admitted into evidence, the error deprived Juan Kinley of his rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio constitution.

In his Third Ground for Relief, Mr. Kinley alleges that the admission of various verbal and written statements which he made violated his constitutional rights. Mr. Kinley points to the admission of the following: (1) the verbal statement, "Is David dead?" that he made at his residence to investigating police officer Detective Sullivan on January 10, 1989; (2) the written statement he made on January 10, 1989; (3) a tape recorded statement he gave to Detective Sullivan on January 10, 1989; and (4) a tape recorded statement he gave to Detective Sullivan on January 12, 1989. Mr. Kinley's position is that his January 10, 1989, statements were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1964) and his January 12, 1989, tape recorded statement was the result of coercion and therefore involuntary and inadmissible at trial. Respondent argues that the evidence establishes that Mr. Kinley was not in custody for purposes of *Miranda* when he gave his January 10, 1989, statements and that his January 12, 1989, statement was not coerced. Mr. Kinley has not replied to Respondent's arguments.

Mr. Kinley raised this claim on direct appeal to both the court of appeals and the Ohio Supreme Court. The Ohio Supreme Court summarily rejected the claim without discussion. *Kinley*, 72 Ohio St.3d at 494. Therefore, this Court looks to "the last reasoned decision on the claim", *Joseph* 469 F.3d at 450, which is court of appeals' analysis and ultimate rejection of the claim.

> In appellant's fourth assignment of error he contends the trial court erred in denying his motion to suppress "all the statements involuntarily made by him to law enforcement officers." He contends this error deprived him of his rights under the Fifth, Eighth and Thirteenth Amendment of the United States Constitution and Section

9, 10, 16 of the Ohio Constitution. Prior to trial appellant filed a motion to suppress all statements made by him to law enforcement officers. These statements were: 1) an oral statement by appellant to Detective Sullivan at appellant's residence on January 10, 1989 wherein the appellant asked Officer Sullivan “Is David dead?” 2) A written statement made by Mr. Kinley on January 10, 1989, 3) A tape statement given by Mr. Kinley to Detective Sullivan on January 10, 1989 and 4) A tape statement given by Kinley to Detective Sullivan on January 12, 1989. After suppression hearings were conducted on August 31, 1990 and November 6, 1990 the trial court overruled appellant's motion in its entirety. In overruling the appellant's motion the court found that the oral statement made by the appellant to Detective Sullivan on January 10th was admissible because the appellant was not in custody at the time that he had this conversation with Detective Sullivan. The Court found that the written statements given by appellant to Sullivan on January 10th and the taped statements given on that date and on January 12, 1989 were obtained after the appellant had been properly advised of his *Miranda* rights and he had executed written waivers of those rights. The Court further found that there was no evidence of police coercion with respect to those statements. Although all four statements were admitted during the State's case in chief the appellant raises particular objection to the oral statement made by the appellant on January 10, 1989 where he asked if David Miller was dead and the taped statement of January 12, 1989 wherein he recanted his statement that he had not been at the victims' home on the date of their death.

Appellant contends that the oral statement given by him to Detective Sullivan should be suppressed because he was in custody on January 10, 1989 when he made the statement to Officer Sullivan. The evidence revealed that four Springfield police officers came to the appellant's residence on January 10, 1989 to inquire about Thelma Miller. Sullivan testified that he asked the appellant if he had seen Thelma Miller and that he informed the appellant that she appeared to be a victim of a homicide. Sullivan testified that the appellant became upset and asked him “Is David dead?” Upon being advised that David Miller was dead, Sullivan stated that the appellant became more upset, walked into the kitchen and hit the refrigerator. After that Sullivan said the appellant was asked to come downtown to give a statement and once at the police department he was advised of his rights prior to giving any written or taped statements on that date. The appellant contends that since he was considered a suspect in the homicide of the Millers that he should have been advised of his constitutional rights as guaranteed by *Miranda v. Arizona* (1964), 384

U.S. 436. In *Miranda*, the United States Supreme Court held that the prosecution may not use any statements whether exculpatory or inculpatory stemming from custodial interrogation of the defendant unless it demonstrates a use of procedural safeguards to secure the privilege against self incrimination and the right to counsel. In *Minnesota v. Murphy* (1984) 465 U.S. 420, the United States Supreme Court defined "in custody" for purposes of Miranda as a formal arrest or restraint on freedom of movement of the degree associated with the formal arrest. Further a line of cases has held that "custody" for Miranda purposes is to be determined by asking whether a reasonable man would believe himself to be in custody under the circumstances of the case. See, *Unites States v. Mendenhall* (1980), 446 U.S. 544.

In *Mendenhall supra*, the United States Supreme Court decided specific examples of when an individual might reasonably believe he was in custody which include 1) a threatening presence of several officers, 2) display of weapons by the officers, 3) physical touching by the officers or 4) language or tone indicating compliance might be compelled. The State contends that although there were four officers present at the appellant's home at the time that the appellant was interviewed they were in plain clothes and their presence was not threatening. The State points out that the appellant was free to move about in his mother's home and that there was no attempt to limit his freedom and at no time did any officer display weapons or attempt to touch or restrain the appellant.

We conclude that the trial court could properly find from the record below that the defendant was not in custody at the time he gave the statement and made statements to the officers on January 10th at his mother's residence. Likewise, the trial court could properly find that the defendant had volunteered this statement to the police officer "Is David dead?" and volunteered statements are not covered within the Miranda decision.

Appellant contends that the statement made by the appellant on January 12, 1990 [sic; should be January 12, 1989] should have been suppressed not because it was given without compliance with the Miranda decision but because it was involuntarily given by the defendant. Appellant points out that whether a confession is voluntary is an issue independent of whether there was "formal compliance with the requirements of Miranda" citing *State v. Chase* (1978), 55 Ohio St.2d 237 at 246. The burden is on the prosecution to show that, considering the totality of the circumstances, the

confession was voluntarily given. *State v. Edwards* (1976), 49 Ohio St.2d 31. The Ohio Supreme Court in *State v. Edwards supra*, syllabus two set forth the factors to be considered in assessing the voluntariness of the confession. In deciding whether the defendant's confession is involuntarily induced the court should consider the totality of the circumstances, including the age, mentality and prior criminal experience of the accused, the length and intensity of the frequency of the interrogation, the existence of physical deprivation or mistreatment, and the existence of threat or inducement.

Appellant points to the following facts which indicate that his statement was not voluntarily given on January 12, 1989:(1) that he was not readvised of his constitutional rights; (2) that Officer Sullivan misrepresented evidence which purportedly linked appellant to the crime; (3) that Officer Sullivan assured him that Sullivan was appellant's friend and that Sullivan was not lying to him; (4) that Sullivan told appellant how the crime occurred; (5) that Sullivan used coercive tactics; and (6) appellant had to restate the facts the way Sullivan wanted him to say them and (7) that Sullivan told Kinley to get it off his chest and clear his conscience and (8) that appellant's continued protestations denying that he killed Thelma Miller in the face of questioning by the police.

The State counters by arguing that the evidence reflects a different picture and one that does not reflect coercive tactics by the police. The State contends that the appellant's interrogation was not lengthy nor particularly intense and that the appellant arrived at the police station on January 12, 1989 at 12:30 or 1:00 p.m. and was transported to the Bureau of Criminal Identification and given a polygraph and interviewed by the police and returned to the police station by 3:15 p.m. The State notes that there was no evidence of threats or inducements made to the appellants and absolutely no evidence that appellant was physically mistreated.

We have examined the record and find that the trial court did not err in finding that the defendant's statement to police officers on January 12, 1989 was voluntary.

After appellant took a polygraph test, Officer Sullivan informed the appellant that appellant's polygraph indicated some deception. During the beginning of the taped interview appellant admits he lied about being at Szulewski's residence on the morning of the homicides. Appellant stated he lied because he was scared but adamantly maintained he did not kill the Millers. (Tr. 113). During the interview

> one of the police officers informed the appellant that one of his fingerprints was found in the Szulewski's garage where the victim's bodies were found. (Tr. 116). In the face of that disclosure, appellant nonetheless maintained his innocence. (Tr. 117). Although appellant admitted to being in the Szulewski home on a prior occasion he denied being there on the date in question. (Tr. 117).
>
> The use of an inherently coercive tactic "during interrogation is a prerequisite to a finding of involuntariness." Such tactics include e.g. physical abuse, threats, or deprivation of food or sleep. *State v. Clark* (1988), 38 Ohio St.3d 252. If there was any "police overreaching" it was in misinforming the appellant that his fingerprints were discovered in the garage. It is notable that such a statement did not generate an admission from the appellant. We have reviewed the taped interview of the appellant on January 12, 1989 and find evidence to support the trial court's finding that the appellant's statements were voluntarily given. The appellant's fourth assignment is overruled.

*Kinley*, 1993 WL 224496 at *9-12.

As Mr. Kinley notes, the cornerstone upon which the law concerning custodial interrogation is built was laid by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1964). In *Miranda*, the Court clearly set forth certain constitutional rights which must be announced to a suspect before the suspect is subjected to custodial interrogation by law enforcement personnel. *Miranda* provides that the "prosecution may not use any statements whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The safeguards include warnings that the accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to counsel. *Id.*

> The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."*Miranda*, 384 U.S. at 444. A suspect is "in custody" for purposes of receiving *Miranda* protection if there has been a

> "formal arrest or restraint on freedom of movement." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994)(per curiam). *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler,* 463 U.S. 1121, 1125 (1983)(per curiam) (quoting *Mathiason,* 429 U.S. at 495). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkeer v. McCarthy,* 468 U.S. 420, 442 (1984).

*Mason v. Mitchell,* 320 F.3d 604, 631 (6th Cir. 2003).

Voluntariness of confession is a legal question for federal court, not a factual question on which state conclusion is presumed to be correct. *Miller v. Fenton,* 474 U.S. 104, 110 (1985). Of course the underlying historical facts as determined by the state courts are presumed to be correct. Under 28 U.S.C. § 2254(e)(1), a state court's findings of fact are presumed correct and may be rebutted by the petitioner only by clear and convincing evidence to the contrary. *Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009), *cert denied sub nom, Cornwell v. Bobby*, ___ U.S. ___, 130 S.Ct. 1141 (2010); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir.2003), *cert. denied*, 534 U.S. 1080; *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir.1998), *cert. denied*, 527 U.S. 1040 (1999). This statutory presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records. *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007), *cert. denied,* ___ U.S. ___, 129 S.Ct. 92 (2008).

Under *Colorado v. Connelly*, 479 U.S. 157(1986), there can be no involuntariness finding without police overreaching. Apart from being voluntary, the *Miranda* waiver must also be “made with a full awareness both of the nature of the right being abandoned and the consequences

of the decision to abandon it." *Smith v. Mitchell*, 567 F.3d 246, 257 (6th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 742 (2009), quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987).

> The test for voluntariness of a confession involves three factors. Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." See *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987) (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)). Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. *Rohrbach*, 813 F.2d at 144. Finally, petitioner must prove that his will was overborne because of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed. [citations omitted].

*McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989).

As noted above, the trial court held hearings on Mr. Kinley's motions to suppress and the *Miranda* issue was entertained by that court. Detective Sullivan testified at the August 31, 1990, hearing as follows: On January 10, 1989, the day Thelma and David Miller were killed, he was at the scene of the killings. Tr. Vol. II, Tab. I at 24-25. While he was at the scene, he learned that Thelma Miller was employed at a Rax restaurant and that Mr. Kinley was, or had been in the past, Thelma Miller's boyfriend. *Id.* at 26. Detective Sullivan and three other plain clothes police officers eventually went to Mr. Kinley's mother's home where Mr. Kinley lived. *Id.* at 28-29. Mr. Kinley was not at home and the officers waited in the car for Mr. Kinley to return. *Id.* at 30. Detective Sullivan approached Mr. Kinley, identified himself, and told Mr. Kinley that he would like to speak with him. *Id.* at 33. Detective Sullivan and Mr. Kinley went into the house and Detective Sullivan asked Mr. Kinley if he had seen Thelma Miller. *Id.* at 33-34. Mr. Kinley asked Detective

Sullivan why he wanted to know and Detective Sullivan informed Mr. Kinley that Thelma Miller had been murdered. *Id.* at 34-35. Mr. Kinley then asked Detective Sullivan: "Is David dead?" to which Detective Sullivan responded, "Yeah". *Id.* at 35. Mr. Kinley got upset and went into the kitchen and hit the refrigerator. *Id.* at 35-36. After Detective Sullivan spent some time trying to calm down Mr. Kinley, he asked if Mr. Kinley "wouldn't mind coming downtown" to provide a statement. *Id.* at 36. The officers accompanied Mr. Kinley downtown to Detective Sullivan's office. *Id.* at 36-38. Detective Sullivan advised Mr. Kinley of his *Miranda* rights and Mr. Kinley executed a waiver form. *Id.* at 39-41. Detective Sullivan then interviewed Mr. Kinley which Detective Sullivan recorded and which was eventually transcribed. *Id.* at 43-46; 49-78; App. Vol I at 49-61. After completing the statement, Mr. Kinley left the police offices. Tr. Vol. II, Tab. I at 46-47.

During the January 10, 1989, interview, Mr. Kinley agreed to take a polygraph test with the understanding that the results could not be used at trial but that its purpose was as an investigative tool. *Id.* at 72. As the Court noted above when addressing Mr. Kinley's Second and Fourth Grounds for Relief, on January 12, 1989, Detectives Roberts and Rude transported Mr. Kinley to the Bureau of Criminal Investigation in London, Ohio, where Mr. Kinley was advised of his rights and underwent a polygraph test. *Id.* at 85; 87-88; 90; 91. Mr. Kinley agreed to speak again with Detective Sullivan. *Id.* Detective Sullivan advised Mr. Kinley that the polygraph results indicated some deception. *Id.* at 93. Detective Sullivan again interviewed Mr. Kinley and recorded that interview which was reduced to writing. *Id.* at 99-122; App. Vol I at 62-72. Throughout the interview, Mr. Kinley maintained that he did not kill Thelma and David Miller. *Id.*

This Court concludes that the undisputed evidence establishes that on January 10,

1989, when Mr. Kinley asked Detective Sullivan, "Is David dead?" he essentially volunteered that question and he was not in custody. Mr. Kinley spontaneously asked about David when Detective Sullivan advised him that Thelma Miller had been killed. Of course, a voluntary statement does not come within the purview of *Miranda*. Moreover, the dialogue between Mr. Kinley and Detective Sullivan took place at Mr. Kinley's residence. There is no evidence that indicates Mr. Kinley was under arrest or that his freedom of movement was impeded in any way. Further, the undisputed evidence establishes that Mr. Kinley voluntarily went with the investigating officers to the downtown location of Detective Sullivan's office. Again, Mr. Kinley was not under arrest nor was his freedom of movement impeded in any way. Nevertheless, the evidence shows that Detective Sullivan advised Mr. Kinley of his rights and after being so advised, Mr. Kinley agreed to provide a statement to Detective Sullivan.

The record does not support Mr. Kinley's claim that his waiver of his *Miranda* rights with respect to his January 12, 1989, statement was coerced. The evidence is, again, uncontradicted. First, Mr. Kinley agreed to speak with Detective Sullivan after he completed the polygraph test. Mr. Kinley was advised of his *Miranda* rights and signed a waiver. There is absolutely no evidence that Detective Sullivan or any of the other investigating officers used coercive tactics in obtaining Mr. Kinley's waiver or in obtaining his statement. Indeed, throughout Detective Sullivan's interview, Mr. Kinley again steadfastly denied that he had killed Thelma and David Miller.

In deciding the motion to suppress question, the state court of appeals gave every indication of careful consideration of the factual record and the governing, clearly established, Supreme Court precedent. After reviewing and analyzing the relevant evidence, this Court concludes that the state court of appeals' findings and decision as to Mr. Kinley's Third Ground for

Relief are not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Third Ground for Relief should be rejected.

Mr. Kinley's Fifth and Twenty-Sixth Grounds for Relief are related and the Court will address them together.

**FIFTH GROUND FOR RELIEF**

The colloquy conducted by the trial court with Mr. Kinley concerning the waiver of his right to a trial by jury was insufficient to guarantee that Kinley made an intelligent, voluntary, and knowing waiver of that right as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**TWENTY-SIXTH GROUND FOR RELIEF**

Petitioner's constitutional right to due process was violated because he did not knowingly, voluntarily, and intelligently waive his right to a jury trial.

In his Fifth and Twenty-Sixth Grounds for Relief, Mr. Kinley argues that he did not freely and intelligently waive his right to a jury trial. Mr. Kinley alleges that the colloquy that the trial court conducted was inadequate with respect to the ramifications on the penalty phase of the trial of his waiving a jury. Respondent argues that the trial court's colloquy and Mr. Kinley's subsequent written waiver far exceed the constitutional requirement that a defendant freely and intelligently waive his right to a jury trial. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley raised this claim on direct appeal. The Ohio Supreme Court summarily rejected the claim without analysis. *Kinley,* 72 Ohio St.3d at 494. Accordingly, this Court looks to the intermediate court of appeals' analysis of Mr. Kinley's jury waiver claim. *Joseph,* 469 F.3d at 450.

> In appellant's sixth assignment, he contends the trial court conducted an insufficient colloquy with the appellant to guarantee that he had made an intelligent, voluntary, and knowing waiver of his right to a jury trial as guaranteed by the United States and Ohio Constitutions.

The appellant appeared in open court with both of his defense attorneys and the trial court conducted the following colloquy with the appellant:

[THE COURT]: [Mr. Kinley]: Your attorney, Mr. James Doughty, and co-counsel Mr. John Butz, are here in court and they're asking that the Court try this as a three-judge panel and that you waive your right to trial by jury.

I want to advise you at this time that you do have a constitutional right to have this case tried before a jury of your peers. That would consist of 12 people. And the burden is on the State of Ohio or the prosecuting attorneys to prove that you are guilty beyond a reasonable doubt to the satisfaction of all 12 members of a jury. And the jury has to unanimously agree that the State has proved it's case beyond a reasonable doubt as to each and every element of the charges against you in this indictment. And that also includes the specifications. The State has to prove beyond a reasonable doubt that you are guilty of every charge and every element of each charge and each of the specifications. And the jury has to unanimously agree, before they can return a verdict of guilty, as to the charges in the indictment and the specifications in the indictment.

Do you understand this right to a trial by a jury?

DEFENDANT KINLEY: Yes, I do.

THE COURT: Your attorneys are asking that this be waived, that you give up this right to a trial by a jury and that the case be tried before a three-judge panel.

Do you understand that?

DEFENDANT KINLEY: Yes, I do.

THE COURT: Do you want to do that?

DEFENDANT KINLEY: Yes.

THE COURT: I want to explain something further that this is a capital case, and it carries a possible death penalty. So the right to trial by jury not only extends to the question of

whether you're guilty or not guilty of the charges in the indictment, and any lesser offense, but it also extends to the additional question, if the jury returns a verdict of guilty on this offense of murder, there is a separate hearing where the jury would be asked to make a recommendation in regard to the penalty.

Now, in that phase, if the jury has returned a verdict of guilty as to the charge in the indictment, then they would be asked to consider whether or not there should be an imposition of a death penalty or whether or not a lesser penalty, such as life imprisonment with no parole for 30 years or life imprisonment with no parole for 20 years, should be imposed in this case; and this recommendation, if they make a recommendation, for something less than a **death** penalty, that recommendation would be binding on the Judge.

Do you understand that?

DEFENDANT KINLEY: Yes, I do.

THE COURT: Now, when you're making this waiver, you would be giving up this right in regard to the penalty phase of the case.

Do you understand that?

DEFENDANT KINLEY: Yes, I do.

THE COURT: And is this your choice, do you want to do this?

DEFENDANT KINLEY: Yes.

THE COURT: Okay. Would the State want to inquire further in regard to the waiver being entered at this time?

MR. SMITH: We have nothing further.

THE COURT: Would the Defense want to place any further statements on the record in regard to the waiver by Mr. Kinley?

MR. BUTZ: If we could have just a moment. No.

THE COURT: Okay. Mr. Kinley, have you discussed this waiver with your attorneys, Mr. Doughty or Mr. Butz?

DEFENDANT KINLEY: Yes, I have.

THE COURT: And you're certain you understand the waiver that's being entered at this time?

DEFENDANT KINLEY: Yes, I do.

THE COURT: This waiver of your right to trial by jury and a request that the case be tried by a three-judge panel must be entered in writing before the Court would accept that, so there is a written waiver that your lawyers have prepared. I want you to read it and if you have any questions, if you don't understand that, ask your attorney or the Court

Can you read and understand that form?

DEFENDANT KINLEY: Yes, I can.

THE COURT: If you'll read it at this time and if you wish to do that, you may sign it. If you're not certain, if you have any questions, ask your lawyer.

MR. BUTZ: Before you sign it, I want you to tell the Judge.

DEFENDANT KINLEY: Yes, I read it. I read it.

THE COURT: Do you understand that?

DEFENDANT KINLEY: Yes, I do.

THE COURT: Do you wish to voluntarily sign that statement?

DEFENDANT KINLEY: Yes, sir.

THE COURT: It's you're asking to be tried by a three-judge panel. That will include your right to trial as to the guilt or innocence phase and also as to the penalty phase, should there be a penalty phase.

Do you understand that?

DEFENDANT KINLEY: Yes, I do.

THE COURT: You're asking not only the indictment but all the specifications also be tried to the three-judge panel?

DEFENDANT KINLEY: Yes, I do.

THE COURT: Okay.

MR. DOUGHTY: Your Honor, I would request you inquire into the Defendant's educational background.

THE COURT: Thank you. Mr. Kinley how old are you?

DEFENDANT KINLEY: 23.

THE COURT: 23. And what school did you attend?

DEFENDANT KINLEY: H.H. Godders, Columbus, Ohio and Sinclair College.

THE COURT: Did you graduate from high school?

DEFENDANT KINLEY: Yes, GED. 12th grade but I took a GED.

THE COURT: You got-

DEFENDANT KINLEY: General.

THE COURT:-general education. And then you went to a college.

DEFENDANT KINLEY: Yes, Sinclair College.

THE COURT: Which college?

DEFENDANT KINLEY: Sinclair College, Dayton, Ohio.

THE COURT: How long did you go there?

DEFENDANT KINLEY: Nine months for a certificate in tech two program. Tool and die.

> THE COURT: All right. Well, then, I want to be certain that you do read and write.
>
> DEFENDANT KINLEY: Yes, I do.
>
> THE COURT: You're with the form there and conversing, you understand that is your rights?
>
> DEFENDANT KINLEY: Yes, I do.
>
> THE COURT: Anything further?
>
> MR. DOUGHTY: That's all, Your Honor.
>
> THE COURT: You may sign that, if you wish.
>
> THE COURT: All right. I'll accept the Defendant's waiver of right to trial by jury and his request that the case be tried by a three-judge panel.

> Appellant contends the trial court's explanation left out two critical matters, to wit: that appellant could only be sentenced to death if the jury recommendation was unanimous and then only if the trial judge agreed with the jury's recommendation.

> In *State v. Jells* (1990), 53 Ohio St.3d 22, the Ohio Supreme Court held there is no requirement that a trial court interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial. The Court held that the Criminal Rules and the Revised Code are satisfied by a written waiver signed by the defendant filed with the court and made in open court after arraignment and opportunity to consult with counsel. Citing, *State v. Morris* (1982), 8 Ohio App.3d 12. The appellant executed just such a waiver in open court on February 19, 1991. While we agree the trial court might have been clearer in his explanation that the jury's verdict also had to be unanimous as to the penalty to be imposed, we find no affirmative misstatement was made by the court in securing the appellant's waiver of his jury trial as vitiated the waiver in *State v. Ruppert* (1978), 54 Ohio St.2d 263. It is also highly relevant that the accused was represented by two competent and experienced defense lawyers whom the appellant acknowledged he conferred with prior to waiving his jury trial. The sixth assignment is overruled.

*Kinley*, 1993 WL 224496 at *13-15.

Trial by jury is fundamental to American criminal jurisprudence. See *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). The purpose of the jury trial is to prevent governmental oppression and arbitrary law enforcement. *Id.* at 155-56. The jury trial gives the defendant "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Apprendi v. New Jersey,* 530 U.S. 466, 548 (2000), citing *Duncan,* 391 U.S. at 156.

In *Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2002), *cert. denied,* 538 U,S, 947 (2003), the Sixth Circuit construed the constitutional requirement for a valid jury waiver as follows:

> [T]he only requirements for a criminal defendant to validly waive his right to a trial by jury are that (1) the waiver must be in writing; (2) the government attorney must consent to the waiver; (3) the trial court must approve the waiver; and (4) the defendant's waiver must be voluntary, knowing and intelligent. *Jackson v. Burt*, 99 F.3d 1139, 1996 U.S.App. LEXIS 27358 (6th Cir.1996) (citing *United States v. Martin*, 704 F.2d 267, 271 (6th Cir.1983)).

*Cooey*, 289 F.3d at 913.

> [T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances – even though the defendant may not know the specific detailed consequences of invoking it. A defendant, for example, may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide.

*United States v. Ruiz,* 536 U.S. 622, 629-30 (2002), citing *Colorado v. Spring,* 497 U.S. 564, 573-75 (1987).

> In *United States v. Martin*, the Court explained what level of knowledge of the jury trial right is required for a defendant to intelligently waive it:

> > A defendant, therefore, should have both the mental ability and some knowledge of the jury trial right before he is allowed to waive it. A technical knowledge of the jury trial right, however, is not what is required. A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors the verdict of the jury must be unanimous, and that the judge alone will decide guilt or innocence should he waive his jury trial right.
>
> 704 F.2d 267, 273 (6th Cir. 1983)(citations omitted; accord *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004); *Spytma v. Howes,* 313 F.3d 363, 370 (6th Cir. 2002). The Court has explained that, while "[knowledge of these essential attributes is generally sufficient to enable a defendant to make a knowing and intelligent decision, *Martin,* 704 F.2d at 273, a defendant's knowledge of these elements is not "constitutionally required." *United States v. Sammons,* 918 F.2d 592, 597 (6th Cir. 1990). Rather, the dispositive inquiry is whether the defendant "'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt of innocence determined by a judge.'" *Sowell*, 372 F.3d at 836 (quoting *Sammons*, 918 F.2d at 597).

*Jells v. Mitchell,* 538 F.3d 478, 509-10 (6th Cir. 2008).

Although it is preferable for the trial court to conduct an on-the-record colloquy of the waiver, there is no constitutional right to such a colloquy. *Sowell,* 372 F.3d at 832. Whether a jury waiver was invalid depends on the factual circumstances of the case. *Lott,* 261 F.3d at 615 (citation omitted).

As noted by the state court of appeals, the record establishes that the trial court held a hearing on February 19, 1991, during which the court engaged in a colloquy with Mr. Kinley. Tr. Vol. I, Tab 12 at 2-8. The state court of appeals accurately reported the colloquy which occurred between the court and Mr. Kinley and this Court will not repeat verbatim that conversation here. However, the Court does note the following. First, Mr. Kinley was represented by two attorneys at

the time of the hearing (as well as during the trial) who were both present at the February 19, 1991, hearing.  *Id.* at 2.  Further, the trial court advised Mr. Kinley that he had a constitutional right to a trial by jury, that the jury would be made up of twelve individuals,  that the prosecution had the burden to prove his guilt beyond a reasonable doubt to the satisfaction of all twelve members of the jury, and that the jury had to unanimously agree before returning a verdict of guilty as to the charges and specifications in the indictment.  *Id.* at 2-3.  The trial court also advised Mr. Kinley that his was a death penalty case, that the right to a jury trial extended to the question of a recommended penalty, and that if the jury were to recommend a sentence other than death, that recommendation would be binding on the court.  *Id.* at 4.

Each time the court explained an aspect of the jury trial right, Mr. Kinley stated that he understood his right.  *Id.* at 2, 3, 4. Additionally, Mr. Kinley acknowledged that he had discussed the waiver of a jury trial with his counsel and that he had read and understood the waiver form.  *Id.* at 6.  Moreover, at the time of the hearing, Mr. Kinley was 23 years old, had attended high school to the twelfth grade and earned a GED, attended  college and earned a certificate in tool and die, and was able to read and write.  *Id.* at 7-8.   Further, before Mr. Kinley signed the jury waiver in open court, the trial court again asked Mr. Kinley if he understood that he was asking to be tried by a three-judge panel including the guilt phase as well as the penalty phase should there be one and Mr. Kinley again acknowledged that he understood.  *Id.* at 6-7.  Mr. Kinley then signed the jury waiver form, which his counsel also signed, the state agreed to the waiver, and the trial court accepted the waiver.  *Id.* at 8; App. Vol I at 275.  In view of these facts, this Court is convinced that Mr. Kinley was sufficiently informed to make an intelligent, knowing, and voluntary waiver of his jury trial right

As noted above, Mr. Kinley complains that the trial court did not explain with sufficient specificity the ramifications on the penalty phase of the trial of his waiving a jury. That is, Mr. Kinley argues that the trial judge did not explain that the jury's recommendation for death had to be unanimous. However, the transcript of the colloquy makes it clear that the trial court indeed advised Mr. Kinley that the jury's verdict would have to be unanimous and that in the case of a guilty verdict, the jury would be asked to make a recommendation as to the penalty. Tr. I, Tab. 12 at 3-4. There is nothing in the transcript which indicates that the trial judge in any way separated the unanimity requirement in the guilt phase from the penalty phase. In addition, as noted, Mr. Kinley was represented by two attorneys with whom he discussed the jury right waiver.

Although he cites numerous federal cases on the issue of waiving the right to a jury, Mr. Kinley has failed to explain how the state appellate court's findings and conclusions are contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Fifth and Twenty-Sixth Grounds for Relief should be denied.

**SEVENTH GROUND FOR RELIEF**

The trial court erred in admitting into evidence several irrelevant, misleading, cumulative, and prejudicial exhibits, over defense counsel's objections, as follows:

> A. State's Exhibit 31—the couch seat that contained the machete. The couch seat had been in a general dumping area for over six years. Tr. 564. It took two men to lift the couch seat. Tr. 577. No one has any idea how long the machete had been in the couch seat. Tr. 579. Reddish stain taken from the foam rubber of the couch seat did not reveal the presence of blood. Tr. 674. Mr. Szulewski testified that the machete he had purchased was bought from a general surplus store in Dayton where a number of the same or similar machetes could be purchased. Tr. 599-621. Mr Szulewski testified that the machete (State's Exhibit 39) found in the couch seat was approximately the same length as the one he purchased. Tr. 615. However, Exhibit 39 lacked the identifying decal that

was on the machete he purchased. Tr. 604.

B. State's Exhibits 69, 70, 85, 86, 87, 88—photos of State's Exhibit 31, the couch seat. Defense counsel's objection to these Exhibits was the same argument advanced for State's Exhibit 31, being that they were misleading. Tr. 1131, 1141. The trial court overruled defense counsel's objection and admitted the Exhibits into evidence. Tr. 1131, 1141.

C. Waived (PageID 277);

D. State's Exhibits 44 and 45—photos of Davie Neil's shoe. Nelson Smith testified that the soles of Mr. Neil's shoes had a similar pattern to the foot print found at the scene of the crime, Tr. 298, but that these shoes could not have caused those print marks. Tr. 299.

State's witness Vernon Fisher testified that Exhibits 44 and 45 somewhat resembled shoes he had seen Mr. Kinley wear. The resemblance was limited to the fact that Mr. Kinley wore and the photos depicted, black high-tops. Tr. 362, 364. Mr. Fisher testified that Mr. Kinley wore name brand shoes, Nike or Reeboks, and that Exhibits 44 and 45 were not the brand of black high-tops that he had seen Mr. Kinley wear. Tr. 359-364. State's witness Homer Franklin Roberts, Jr. essentially testified the same as Mr. Fisher in that he had seen Mr. Kinley wear black high-top Reeboks, Tr. 375, 378, and that State's Exhibits 44 and 45 only resembled what he had seen Mr. Kinley wear, being black high-tops. Tr. 372-76.

Defense counsel objected that David Neil's shoes were not relevant to Mr. Kinley's case, and contrary to the State's position, witnesses did not identify Exhibits 44 and 45 as the type of shoe Mr. Kinley work. Exhibits 44 and 45 resembled the style of shoe Mr. Kinley wore, black high-tops.

The trial court overruled defense counsel's objection because witnesses had referred to Exhibits 44 and 45 in their testimony.

E. State's Exhibit 71—enlargement of State's Exhibit 22, a footprint at the scene of the crime. Tr. 309. The State described Exhibit 71 as a photo enlarged to scale, depicting a size 10 footprint. Tr. 1132-33. Officer Priest testified that

Exhibit 71 was only "approximately to scale." Tr. 310, 311. Officer Priest testified that he compared his own size 10 shoe, and a size 10 shoe from Reco Sporting Goods, and both shoes "approximately fit on this scale." Tr. 312.

Defense counsel objected that this Exhibit was not probative and Officer Priest was not qualified to render an opinion that the photos matched a shoe size. Tr. 1133. The trial court found that Officer Priest was not qualified as an expert, and could only issue a lay opinion. Tr. 318. the trial court summarily overruled defense counsel's objection and admitted Exhibit 71 into evidence. Tr. 1133.

F. State's Exhibit 72—a size 10 Converse tennis shoe. During Officer Priest's testimony on Exhibit 71 (the enlarged photograph of a size 10 footprint), the State submitted Exhibit 72. The size 10 Converse tennis shoe had just been secured from a sporting goods store and was being used by the State for demonstrative purposes. Tr. 319.

The State had Officer Priest place Exhibit 72 over the outline of the footprint in Exhibit 71. Tr. 320. Officer Priest testified that Exhibit 72 approximately lined up with Exhibit 71. Tr. 321. Officer Priest testified that he did not know if all size 10 shoes were the same length and width. Tr. 322.

Defense counsel objected to Exhibit 72 at trial, as an exhibit that had not been disclosed in discovery. Tr. 319. The trial court overruled defense counsel's objection. Tr. 320.

Defense counsel also objected to Exhibit 72 because it was confusing and misleading. Officer Priest was unable to testify whether Exhibit 72 was a standard size 10 shoe. Tr. 1134. The trial court ruled that defense counsel's argument went to weight, not admissibility, and admitted Exhibit 72. Tr. 1134.

G. State's Exhibit 80—student validation ticket. Lieutenant Sullivan testified that during the search of the Kinley residence on January 12, 1989, Detective Fisher found Exhibit 80, a student validation card, in the name of Juan Kinley laying on the back of the bed. Tr. 467. Defense counsel objected to the relevancy of this exhibit. Tr. 1129. The State countered that Exhibit 80 was offered to show that

> Exhibit 79 (money and change purse) were found in Mr. Kinley's bedroom. The trial court found that defense counsel's objection went to weight, not admissibility, and admitted Exhibit 80. Tr. 1139.
>
> H. Waived (PageID 282);
>
> In addition to these exhibits to which counsel objected, counsel should have objected to and the court should have excluded the following:
>
> > A. State's Exhibits 9, 10, 11, 12, 13, 22, 23, 24, 25, 26, 27, 28—all being the cumulative photos of the shoe prints found at the scene.
> >
> > B. State's Exhibits 81 and 82—photos taken of shoes found at Picway, which had a different sole pattern from the print at the scene. Tr. 471-476, 504-511.
> >
> > C. State's Exhibit 46—a diagram reflecting the sole pattern found at the scene. Tr. 294.

In his Seventh Ground for Relief, Mr. Kinley argues that the trial court erred in admitting numerous exhibits. Respondent's position is that this Ground involves state evidentiary matters which are not reviewable in a federal habeas action. Respondent argues further that if reviewable, in order for this claim to be successful, the Court would have to find that the admissions of the exhibits so infected the entire trial as to violate Mr. Kinley's due process rights which it did not. In response, Mr. Kinley argues that the admission of the various exhibits was fundamentally unfair and denied him a fair trial. However, he has failed to explain how the result of his trial or his sentence would have been different if the trial court had not admitted the exhibits.

Mr. Kinley raised this precise claim on direct appeal to the state court of appeals as Assignment of Error No. X, (App. Vol. II at 179-85), and to the Ohio Supreme Court as Proposition of Law VII. App. Vol. IV at 164-72. The Ohio Supreme Court rejected Mr. Kinley's claim without

discussion. *Kinley*, 72 Ohio St.3d at 494. The court of appeals rejected Mr. Kinley's claim stating:

> In his tenth assignment appellant contends the trial court committed prejudicial error in admitting several misleading and irrelevant exhibits over his counsel's objections. We disagree.
>
> He contends the trial court erred in admitting photos of the couch where the machete was recovered, the garage door piece, photos of David Neil's shoe, photo enlargements of the footprint, a size ten Converse tennis shoe, a student validation ticket, and bank envelopes.
>
> The photos of the couch where the machete was recovered were clearly relevant. Evid.R. 401 defines "relevant evidence" as any evidence which has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than not. Mr. Szulewski identified the machete as the machete which he hung in his garage and which was missing after the homicides. There was nothing misleading about the photos of the couch. We agree that the garage door piece, Exhibit 40, lacked any probative value as Tim Shepard could not identify the tool which made the mark on the garage door. The admission of this evidence was harmless. It neither added nor detracted from the State's case.
>
> Nelson Smith testified that the soles of David Neil's gym shoes had a similar pattern to the footprint at the homicide scene and that State's witness Vernon Fisher testified that the appellant wore a similar style of black high top gym shoes. The photos of Neil's shoes had a very limited probative value but the photo's admission was not prejudicial.
>
> State's exhibit 71, an enlargement of the photo of the footprint left at the scene of the homicides, was clearly relevant and probative. The fact that the photo was only "approximately to scale" goes to the weight of this evidence and not to its admissibility. State's exhibit 72, the size 10 Converse tennis shoes, was similarly properly admitted.
>
> State's exhibits 99-103 were bank envelopes. Defense counsel objected that these exhibits were confusing and misleading. The State offered the exhibits to demonstrate that they were similar to the envelopes Mark Spencer had been given by Thelma Miller and similar to the bank envelope which Victor Bishop saw appellant have on the day of the murders. The student validation card was admissible to assist in identifying the appellant's bedroom where the money and change purse were recovered.

> The admission of evidence by a trial court should not be disturbed on appeal unless it is clear that the trial court abused its discretion in admitting the evidence, and the complaining party was materially prejudiced. We find the court properly admitted most of the exhibits complained of in this assignment, and those improperly admitted caused no material prejudice to appellant. The tenth assignment is overruled.

*Kinley*, 1993 WL 224496 at *17.

As this Court has noted in addressing Mr. Kinley's First Ground for Relief, federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis*, 497 U.S. at 780. Pursuant to *Estelle*, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States and it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. 502 U.S. at 67-68. Accordingly, errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus. *Walker*, 703 F.2d at 962. Otherwise stated, a state court's violation of its own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may grant habeas relief and under this very deferential standard, due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512.

The only issue before this Court, then, is whether the admission of the evidence about which Mr. Kinley complains in his Seventh Ground for Relief was "so egregious that it resulted in a denial of fundamental fairness." *Bugh, supra.*

State's exhibit 31 is a seat from a couch that was located in an alley behind Mr. Kinley's house and state's exhibit 39 was a machete. William Scott testified that while he was playing with friends and looking for a dime his friend had dropped, he found the machete, state's

exhibit 39, jammed into the springs of a couch that had been abandoned in an alley near where he lived. *Id.* at 543-45. Leon Howard testified that he saw William and other children playing with the machete, that he (Leon) took it to his mother, and that his mother called the police. *Id.* at 554. Leon also testified that he had William show him and the police where he had found the machete and that William brought them to an alley catty-corner from the back of Mr. Kinley's house. *Id.* at 555-56. Richard Szulewski testified that state's exhibit 39 was his machete that had been hanging in his garage, that he was able to identify it because it had certain distinctive markings, specifically a decorative black and silver decal, and that he first noticed that his machete was missing from his garage after Ms. Miller's and David Miller's bodies were discovered. Tr. Vol. V at 602-03. State's exhibits 31 and 39 were relevant to the killings of Thelma and David Miller.

States exhibits 69, 70, 85, 86, 87 and 88 are photographs of the couch where William Scott testified he found the machete and those photographs reflect the bottom of the seat and where the couch was found. See Tr. Vol. VII at 1131-32; 1141. Those photographs were probative of where William Scott testified he found the machete and where the couch was located, specifically near Mr. Kinley's home.

State's exhibits 44, 45, 71, and 72 are related to shoe prints found at the scene of the killings. The state had attempted to create the inference that Mr. Kinley owned shoes that were similar in size and style to the shoes which left the prints at the scene. However, on cross examination of Detective Sullivan, Mr. Kinley's counsel established that the investigating officers never found any shoes belonging to Mr. Kinley that matched the shoe print they found at the scene. Tr. Vol. IV at 484-87. The state never introduced evidence to the contrary. Accordingly, exhibits 44, 45, 71, and 72 were of limited, if any, probative value to the state and, indeed, were actually

favorable to Mr. Kinley.

State's exhibit 80 is a student validation card with Mr. Kinley's name on it. Detective Sullivan testified that during the search of Mr. Kinley's home on January 12, 1989, Detective Fisher found exhibit 80 laying on the back of the bed in the room where the detectives found money and a change purse. *Id.* at 466-67. Exhibit 80 was relevant for the purpose of establishing that the room in which the detectives found the money was accessible to Mr. Kinley as well as to establish the theft offense.

The remaining state's exhibits about which Mr. Kinley complains, exhibits 9, 10, 11, 12, 13, 22, 23, 24, 25, 26, 27, 28, 81, 82, and 46, all go to the "shoe issue" discussed *supra.*

Finally, even assuming *arguendo* that the exhibits at issue were improperly admitted, Mr. Kinley chose to be tried by a three-judge panel and not a jury. In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making a decision. *Smith v. Mitchell,* 348 F.3d 177, 206 (6th Cir. 2003), *cert. denied,* 543 U.S. 841(2004)(citation omitted).

This Court concludes that the admission of the state's exhibits about which Mr. Kinley complains in his Seventh Ground for Relief was not so egregious that it resulted in a denial of fundamental fairness. *Estelle, supra.* The state court's findings and conclusions are not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Seventh Ground for Relief should be rejected.

**EIGHTH GROUND FOR RELIEF**

Where evidence of other acts fails to show by substantial proof that because of a unique identifiable plan of criminal activity there is a strong likelihood that the person who committed the other acts also committed the acts charged, the admission of the other acts evidence is in violation of the rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In his Eighth Ground for Relief, Mr. Kinley argues that the trial court improperly admitted evidence about prior acts of violence and threats to Ms. Miller and improper character evidence of his jealousy and desire to dominate Ms. Miller. Again, Respondent's position is that this Ground involves state evidentiary matters which are not reviewable in a federal habeas action. Respondent argues further that if reviewable, in order for this claim to be successful, this Court would have to find that the evidentiary ruling so infected the entire trial as to violate Mr. Kinley's due process rights which it did not. Respondent's position is that the admission of this evidence was necessary in order for the state to establish that Mr. Kinley acted with prior calculation and design and that he intended to take the lives of his victims. Essentially, Mr. Kinley's response to the Respondent's position is that her argument is specious.

Mr. Kinley raised this claim in the Ohio Supreme Court on direct appeal as Proposition of Law VIII which the court summarily rejected without opinion. *Kinley*, 72 Ohio St.3d at 494. Therefore, this Court looks to the intermediate state appellate court's disposition of the claim:

> In his eleventh assignment, he contends the trial court committed prejudicial error in overruling his pre-trial motion to limit testimony that the appellant had engaged in violent arguments with Thelma Miller in the three months period preceding her death. The trial court ruled that this testimony was admissible pursuant to Evid. R. 404(B)for the limited purpose of proving intent or motive.
>
> The State presented in its case-in-chief the testimony of several witnesses who witnessed the appellant strike the victim Thelma Miller and threaten to violently harm her. (See page 5 and 6 of this opinion).
>
> Ohio Rule of Evidence 404(B) states:
>
> > (B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

> person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

If the other act does in fact "tend to show" by substantial proof any of these things enumerated by the rule then evidence of the other act may be admissible. *State v. Broom* (1988), 40 Ohio St.3d 277. The other acts need not be similar to the crime charged in the indictment to be admissible. *State v. Jamison* (1990), 49 Ohio St.3d 182.

Evidence of extrinsic offenses may be admissible to show motive, which has been defined as "the reason that nudges the will and prods the mind to indulge the criminal intent." Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Trb. 325, 328 (1956).

In *State v. Banks* (1986), 31 Ohio App.3d 57, the Franklin County Court of Appeals held that in a prosecution for murder where the defendant testifies that he would do nothing to harm his spouse or his unborn child, testimony of his prior acts of violence against the victim-spouse was admissible since the acts were relevant to the issues of intent or purpose and his capability of violent acts against his spouse. The court held that the other act evidence was not too remote in time although they occurred several months prior to the conduct at issue.

In *State v. Moore* (1948), 149 Ohio St. 226, the Ohio Supreme Court held that in a prosecution for felonious homicide, the testimony as to threats made by the defendant against a third person sometime prior to the killing, with which the former incident the deceased had no connection and which formed no part of the affair in which the deceased was killed is not over objection admissible against the defendant. The Court held that the "other acts" contemplated by the General Code were acts of a character so related to the offense for which the defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense. See also, *State v. Jacocks* (1990), 64 Ohio App.3d 713.

Similarly, in *State v. Anderson* (June 19, 2991), Hamilton App. No. C-900659, unreported, the court upheld the introduction of evidence that the defendant had threatened the life of the murder victim during a two-to-three week period prior to her death. The Court stated:

> We are convinced that the testimony of ... [the] sisters of the victim was admissible in accordance with Evid. R. 404(B) for the purpose of establishing the defendant's intent ..., and that such testimony was indeed relevant and probative evidence.

> *State v. Anderson*, supra at 5-6 of slip opinion (citation omitted). See also *State v. Morris* (February 13, 1989, Butler App. No. CA88-06-081, unreported (Court held that prior threats directed towards the murder victim several months before her death-i.e. that defendant would kill the victim "if she was out with another guy," etc.---was admissible pursuant to R.C. 2945.59 to show intent and absence of mistake or accident).

> We find that the trial court did not abuse its discretion in admitting testimony that the appellant struck Thelma Miller and threatened on several occasions to kill her and members of her family. This testimony bore a logical connection to the homicides of Thelma and David Miller and to establish the appellant's motive for committing the crimes charged in the indictment. The eleventh assignment is overruled.

*Kinley*, 1993 WL 224496 at * 18.

As noted several times, federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis*, 497 U.S. at 780. Of course, pursuant to *Estelle*, 502 U.S. at 67-68, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States and it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. Accordingly, errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus. *Walker*, 703 F.2d at 962. Otherwise stated, a state court's violation of its own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may grant habeas relief and under this very deferential standard, due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512.

The only issue before this Court, then, is whether the admission of the "other acts" evidence was "so egregious that it resulted in a denial of fundamental fairness." *Bugh, supra.*

The evidence about which Mr. Kinley complains consisted of testimony from several witnesses.

Darlene McKeachie was one of Ms. Miller's and Mr. Kinley's co-workers at the Rax restaurant where they were employed. Tr. Vol. III at 39-59. Ms. McKeachie testified that one day in about the middle of December, 1988, Mr. Kinley followed Ms. Miller around the restaurant arguing with her, that she (Ms. McKeachie) saw Mr. Kinley hit Ms. Miller in the face with his fist and that at some point, Ms. Miller was on the floor and she (Ms. McKeachie) saw Mr. Kinley picking Ms. Miller up while he was hitting her with his fist. *Id.* About six times during her testimony, Ms. McKeachie described Ms. Miller as being upset. *Id.* In addition, Ms. McKeachie testified that Ms. Miller was usually calm, mild, and easy to talk, to but during this incident, she was really upset and frustrated. *Id.*

Lisa Lynn, formerly known as Lisa Tuttle, was another of Ms. Miller's and Mr. Kinley's co-workers at Rax. *Id.* at 60-74. Ms. Lynn testified that on occasion she and her boyfriend and Ms. Miller and Mr. Kinley would go out together and that sometime in the middle of December, 1988, she saw Mr. Kinley hit Ms. Miller three times in the face. *Id.* Ms. Lynn also testified that on another occasion, she and her boyfriend went to Ms. Miller's apartment and before they went into the apartment, she heard Ms. Miller and Mr. Kinley screaming at each other, that after she went into the apartment she heard things falling and breaking, and then she saw Mr. Kinley who told her and her boyfriend to "get out or else we would get the same." *Id.* Ms. Lynn testified further that she heard Ms. Miller yelling for someone to help her, and that Mr. Kinley told Ms. Miller, "Shut up or

I'll kill you." *Id.*

Cindy Spencer, Ms. Miller's niece, testified that on January 7, 1989, she went to Ms. Miller's apartment to babysit for Daniel Miller while Ms. Miller went to work. *Id.* at 74-86. Ms. Spencer also testified that when Ms. Miller returned home, her boyfriend Ronald Hildebrand was with her. *Id.* Ms. Spencer testified further that while they she, Ms. Miller, and Mr. Hildebrand were watching television, someone knocked on the apartment door and when Mr. Hildebrand opened the door, Mr. Kinley pushed his way into the apartment and started calling Ms. Miller "white trash, a bitch and a slut" and told her he "was going to get her and her boys." *Id.*

Mr. Hildebrand testified that he met Ms. Miller in December, 1988, when she worked at Rax, that he was a customer, and that he dated her. *Id.* at 117-125. Mr. Hildebrand also testified that on the evening of January 7, 1989, into the early morning hours of January 8, 1989, he was at Ms. Miller's apartment and Mr. Kinley came into the apartment and started screaming at Ms. Miller and said, "I ought to kill you, bitch" and also called her a whore and a slut. *Id.* Mr. Hildebrand testified further that Mr. Kinley left the apartment and came back and said to Ms. Miller, "When the police get here, I'll show them what I can do to you", but that he (Mr. Kinley) left before the police arrived. *Id.*

Mark Spencer, Ms. Miller's brother and David Miller's uncle, testified that he was the manager of the Rax restaurant where Ms. Miller and Mr. Kinley worked. *Id.* at 125-36. Mr. Spencer testified further that after he became aware of a relationship between Ms. Miller and Mr. Kinley, he had observed that she had injuries on her face and arm. *Id.* Mr. Spencer also testified that the day after he observed the injuries, Mr. Kinley told him that he had seen Ms. Miller at the movies with another man and that he "went off" and beat Ms. Miller. *Id.* Mr. Spencer testified that

one evening in late October, 1988, Ms. Miller came to the Rax drive-through, her face was bruised, her cheeks were red, she had marks and scrapes on her back and arm, and he took her to the hospital for treatment. *Id.*

Vernon Fisher testified that he knew Ms. Miller and Mr. Kinley for as long as they "was together", probably about a year, Tr. Vol. IV at 357-59. Mr. Fisher testified further that the day before Ms. Miller was killed, Mr. Kinley told him that Ms. Miller had done something that "made him mad and he felt like killing her." *Id.* at 363.

Homer Roberts testified that he lived in the same apartment complex as Ms. Miller and that he knew Ms. Miller and Mr. Kinley. *Id.* at 369-70. Mr. Roberts testified further that the day before Ms. Miller was murdered, he heard Mr. Kinley remark about Ms. Miller, "Well, if I can't have her, no one will, or can...". *Id.* at 373.

James Swanson testified that he worked at Rax with Mr. Kinley. *Id.* at 383-84. Mr. Swanson testified further that a few days after Mr. Kinley was fired from Rax, he saw him in Rax speaking with Ms. Miller and heard him say to her, "If you give anybody rides home from work and I see you, I'll run you off the road." *Id.* at 387-88. Mr. Swanson testified further that on an occasion in December, 1988, after Rax had closed, he saw Ms. Miller inside Rax and he heard Mr. Kinley's voice from outside Rax and he (Mr. Kinley) was yelling at Ms. Miller and "more or less" said, "if I catch you with somebody I'll kill you." *Id.* at 388-89.

Mr. Kinley also takes issue with the state's references in its opening statement that he was "extremely assaultive", he terrorized Ms. Miller, and that he had repeatedly threatened to kill Ms. Miller. Further, Mr. Kinley complains that the state "repeatedly included" in its closing argument that he had made threats to Ms. Miller and that he wanted to dominate Ms. Miller. (Doc.

2 at 46-47).

It is indeed true, as Mr. Kinley notes, that all of the evidence which Mr. Kinley claims was improperly admitted was about incidents which occurred before the murders of Ms. Miller and her son David Miller. However, all of the evidence at issue goes to the relationship between Mr. Kinley and Ms. Miller. That is, the evidence about which Mr. Kinley complains is focused on the kind of relationship that Mr. Kinley had with Ms. Miller—a relationship that can be characterized as "rocky" at best. The evidence also shows that Mr. Kinley had threatened to kill Ms. Miller particularly if he "caught her" with someone else, that in the early hours of January 8, 1989, two days before he killed Ms. Miller and David Miller, he went to her apartment where he found her with Mr. Hildebrand at which time he again threatened to kill her.

To secure a conviction for aggravated murder, the state had the burden of establishing beyond a reasonable doubt that Mr. Kinley acted with a prior calculation and design and an intent or purpose to take the lives of Ms. Miller and her son David. See O.R.C. § 2903.01. The evidence at issue goes to the state's "prior calculation and design" burden.

Finally, even assuming *arguendo* that the evidence at issue was improperly admitted, Mr. Kinley chose to be tried by a three-judge panel and not a jury. As noted above, in bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decision. *Smith*, 348 F.3d at 206.

This Court concludes that the admission of the "other acts" evidence was not so egregious that it resulted in a denial of fundamental fairness. *Estelle, supra*. In any event, Mr. Kinley was found not guilty on Counts 3 and 4 of the Indictment, the counts in which prior calculation and design was an element.Accordingly, the state court's findings and conclusions are

not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Eighth Ground for Relief should be rejected.

**NINTH GROUND FOR RELIEF**

During the trial phase of Appellant [sic] Kinley's capital case, the prosecutor elicited victim impact evidence from State's witness Darlene McKeachie. The use of such evidence violated Mr. Kinley's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The character of Thelma Miller, one of the two victims in the case, was introduced through Ms. McKeachie's testimony on direct that Ms. Miller had been "a real nice person" [Tr. 41]. "really mild ...easy to talk to" [Tr. 52].

In his Ninth Ground for Relief, Mr. Kinley claims that the state elicited certain testimony from Ms. McKeachie the admission of which violated his constitutional rights "guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Doc. 2 at 49). Mr. Kinley has not identified with any specificity which of his rights the state allegedly violated. *Id.* at 49-50. Additionally, Mr. Kinley has not identified the federal law the state court allegedly applied unreasonably, which, of course, is his burden under the ADEPA. Respondent raises the same arguments in opposition to this Ground as she raised in opposition of Mr. Kinley's Seventh and Eights Grounds for Relief, *supra.* Mr. Kinley has again failed to respond to the Respondent's arguments.

As noted in the Court's discussion of Mr. Kinley's Eighth Ground for Relief, Mr. Kinley raised this claim on direct appeal, the Ohio Supreme Court rejected it without opinion, and the court of appeals rejected it as noted *supra*. See *Kinley,* 1993 WL 224496 at * 18. In addition, this Court reviewed, *supra,* Ms. McKeachie's testimony about which Mr. Kinley complains.

For the same reasons given with respect to Mr. Kinley's Eighth Ground for Relief, *supra*, this Court concludes that the admission of Ms. McKeachie's complained-of testimony was

not so egregious that it resulted in a denial of fundamental fairness. *Estelle, supra.* Accordingly, the state court's findings and conclusions are not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Ninth Ground for Relief should be rejected.

**TENTH GROUND FOR RELIEF**

> Forensic Criminalist Timothy C. Shepherd testified for the State in its case-in-chief during the trial phase of Mr. Kinley's capital case. However, his testimony—containing both irrelevant, unfairly prejudicial matter and improperly admitted matter—violated Mr. Kinley's rights under the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

In his Tenth Ground for Relief Mr. Kinley challenges the admission of Timothy Shepherd's testimony about the "reddish stains" found in Mr. Kinley's mother's car and on the machete and which Mr. Shepherd identified as blood. Essentially, Mr. Kinley's position is that Mr. Shepherd was unable to establish a connection between the blood and the crimes with which he (Mr. Kinley) was charged and therefore Mr. Shepherd's testimony was irrelevant and unfairly prejudicial. Respondent argues that Mr. Kinley has referenced no law whatsoever and his argument is that the trier of fact should not have attached significance to Mr. Shepherd's testimony. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley raised this claim as Proposition of Law XI on direct appeal to the Ohio Supreme Court. *Kinley,* 72 Ohio St.3d at 497; App. Vol. IV at 73-77. The Ohio Supreme Court rejected Mr. Kinley's claim without discussion. *Kinley,* 72 Ohio St.3d at 494. Therefore, this Court looks to the intermediate state appellate court's disposition of the claim:

> In his fourteenth assignment he contends the trial court committed prejudicial error in permitting criminalist Timothy Shepherd to testify he found human blood on the steering wheel of appellant's car, blood on the car's armrest and brake lever, and upon the machete recovered

from the couch.

There was no objection lodged by appellant's counsel to the bloodstain evidence and thus any error in its admission is waived. *State v. Williams* (1977), 51 Ohio St.2d 112. The doctrine of waiver is applicable even in capital cases. *State v. Mauer* (1984), 15 Ohio St.3d 239. Neither is "plain error" appropriately applied as the outcome of the trial would not have clearly been different were not the bloodstain evidence admitted.

In any event, we agree with the State of Ohio that the bloodstain evidence was clearly relevant to the matter at issue. See, *State v. Jells* (1990). 53 Ohio St.3d 22. Blood does not normally appear on steering wheels and its presence on the defendant's car shortly after the crime was relevant, probative, and material evidence. The fact that the blood could not be typed goes to the weight to be accorded this evidence, not to its admissibility. The same applies to the blood found on the armrest, brake lever, and machete. We cannot say its relevance was substantially outweighed by its prejudicial impact. Evid. R. 403.

Appellant contends he was also prejudiced by the prosecutor improperly "refreshing" the forensic criminalist's memory. He contends the witness Timothy Shepherd was improperly permitted to read to the jury excerpts of his forensic report when there was no evidence that his memory had been exhausted or that the report refreshed his recollection. The following occurred at page 657 of the trial record:

> Q. Now, were you also able to do any further testing as to the species or type of that blood?
>
> A. No, I was not. There was insufficient quantity of material present to positively determine the specifies [sic] or the ABO blood type.
>
> Q. Mr. Shepherd, did you issue a report in regards to this?
>
> A. Yes, I did.
>
> (WHEREUPON, State's Exhibit 96 was marked for purposes of identification).
>
> BY MR. SCHUMAKER:

> Q. Mr. Shepherd, I'll show you what's been marked for purposes of identification as State's Exhibit 96. If you could use that to refresh your memory as to the items or the stain on the steering wheel that you examined, were you able to go beyond the preliminary test of it just being blood?
>
> A. Yes, I did misstate my findings. I was able to take a sample from the steering wheel and do a species testing using crossover electrophoresis. Examination of that material did reveal the blood to be human.

> No objection was lodged to the prosecutor's examination of Mr. Sheperd [sic]. Any error in the manner of refreshing this witness' memory is waived. See, *State v. Williams,* supra. In any event, there is no evidence that Shepherd merely read the report. The record supports an inference that Shepherd examined his report and recalled that the blood on the steering wheel was human. This assignment has no merit.

*Kinley,* 1993 WL 224496 at *21.

As noted above, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle,* 201 F.3d at 716. Ohio's contemporaneous objection rule—that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected—is an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003)(citations omitted). A state court does not waive procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. See *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute an waiver of state procedural default rules. See *Girts v. Yani*, 501 F.3d 743, 755 (6th Cir. 2007), *cert. denied,* ___ U.S. ___, 129 S.Ct. 92 (2008). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. See *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir, 1991).

A review of the trial transcript reveals that Mr. Kinley did not object to Mr. Shepherd's testimony about which he now complains. Tr. Vol. XIV at 645-88. The state appellate court noted the lack of contemporaneous objections and determined that Mr. Kinley had waived the claimed errors. Accordingly, a colorable claim of procedural default could be made. However, Respondent has not asserted that defense and this Court will therefore address the claim.

As Respondent has noted, Mr. Kinley has cited absolutely no law, let alone federal law, in support of his Tenth Ground for Relief. (Doc. 2 at 51-54). Additionally, Mr. Kinley has failed to explain how the state court's decision is contrary to or an unreasonable application of clearly established federal law. *Id.* Mr. Kinley simply argues that Mr. Shepherd's testimony was irrelevant and unfairly prejudicial.

Again, this Court notes: (1) federal habeas corpus is available only to correct federal constitutional violations, 28 U.S.C. § 2254(a); *Lewis* , 497 U.S. at 780; (2) pursuant to *Estelle,* 502 U.S. at 67- 68, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States and it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions; and (3) errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus. *Walker*, 703 F.2d at 962. Therefore, the only issue before this Court is whether the admission of Mr. Shepherd's testimony about which Mr. Kinley complains was "so egregious that it resulted in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512.

Mr. Shepherd, a criminologist, testified at Mr. Kinley's trial that on January 11, 1989, he went to [the Szulewsi residence] to examine the scene to determine if there was any physical evidence that could be collected, to determine if there was any blood present in the garage area

where there were reddish stains on the floor, and that his preliminary testing indicated the presence of blood. Tr. Vol. XIV at 647. Mr. Shepherd also testified that there were some red stains noted in the hallway that went from the garage into the house but his examination of those stains did not reveal that they were blood, that there were red stains on the screen door between the garage and living area which he determined were blood, and that there were red spatters on the garage door which he determined were blood. *Id.* at 652-53; 655. Mr. Shepherd testified further that he examined [Mr. Kinley's mother's automobile] and noted some reddish stains present on the driver's side armrest, on the steering wheel, and on the brake handle and that he determined the stains were blood. *Id.* at 655-67. Mr. Shepherd also testified that there was insufficient quantity of the material present to positively determine the specifics of the ABO blood type. *Id.* at 657. Mr. Shepherd then testified that he had prepared a report of his findings, State's Ex. 96, which report he identified. *Id.* at 657. The following exchange then took place between Mr. Schumaker, the prosecutor, and Mr. Shepherd:

> BY MR. SCHUMAKER:
>
> Q. Mr. Shepherd ... if you could use that to refresh your memory as to the items or stain on the steering wheel that you examined, were you able to go beyond the preliminary test of it just being blood?
>
> A. Yes, I did misstate my findings. I was able to take a sample from the steering wheel and do a species testing using crossover electrophoresis. Examination of that material did reveal the blood to be human.

*Id.* at 657-58. Finally, Mr. Shepherd testified that on April 25, 1989, he examined the machete at issue in this case and that there was blood present on the machete. *Id.* at 670.

The evidence in this case established that Mr. Kinley had been driving his mother's car on the day Thelma and David Miller were killed. Mr. Shepherd's testimony as to the presence

of blood in that vehicle was clearly relevant to the murders for which Mr. Kinley was being tried. Specifically, as noted by the state court, blood does not normally appear on the steering wheel of a car. In this case, the presence of blood on the steering wheel of the car Mr. Kinley was known to be driving on the day of the killings was relevant, probative, and material. Simply stated, it could raise the inference that Mr. Kinley had gotten blood on his person and transferred that blood to the steering wheel of the car he drove that day. The fact that Mr. Shepherd was not able to identify the blood type went to the weight of the evidence, not its admissibility. The same analysis applies to the blood Mr. Shepherd found on the driver's side armrest, the brake handle, and the machete.

With respect to Mr. Shepherd's report, State's Ex. 96, the transcript clearly shows that Mr. Shepherd did not simply read his report. Rather, when initially testifying, Mr. Shepherd had a misrecollection of his findings and that the prosecutor, Mr. Schumaker, used Mr. Shepherd's report to refresh his recollection. While Mr. Schumaker may not have used any of the "magic words" which lawyers frequently employ in refreshing a witness' memory, the result was the same.[2]

This Court concludes that the admission of Mr. Shepherd's complained-of testimony was not so egregious that it resulted in a denial of fundamental fairness to Mr. Kinley. *Estelle*, *supra*. Accordingly, the state court's findings and conclusions are not contrary to or an unreasonable application of clearly established federal law.

Mr. Kinley's Tenth Ground for Relief should be denied.

**ELEVENTH GROUND FOR RELIEF**

The state did not timely disclose its witness, Victor Bishop, to the defense, until 4:00 p.m. the afternoon before he testified. [Tr. 692]. Defense counsel timely objected, [Tr. 692], and pursuant to Ohio R. Crim P.16(E)(3) requested a continuance in order for them to talk to

[2] That is not to say that, arguably, Mr. Schumaker's approach was not objectionable. However, as noted, Mr. Kinley did not lodge any objection at the time of Mr. Shepherd's testimony.

> Mr. Bishop on the matters about which the state was now indicating he would be testifying, so that they might prepare for his cross-examination. [Tr. 694, 695]. The trial court overruled defense counsel's objection. [Tr. 695].

In his Eleventh Ground for Relief, Mr. Kinley argues that the trial court violated his due process rights when the court denied his motion for a continuance so that his counsel could prepare for Victor Bishop's cross-examination. Mr. Kinley's position is that the court should have granted his motion pursuant to Ohio Criminal Procedure 16(E)(3). Respondent argues that Ohio Crim.R. 16(E)(3) is irrelevant, that the facts do not support Mr. Kinley's position, and that a trial court's decision to grant or deny a motion for continuance is within the sound discretion of the trial court. Mr. Kinley has not countered Respondent's arguments.

Mr. Kinley raised this claim on direct appeal before the Ohio Supreme Court at Proposition of Law No. XIII. *Kinley*, 72 Ohio St.3d at 501; App. Vol. IV at 200-04. The Ohio Supreme Court summarily rejected Mr. Kinley's claim. *Kinley*, 72 Ohio St.3d at 494. Accordingly, this Court looks to the state appellate court's analysis of Mr. Kinley's claim:

> In appellant's sixteenth assignment of error he contends the trial court abused its discretion when it overruled his counsel's continuance request in order to investigate the state's untimely disclosed discoverable evidence, in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Section 9, 10, and 16 of Art. 1 of the Ohio Constitution and Crim. R. 16. The evidence reveals that the State revealed as part of discovery the name of Victor Bishop to the defense as part of pre-trial discovery in October of 1989. The State disclosed to the defendant that Mr. Bishop was one of three witnesses who would testify that the appellant was not with them between 10:30 A.M. and 12:00 P.M. on the day of the murders. Appellant's counsel had spoke [sic] to Mr. Bishop about these matters prior to trial. When Mr. Bishop testified at appellant's trial his testimony was more extensive and he testified that he first saw appellant on January 10, 1989 when Bishop woke up shortly after 9:00 A.M. that morning. Bishop testified that he and appellant went out to see George Bishop

> then went back to Bishop's home and appellant left indicating that he had to do something at approximately 10:45 A.M. Bishop testified he saw appellant about an hour later and that he had money with him at that time in a bank envelope. Mr. Bishop identified State's Exh. 101 as looking like the bank envelope that he saw Kinley have [sic] on January 10, 1989. Bishop further testified that he saw Kinley with a set of keys that were different from appellant's car keys. During cross-examination appellant's counsel elicited from Bishop that appellant was gone for only a hour and that appellant was wearing the same clothes when he returned as when he left and that appellant was not acting strange and did not have any blood on his clothes after he returned. On cross-examination Bishop was unable to describe the keys or the key ring that he saw appellant have on January 10, 1989.
>
> The defense counsel objected prior to Bishop's testimony and requested a continuance in order for counsel to talk to Bishop about the matters that the State indicated he would be testifying concerning so that they might be better prepared to cross-examine Bishop. The trial court overruled counsel's objection. Before ruling on the motion the Court was informed that Bishop's name had been originally disclosed by the prosecutor months before trial and he had in fact been disclosed as a defense witness by the defendant. The trial courts have broad discretion in deciding whether to grant a continuance and that discretion will not be disturbed by a reviewing court in the absence of an abuse of that discretion. Bishop's testimony took place on day four of the trial and there is no evidence that counsel requested the opportunity to recall him at a later stage of the trial as upon cross-examination. We find no abuse of discretion in the trial court's refusing to grant a continuance and the sixteenth assignment of error is also overruled.

*Kinley*, 1993 WL 224496 at *22-23.

First, this Court notes that Mr. Kinley has not relied on any federal law in support of his argument. The Court also notes that Mr. Kinley has not argued how the outcome of his trial–either the guilt phase or the mitigation phase–would have been different had the trial court granted his motion for a continuance. Finally, as Respondent has pointed out, the Court notes that Ohio Crim.R. 16(E)(3) addresses the issue of court orders with respect to discovery and seems irrelevant to Mr. Kinley's claim about a continuance. Nevertheless, the Court turns to the merits of

Mr. Kinley's claim.

> A trial court's decision to grant or deny a continuance is a matter of discretion. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *Bennett v. Scroggy*, 793 F.2d 772, 774-75 (6th Cir.1986). As we held in *Powell v. Collins*, "[a]bsent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process." 332 F.3d 376, 396 (6th Cir.2003) (citing *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988)). The denial of a continuance constitutes a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'...." *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (quoting *Ungar*, 376 U.S. at 589, 84 S.Ct. 841). As *Morris* and Ungar indicate, the denial of a continuance will rarely give rise to a constitutional violation and "[t]he circumstances of a particular case determine whether the denial of a continuance is so arbitrary as to violate due process." *Burton v. Renico*, 391 F.3d 764, 773 (6th Cir.2004) (citing *Ungar*, 376 U.S. at 589, 84 S.Ct. 841). In addition, "[t]o demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir.1997) (internal quotation marks and citation omitted). "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited [sic] the defense." *Powell*, 332 F.3d at 396.
>
> The relevant factors in determining whether a continuance was properly denied include: (1) the length of the requested delay; (2) whether other continuances had been requested and granted; (3) whether the delay was for legitimate reasons; (4) the inconvenience to the parties, witnesses, counsel, and the court; (5) whether the defendant contributed to the circumstances giving rise to the request; (6) whether denying the continuance resulted in prejudice to the defendant; and (7) the complexity of the case. See *id*. (citing *United States v. Burton*, 584 F.2d 485, 490-91 (D.C.Cir.1978)).

*Landrum v. Mitchell*, 625 F.3d 905, 927-28 (6th Cir. 2010).

During Mr. Kinley's trial, specifically on Friday, March 8, 1991, the state called Victor Bishop as a witness. Tr. Vol. VI at 691. Mr. Kinley's counsel objected to Mr. Bishop's

testifying on the ground that the state did not disclose him as a witness until Thursday, March 7, 1991, at about four o'clock in the afternoon. *Id.* at 692. In considering defense counsel's objection, the court held a bench conference during which the following dialogue took place:

> MR SCHUMAKER [prosecutor]: I would indicate for the record, Your Honors, that Mr. Bishop was disclosed to us as a Defense witness on Wednesday [March 6, 1991]. I sent officers out to speak with him on Wednesday night, I interviewed him yesterday, the late morning hours, and then he was, a decision was made he would be appearing for the State and he was disclosed yesterday afternoon. But the reason that he wasn't disclosed earlier because we didn't get disclosure he was a Defense witness until Wednesday. We then disclosed him on Thursday as a State's witness.
> ...
>
> MR. DOUGHTY [Mr. Kinley's counsel]: Your Honor, he was disclosed by the prosecution in a statement given by a man Howard and he was one of the three witnesses that substantiated that the Defendant was not present on the premises with these three guys between 10:30 and 12:00 and that disclosure was made in October of 1989 by the State.
>
> Now, unfortunately, apparently the State didn't talk to this witness about the facts they want to present today. Now, that's —
>
> JUDGE LORIG**:** But you were aware of the existence of this witness prior to that.
>
> MR. DOUGHTY**:** And I talked to him. Because of his record and unreliability, we didn't call him but he was disclosed to us, to the Defense, by the prosecution as one of their witnesses in October of 1989.
>
> JUDGE LORIG**:** I see no prejudice.
>
> MR. BUTZ [Mr. Kinley's counsel]: I think the point is that the state knew about him all along.
>
> MR. DOUGHTY**:** They knew about him all along.
>
> MR. BUTZ**:** We've not had a chance to talk to the witness about the matters he's going to testify about today. In other words —

JUDGE LORIG**:** Had you talked to him in the past?

MR. BUTZ: Yes, and he told us nothing like what he's going to testify today based on what Mr. Schumaker tells he's going to testify about. I think it's highly prejudicial for us to have to go forward and try to cross-examine this witness about things that I've never heard that he said. So at the very least we need time so that we can talk to this man before he testifies so that I can adequately prepare a cross-examination. So at the very least —

JUDGE LORIG: Well, well, you did know about him and you could have talked to him.

MR. BUTZ: We did talk to him. My point is, and he said nothing what Mr. Schumaker indicates he's going to say today. So we did talk to him, and I think we ought to at least have the chance to explore with him what I understand his testimony is going to be before I cross-examine him. If I would have had any idea he was going to say this, we could have explored that with him when we talked.

JUDGE LORIG: Well, all right, any further comment on this?

MR. SCHUMAKER: No, Your Honor.

JUDGE LORIG: All right. Do you see —

MR. BUTZ: I think under the rule we're entitled to a continuance, Your Honor. Under the discovery rule, we're entitled to a continuance.

JUDGE LORIG: For how long?

MR. DOUGHTY: Sufficient time to talk to this witness and —

JUDGE LORIG: An hour or something like that?

MR. DOUGHTY: And prepare. No, I would say —

MR. BUTZ: Depends what we learn talking to him.

MR. SCHUMAKER: I would simply indicate not only did the Defense disclose him as a witness, apparently we disclosed him last

October.

   MR. DOUGHTY:  And you should have talked to him last October. We'd have had the testimony ready to go beginning of the trial.

   JUDGE LORIG:  I'm going to overrule the objection.  You may proceed.

   MR. SCHUMAKER:  Thank you.

*Id.* at 692-95.

     The record establishes, and Mr. Kinley does not dispute, that the state first disclosed Mr. Bishop to defense counsel some five months before trial.  In addition, the record establishes that the defense disclosed on March 6, 1991, *its* intent to call Mr. Bishop as a witness.  Mr. Kinley's counsel admitted to the trial court that the defense was aware of the existence of Mr. Bishop. Further, Mr. Kinley's counsel acknowledged to the trial court that the defense had, in fact, interviewed Mr. Bishop.  It was the defense team's decision to not call Mr. Bishop as a defense witness.  Nevertheless, the defense's decision to not call Mr. Bishop as a witness in no way dilutes the facts that the defense knew of him months before the trial, had itself disclosed its intent to call him as a witness, and that defense counsel had actually interviewed Mr. Bishop prior to trial and certainly before the state called him as a witness.

     The facts as established by the record do not support Mr. Kinley's argument that the state did not disclose Victor Bishop to him until the afternoon before the state called him as a witness.  Under these circumstances, it simply was not a violation of Mr. Kinley's federal constitutional rights for the trial court to deny Mr. Kinley's motion for a continuance.

     The state court's decision on this issue is not contrary to or an unreasonable application of clearly established federal law.  Mr. Kinley's Eleventh Ground for Relief should be

dismissed.

**TWELFTH GROUND FOR RELIEF**

In Juan Kinley's capital case, the prosecutor failed to conform his conduct to the requirements of the law. These errors both singularly and cumulatively rendered Mr. Kinley's convictions and sentences illegitimate, as they were obtained in violation of Mr. Kinley's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

In his Twelfth Ground for Relief, Mr. Kinley argues that during both the guilt and mitigation phases of his trial the prosecution made various statements which so inflamed and misled the triers of fact that the state violated his constitutional rights. In support of this Ground, Mr. Kinley cites at length to several statements the prosecutor made during closing arguments at both the guilt and mitigation phases. Specifically, Mr. Kinley complains as follows:

1. During the initial trial phase closing argument, the prosecutor cited other acts evidence. In discussing Lisa Lynn's description of an incident in which Ms. Lynn heard Mr. Kinley apparently beating Thelma Miller, the prosecutor said, "[Lisa Lynn] heard the falling, the breaking, she heard Thelma hollering, 'Somebody please help me.' She heard the threat. She was told "Get out of here, you'll get some of it too."

2. Over objection, the prosecutor replayed a section of the 911 tape during his closing argument. In re-introducing this tape, the prosecutor implicitly conceded its inflammatory nature, its cumulativeness, even the prejudicial irrelevance of some of its elements.

3. In his initial phase closing argument, the prosecutor discussed the place where the machete, the alleged murder weapon, had been found and argued that it "was the perfect hiding place ... someplace where the defendant, if he wanted to, could go back and have access to it again. Perhaps where he would relive what he had done." Mr. Kinley claims this comment

portrayed his as "some sort of ghoul who would delight in reliving mass, bloody murder" and that this was an illegitimate technique of proving conduct through character.

4. During the guilt phase of the trial the prosecutor described the horribleness of the victims' deaths which served only to inflame the finders of fact rather than help them to determine who caused the deaths.

5. During his penalty phase closing argument, the prosecutor improperly:

(a) engaged in inflammatory rhetoric by arguing victim impact evidence and non-statutory aggravators including the brutality of the killings and David Miller's young age;

(b) misstated the standard of proof and asked the court to not give Mr. Kinley individualized consideration of his particularized family background and character;

c) expressed his personal opinion about Mr. Kinley's mitigation evidence.

See Doc. 2 at 58-67.

Respondent first points out that this matter was heard by a three-judge panel and not a jury. Respondent then argues that Mr. Kinley has failed to demonstrate how the prosecutor's actions, even if improper, had a substantial and injurious effect or influence on the trial court's decision. Mr. Kinley has not replied to Respondent's arguments. Rather, in response, Mr. Kinley has simply restated, almost verbatim, twenty-one of the thirty-three paragraphs in his Petition which address this claim. *Compare*, Doc. 2 at 58-63, *with*, Doc. 54 at 9-14 (PageID# 325-30).

Mr. Kinley raised this claim in the Ohio Supreme Court as Proposition of Law XVI and that court summarily rejected it without opinion. *Kinley*, 72 Ohio St.3d at 494. This Court, then

looks to the intermediate appellate court's disposition of Mr. Kinley's prosecutorial misconduct claim:

> Appellant contends in his nineteenth assignment that he was denied a fair trial because of misconduct of the prosecutor during final argument during the guilt phase and the mitigation phase of the trial.
>
> Specifically appellant contends the trial court erred in permitting the prosecuting attorney to argue about "other acts" evidence wherein Lisa Lynn heard Thelma Miller plead for help during a prior assault by the appellant.
>
> Appellant contends the court should not have permitted the prosecutor to replay a section of the "911" tape wherein Daniel Miller pleads for help for his mother during the confrontation of his mother with appellant a few days before their death.
>
> He contends the prosecutor improperly argued that the placement of the machete reflected a desire by the appellant to relive the murders. He argues that the prosecutor should not have been permitted to remind the panel how horrible the victims' death[s] must have been.
>
> Appellant contends the prosecuting attorney engaged in inflammatory rhetoric in the penalty phase by arguing victim impact evidence and non-statutory aggravation. Appellant contends that it was improper to argue that no mitigating evidence could overcome the savagery and brutality of the killings and the fact that one of the victims was a twelve year old. Appellant contends no mention should have been made of the characteristics of the victim no matter how undeserving of death the victim may have seemed. (Brief, at 115).
>
> Appellant also contends that the prosecutor encouraged the panel to analyze appellant's mitigating evidence by comparing him to unspecified other persons rather than weighing the mitigating effect of appellant's character and background. The prosecutor had argued that there were many persons who had endured childhoods similar to appellant's who had never engaged in any criminal activity much less capital murder.
>
> Most of the arguments made by the prosecutor were not objected to by appellant's counsel. Improper remarks of counsel during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to or otherwise error cannot be predicated upon the

alleged improper remarks. *State v. Johnson* (1989), 46 Ohio St.3d 96.

We agree with the State that the prosecutor's description of the victims' deaths was not improper. Under R.C. 2929.03(F) a trial court may rely upon and cite the nature and circumstances of the offense as reasons supporting its findings that the aggravating circumstances were sufficient to outweigh the mitigating factors. *State v. Stumpf* (1982), 32 Ohio St.3d 95.

There is no evidence that the panel did not consider appellant's family background and childhood in considering appellant's mitigating evidence. It is not improper to argue that an appellant's background is not dissimilar to large numbers of the population. See, *State v. Van Hook* (1988), 39 Ohio St.3d 256.

Appellant contends the prosecutor's reference to David Miller's age was improper victim impact evidence. Victim impact evidence describes the personal characteristics and reputation of the victim as well as the crime's effect on other family members. We do not believe a victim's age can be properly called “victim impact” evidence. In any event, the Eighth Amendment erects no “per se” bar if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject. *Payne v. Tennessee* (1991), 111 S.Ct. 2597.

The appellant contends the prosecutor improperly expressed “personal opinion” in his final argument when he argued:

> The Defendant says he's sorry. Well, I say you can't hack two innocent persons to death and then say you're sorry and expect any kind of positive reaction.

It is improper for counsel to express his personal belief or opinion as to the credibility of a witness as to the guilt of the accused. *State v. Thayer* (1931), 124 Ohio St. 1. The prosecutor did not express his opinion as to any witness' credibility or as to the guilt of the accused.

It is clear that the prosecution must be given some latitude during summation. *State v. Woodards* (1966), 6 Ohio St.2d 14. We have reviewed the final arguments made by the State and find no evidence that the argument was improper. The appellant's nineteenth assignment of error is overruled.

*Kinley*, 1993 WL 224496 at *24-25.

The Sixth Circuit has articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

> "In the evaluation of a claim for prosecutorial misconduct, it is not enough that the prosecutor's comments were improper, but '[t]he relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " *Smith*, 567 F.3d [246] at 255 [6th Cir. 2009] (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In other words, "[i]n order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir.2006), cert. denied, 549 U.S. 1255, 127 S.Ct. 1376, 167 L.Ed.2d 165 (2007). To determine whether improper conduct is flagrant, we consider four factors:
>
>> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.
>
> *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 546 U.S. 865, 126 S.Ct. 163, 163 L.Ed.2d 150 (2005).

*Goff v. Bagley*, 601 F.3d 445, 480 (6th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1045 (2011).

With these principles in mind, the Court turns to the prosecutor's comments about which Mr. Kinley complains.

First, this Court concludes that two of Mr. Kinley's claims in this Ground are procedurally defaulted.[3] As noted above, the state court of appeals determined that "most of the arguments made by the prosecutor were not objected to by appellant's counsel" and that absent

[3] None of these claims were the subject of Respondent's November, 2003, Motion to Dismiss Procedurally Defaulted Claims which the Court denied. (Doc. 15; 22).

objection "error cannot be predicated upon the alleged improper remarks." In other words, the state court declined to review some of Mr. Kinley's prosecutorial misconduct claims on the basis that he had not preserved those alleged errors for review because there were no objections made during the prosecutor's closing arguments.

As noted above, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle,* 201 F.3d at 716. As also noted *supra*, Ohio's contemporaneous objection rule—that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected—is an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice. *Mason,* 320 F.3d at 635.

A review of the transcript of Mr. Kinley's state court trial reveals that, indeed, counsel failed to object to some of the prosecutor's argument about which Mr. Kinley now complains. Specifically, Mr. Kinley's counsel did not make a contemporaneous objection with respect to the prosecutor's argument about which Mr. Kinley complains in the above sections (1), (3), and (4). Tr. Vol. XI at 1420 (other acts evidence argument), 1441 (machete hiding place argument), and 1427-30 (horribleness of victims' deaths argument).

Although Mr. Kinley did not object to the prosecutor's argument which he now describes in section (4) (the horribleness argument), the state appellate court nevertheless addressed that claim on the merits. See *supra*. Accordingly, this Court will do the same. However, with respect to the arguments in sections (1) and (3), because Mr. Kinley failed to follow the contemporaneous objection rule and the state appellate court declined to review those claims on that basis, absent "cause and prejudice", those claims are procedurally defaulted.

Assuming *arguendo* that Mr. Kinley is able to establish the cause requirement, see Thirteenth Ground for Relief, *infra*, he is not able to establish the prejudice requirement.

First, prosecutors can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 1991 (2009). In addition, a prosecutor may rely in good faith on the evidentiary rulings by the state trial judge and make arguments in reliance on those rulings. *Id.* at 900. Finally, as noted above, in bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decision. *Smith*, 348 F.3d at 206.

With respect to Mr. Kinley's claim in section (1), the "other acts evidence" claim, this Court notes that the trial court ruled, over defense counsel's objection that Ms. Lynn's testimony was admissible. Tr. Vol. III at 63. In addition, the court specifically admitted over objection Ms. Lynn's testimony about which Mr. Kinley complains in this Ground. *Id.* at 67-68. Therefore, it was not improper for the prosecutor to highlight Ms. Lynn's testimony in his closing argument. Accordingly, Mr. Kinley could not have been prejudiced by that argument.

As to the claim in section 3, the machete hiding place argument, this Court concludes that it was arguably improper for the prosecutor to suggest that the machete was someplace where Mr. Kinley could again have access to it so that he could perhaps relive what he had done. Nevertheless, even assuming that the prosecutor presented improper argument on that point, a three-judge panel tried this matter. As noted above, in bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decision. In the absence of any indication to the contrary, this Court applies that long-accepted maxim and therefore cannot say that the

prosecutor's "machete hiding place" argument prejudiced Mr. Kinley.

Accordingly, the prosecutorial misconduct claims Mr. Kinley raises with respect to the other acts evidence argument and the machete hiding place argument are procedurally defaulted. In the alternative, assuming that those claims are not procedurally defaulted, for the same reasons Mr. Kinley is unable to establish the prejudice prong of the procedural default "cause and prejudice" requirement, those claims are without merit.

The Court now turns to the remaining prosecutorial misconduct claims Mr. Kinley has raised in his Twelfth Ground for Relief.

With respect to the 911 tape, during the state's case-in-chief, the three judges on the panel agreed that the tape was admissible and the prosecutor played the entire tape in open court. Tr. Vol. III at 107-12. During his closing argument, the prosecutor played a portion of the 911-tape. Tr. Vol. XI at 1421-22. It was not improper during his closing argument for the prosecutor to highlight a short portion of the tape which had been admitted into evidence. See *Cristini, supra.*

As to the prosecutor describing the horribleness of the victims' deaths, again, the prosecutor was arguing the evidence that had been admitted during trial. Specifically, David Smith, a medical doctor and deputy coroner who performed David Miller's autopsy as well as Thelma Miller's autopsy testified at length about the injuries each sustained as well as the causes of their deaths. Tr. Vol. IV at 228-71. A prosecutor may legitimately refer to the nature and circumstances of the offense because Ohio law allows the trial court to rely upon the nature and circumstances of the offense as reasons supporting its findings that the aggravating circumstances were sufficient to outweigh the mitigating factors. See *Hoffner v. Bradshaw*, 622 F.3d 487, 507 (6th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 2117 (2011); *Goff*, 601 F.3d at 478.

Mr. Kinley claims next that the prosecutor improperly engaged in inflammatory rhetoric by arguing victim impact evidence and non-statutory aggravators including the brutality of the killings and David Miller's young age.

Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991). Victim impact evidence includes the victim's personal characteristics. *Baze v. Rees,* 553 U.S. 35, 85 (2008). Personal characteristics include, *inter alia,* age. See *Davie v. Mitchell,* 547 F.3d 297, 322 (6th Cir. 2008), *cert. denied,* ___ U.S. ___, 130 S.Ct. 503 (2009).

> ...[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne*, 501 U.S. at 827; see also, *Baze,* 553 U.S. at 85.

This Court addressed above the issue of the brutality, or in Mr. Kinley characterization, the horribleness, of the killings and determined that it was not error for the prosecutor to argue the nature and circumstances of the offense. Additionally, the circumstances of a capital crime are admissible during the sentencing phase to dispel the existence of any mitigating circumstances. *Slagle v. Bagley*, 457 F.3d 501, 519 (6th Cir., 2006), *cert. denied*, 551, U.S. 1134 (2007). David Miller's age was one of his personal characteristics. As noted above, a prosecutor may properly refer to a victim's personal characteristics, including age, in his argument.

Mr. Kinley's next argument is that the prosecutor engaged in misconduct by misstating the standard of proof and by asking the court to not give him individualized consideration

of his particularized family background and character.

In support of his "standard of proof" argument, Mr. Kinley refers to the following argument which the prosecutor made:

> Now, what has the Defendant offered in mitigation to counterbalance what he did to Thelma and David? What has he advanced? You know, probably the first question here should be is there anything that he could advance. That could outweigh the gravity of what he left lying on the Szulewskis' garage floor in January of 1989. Is there anything he could come in here and set forth to you that would mitigate against those savage and brutal murders? I think arguably there is not.

Tr. Vol. XII at 170. In his Petition, Mr. Kinley has emphasized the word "outweigh" and the phrase "is there anything that he could advance" and "I think arguably there is not". (Doc. 2 at 63-64).

It is not unconstitutional to require the death penalty if the State has proved beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors. See *Blystone v. Pennsylvania*, 494 U.S. 299, 305-06 (1990); *Williams v. Bagley*, 380 F.3d 932, 964-65 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005), citing *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001). Aggravating circumstances are elements of the crime which must be proven to the jury beyond a reasonable doubt. *House v. Bell*, 311 F.3d 767, 776 (6th Cir. 2002)(en banc), *cert. denied*, 539 U.S. 947 (2003), citing *Ring v. Arizona*, 536 U.S. 584 (2002).

First, the Court notes that the prosecutor's closing argument is approximately seven pages long. Tr. Vol. XII at 167-74. The portion of that argument about which Mr. Kinley complains is approximately eight lines in length. *Id.* at 170, L. 4-12. Even assuming that the prosecutor's isolated comment misstated the burden of proof by suggesting that Mr. Kinley had the burden of establishing mitigating factors which outweighed the aggravating circumstances, that error did not so infect Mr. Kinley's trial as to make it fundamentally unfair. That is true in light of the relatively

short section of the prosecutor's argument about which Mr. Kinley complains.  More importantly, however, the prosecutor's argument notwithstanding, the three judge panel unanimously found with respect to both Count One and Count Two that the state had proved beyond a reasonable doubt that the aggravating circumstances that Mr. Kinley was found guilty of committing were sufficient to outweigh the mitigating factors. *Id.* at 185;  App. Vol. I at 434-35.  It is clear that any alleged prosecutorial misconduct with respect to the closing argument did not result in the three-judge panel reaching an erroneous conclusion.

Mr. Kinley claims that the prosecutor engaged in misconduct by asking the court to not give him individualized consideration of his particularized family background and character. However, even assuming that the prosecutor engaged in misconduct as Mr. Kinley claims, it is again clear that such misconduct did not so infect Mr. Kinley's trial so as to make it fundamentally unfair. In determining that the aggravating circumstances outweighed the mitigating factors, the three judge panel specifically referred to factors particular to Mr. Kinley.  For example, the panel noted that Mr. Kinley was twenty-two years of age when he committed the offense and that he is of below-average intelligence with a personality that is anti-social, emotionally stunted, and prone to violence.   App. Vol I at 434.  In addition, the panel noted that throughout his childhood neither his parents, other relatives, schools, nor various state institutions were able to change Mr. Kinley's personality traits. *Id.*

Mr. Kinley alleges that the prosecutor improperly expressed his personal opinion about his (Mr. Kinley's) mitigation evidence when he argued, "Is there anything [Mr. Kinley] could come in here and set forth to you that would mitigate against those savage and brutal murders.  I think arguably there is not."  Tr. Vol. XII at 170.

It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *United States v. Young*, 470 U.S. 1, 17-19 (1985); *Berger v. United States*, 295 U.S. 78, 86-88 (1935) (citing prosecutor's statements suggesting that he had personal knowledge that a witness was not being truthful as one example of egregious prosecutorial misconduct). "To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they can not put forth their opinions as to credibility of a witness, guilt of a defendant, or appropriateness of capital punishment." *Bates*, 402 F.3d at 646. In *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir., 2006), *cert. denied*, 551 U.S. 1134 (2007), the court categorized various types of prosecutorial misconduct: character assault, referring to facts outside the record, referring to nonstatutory aggravating factors, denigration of defense counsel and witnesses, and vouching for prosecution witnesses.

In his closing argument at the completion of the penalty phase of Mr. Kinley's trial, the prosecutor did not express his opinion about the credibility of a witness, Mr. Kinley's guilt, or about the death penalty. Nor did the prosecutor engage in any sort of character assault or engage in any type of prosecutorial misconduct which the *Young, Berger,* or *Slagle* courts identified. Rather, the prosecutor simply commented on the quality of Mr. Kinley's mitigating evidence. That is permissible conduct pursuant to *Bates.*

In addition to considering Mr. Kinley's claims of prosecutorial misconduct individually, this Court has considered them in toto within the context of the entire trial. As noted above, several of the prosecutor's arguments simply were not improper. However, even assuming that several of them were, this Court concludes that they were not so prejudicial as to render Mr.

Kinley's trial fundamentally unfair. As noted above, in bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decision. *Smith*, 348 F.3d at 206. This Court finds that it is not unreasonable to extend that maxim to the closing argument in this case.

Mr. Kinley's Twelfth Ground for Relief should be dismissed as meritless.

**THIRTEENTH GROUND FOR RELIEF**

Mr. Kinley's trial counsel provided ineffective assistance during Mr. Kinley's capital case. The following is a list of issues that should have been raised by Mr. Kinley's former trial counsel.

A. Failure to litigate at a pretrial hearing the reliability and admissibility of the DNA evidence.

B. Failure to object to the admission of the money found in Mr. Kinley's house, State's Exhibit 79, as being the fruit of an illegal pretextual arrest.

C. Failure to insure a proper jury waiver colloquy with the trial court.

D. Failure to object to the victim impact testimony at Tr. 48-56 (excepting the witness's testimony, at Tr. 53-54, that Thelma Miller said now Mr. Kinley was in trouble, because now she had witnesses to his striking her; and the witness's testimony, at Tr. 56, that Thelma Miller wanted to see her children, both of which statements were objected to).

E. Failure to object to Forensic Criminalist Shepherd's testimony on irrelevant, unfairly prejudicial matter and failure to object to the improper "refreshing" of Mr. Shepherd's memory.

F. Failure to object to the admission of the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30.

G. Failure to object to prosecutorial misconduct at Tr. 1428-1429, 1441; Mit. Tr. 169-174.

In his Thirteenth Ground for Relief, Mr. Kinley argues that he was denied his right to effective assistance of counsel. Mr. Kinley identifies seven ways in which he alleges his counsel were ineffective. However, Mr. Kinley has failed to explain how he was prejudiced by any such ineffectiveness. Mr. Kinley simply argues that he "was prejudiced by the unreasonable errors and omissions of his counsel" without explaining how the result of his trial or his sentence would have been different had his counsel not been ineffective in the ways he alleges. (Doc. 2 at 68-69).

Mr. Kinley raised these ineffective assistance claims on direct appeal. However, the Ohio Supreme Court rejected them without discussion. *Kinley,* 72 Ohio St.3d at 494, 501. The court of appeals addressed Mr. Kinley's claims and rejected them as follows:

> In appellant's twentieth assignment he contends he was denied the effective assistance of counsel and thus was denied a fair trial as guaranteed by the United States and Ohio Constitutions. Appellant contends his trial counsel were ineffective in the following specifics:
>
> 1. Failure to litigate at a pretrial hearing the reliability and admissibility of the DNA evidence. (See Assignment of Error No. I.)
>
> 2. Failure to object to the admission of the money found in Mr. Kinley's house, State's Exhibit 79, as being the fruit of an illegal pretextual arrest. (See Assignment of Error No. V.)
>
> 3. Failure to insure a proper jury waiver colloquy with the trial court. (See Assignment of Error No. VI.)
>
> 4. Failure to object to the victim impact testimony at Tr. 48-56 (excepting the witness's testimony, at Tr. 53-54, that Thelma Miller said now Mr. Kinley was in trouble, because now she had witnesses to his striking her; and the witness's testimony, at Tr. 56, that Thelma Miller wanted to see her children, both of which statements *were* objected to). (See Assignment of Error No. XII.)
>
> 5. Failure to object to Forensic Criminalist Shepherd's testimony on irrelevant, unfairly prejudicial matter and failure

> to object to the improper "refreshing" of Mr. Shepherd's memory. (See Assignment of Error No. XIV.)
>
> 6. Failure to object to the admission of the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30. (See Assignment of Error No. XVIII.)
>
> 7. Failure to object to prosecutorial misconduct at Tr. 1428-1429, 1441; Mit. Tr. 169-174. (See Assignment of Error No. XIX.)

> We have previously found the DNA evidence presented by the State was properly admitted by the trial court. We also held that appellant's arrest was not pre-textual and the money found as a product of the search of appellant's home was admissible. We also found the jury waiver colloquy was adequate and that the victim impact evidence, forensic evidence offered by Timothy Shepherd, and photos of the crime scene were properly admitted into evidence by the trial court. Finally, in the resolution of the nineteenth assignment, we found that the remarks made by the prosecuting attorney in final argument were not improper or prejudicial. Accordingly, the appellant's twentieth assignment of error is also overruled.

*Kinley*, 1993 WL 224496 at *25-26.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, (1970) (citations omitted). "The Supreme Court set forth the test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, ... (1984)". *Eley v. Bagley,* 604 F.3d 958, 968 (6th Cir.), *cert. denied,* ___ U.S. ___, 131 S.Ct. 822 (2010).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that the counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes

> both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkis*, ___ U.S. ___, ___, 130 S.Ct. 2250, 2255 (2010), citing *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S at 689, quoting *Michel v. State of Louisiana*, 350 U.S. 91, 101 (1955).

As to the second prong, the Supreme Court said:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Strickland*, 466 U.S. at 694; see also, *Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998).

Even assuming that Mr. Kinley's counsels' performances were constitutionally deficient, for the following reasons Mr. Kinley was not prejudiced by any of his counsels' alleged deficient performances.

In addressing Mr. Kinley's First Ground for Relief, this Court determined that Mr. Kinley's claim that the DNA evidence which the state introduced at trial was not reliable was without merit. Because Mr. Kinley's DNA claim is without merit, he could not have been, nor was he, prejudiced by his counsels' failure to litigate the reliability and admissibility of the DNA evidence.

This Court determined in addressing Mr. Kinley's Second and Fourth Grounds for Relief that his claims related to his allegations of improper search and pre-textual arrest are meritless. Accordingly, counsels' failure to object to the admission of the money detectives found in Mr. Kinley's house could not and did not prejudice Mr. Kinley.

Mr. Kinley raised in his Fifth Ground for Relief the claim that his jury waiver was constitutionally infirm and the Court determined that his claim is without merit and should be rejected. Therefore, any claim that counsel were ineffective for failing to insure a proper waiver is also without merit.

In his Ninth Ground for Relief, Mr. Kinley argued that the prosecutor improperly elicited victim impact testimony. This Court determined that Mr. Kinley's claim in his Ninth Ground is without merit. Therefore, Mr. Kinley's claim that his counsel were ineffective because they failed to object to the victim impact testimony is also without merit.

Mr. Kinley claimed in his Tenth Ground for Relief that the admission of criminalist Mr. Shepherd's testimony violated his constitutional rights because it was irrelevant and unfairly prejudicial. This Court rejected Mr. Kinley's claim in his Tenth Ground and therefore, any claim that his counsel were ineffective for failing to object to Mr. Shepherd's testimony is meritless.

Mr. Kinley alleges that his counsel were ineffective for failing to object to the

admission of "the following inflammatory and gruesome photos: State's Exhibits 11, 29, and 30." State's exhibits 11, 29, and 30 are three of several crime scene photographs taken at the Szulewski residence and which depicts footprints and blood on the garage floor.  Tr. Vol. VII at 1121; 1122. Mr. Kinley has not shown how or why they were "inflammatory and gruesome", and has not explained how the admission of those photographs prejudiced him during his trial to the three-judge panel.  Indeed, Mr. Kinley has not even attempted to explain how the result of his trial or his sentence would have been different if his counsel had objected to the admission of the photographs and they had been excluded.  Mr. Kinley's claim of ineffective assistance of counsel with respect to the crime scene photographs has no merit.

Mr. Kinley's final claim of ineffective assistance of counsel in his Thirteenth Ground for Relief is that his counsel failed to object to prosecutorial misconduct.  Mr. Kinley simply provides citations to the trial record in support of his claim.  First, Mr. Kinley points to "Tr. 1428-1429, 1441" and then to "Mit. Tr. 169-74".

A review of the transcript reveals that "Tr. 1428-1429, 1441" encompasses the state's guilt phase closing argument.  Tr. Vol. XI at 1428-29; 1441.   Further, "Mit. Tr. 169-74" encompasses the state's mitigation phase closing argument.  Tr. Vol. XII at 169-74.  While Mr. Kinley has provided the citations to the state's arguments, he had utterly failed to identify what the prosecutors said that was so objectionable as to comprise prosecutorial misconduct and to which his counsel should have objected.  More importantly, as with his other claims in his Thirteenth Ground for Relief, Mr. Kinley has failed to show how he was prejudiced by his counsels' failure to object to any alleged prosecutorial misconduct.

Mr. Kinley's Thirteenth Ground for Relief has no merit and should be rejected.

**FOURTEENTH GROUND FOR RELIEF**

> The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). Further, a conviction based upon evidence which is not sufficient to prove guilt beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia,* 443 U.S. 307 (1979).

In his Fourteenth Ground for Relief, Mr. Kinley argues that there was insufficient evidence presented at his trial to prove all the elements of aggravated robbery. Respondent argues that *Jackson, supra*, does not require a federal habeas court to sit as a trier of fact, that the habeas court should give every weight to the jury's ability to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Respondent's position is that there was sufficient evidence before the triers of fact to find Mr. Kinley guilty of aggravated robbery. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley raised this claim on direct appeal. The Ohio Supreme Court rejected the claim, Proposition of Law XX, without analysis. *Kinley,* 72 Ohio St.3d at 494. Accordingly, this Court looks to the intermediate court of appeals' analysis of the claim:

> In his twenty-first assignment, the appellant contends the State failed to introduce evidence to prove all the elements of aggravated robbery beyond a reasonable doubt.
>
> When a defendant challenges the legal sufficiency of the State's evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 442 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed. 560, 573." *State v. Waddy* (1992), 63 Ohio St.3d 424,430.
>
> The appellant contends the evidence presented by the State was not irreconcilable with a theory of innocence and thus a reasonable juror must have entertained a reasonable doubt of his guilt of the crime of aggravated robbery citing *State v. Kulig* (1974) 37 Ohio St.2d 157.

The State, however, argues that *Kulig* was overruled by *State v. Jenks* (1991) 61 Ohio St.3d 259, wherein the Ohio Supreme Court held that circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. The Court held that when the State relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. The appellant argues that the *Jenks* decision cannot be applied to him because the alleged crime occurred before *Jenks* was decided and to apply it to him would violate the *ex post facto* provisions of the Federal Constitution.

The State argues that *Jenks* did not lower the burden of proof in a criminal case below a reasonable doubt but merely abolished the distinction between direct and circumstantial evidence. We agree with that argument.

In *Collins v. Youngblood* (1990), 110 S.Ct. 2715, the United States Supreme Court held that a law violates the Ex Post Facto Clause only if it punishes as a crime an act previously committed, which was innocent when done, makes more burdensome the punishment for crime after its commission, or deprives one charged with crime of any defense available under law in effect when the act was committed.

The Ex Post Facto Clause was not intended to prohibit the application of new evidentiary rules in trial for crimes committed before the charges. *Thompson v. Missourt* (1898), 171 U.S. 380. *Collins v. Youngblood*, supra, at fn. 3.

The State of Ohio presented evidence that Thelma Miller was seen with $121 in a bank envelope resembling Security Bank deposit envelopes two days before her death. There was also evidence that the Szulewskis had approximately $320 in "twenties" in their house before the murders. There was evidence that the Szulewskis left twenty-five dollars in the master bedroom for Thelma Miller. After the homicides were discovered, police discovered that Ms. Miller's envelope was missing, Szulewski's $320 was stolen as well as the money left by them for Thelma Miller. Thelma Miller's purse and car keys were never found.

The state presented the taped statement of the appellant wherein he stated he borrowed $40 from Thelma Miller to pay a $31 court fine

> on the morning of the homicides. Victor Bishop stated he saw the appellant in possession of a bank envelope similar to a security bank envelope at approximately noon on the day of the homicide and appellant said he got the money from "the bank.". Bishop said the appellant also had a different set of car or house keys than that of his mothers [sic].
>
> The police recovered $291 from appellant's shirt during the search of his home.
>
> There was sufficient evidence presented by the State of Ohio from which a reasonable jury could have concluded that the appellant committed aggravated robbery as alleged in the indictment. The appellant's twenty-first assignment is likewise without merit.

*Kinley*, 1993 WL 224496 at *26-27.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *In re Winship*, 397 U.S. 358, 364 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006), citing, *Jackson*, *supra*. This rule was adopted as a matter of Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 103 n.4 (1997). Of course, it is state law which determines the elements of offenses; but

once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

First, this Court notes that in his Petition Mr. Kinley argues in part that, "The State's proof of aggravated robbery, established totally by circumstantial evidence, did not exclude all reasonable theories of innocence. *Kamel, supra*. ..." (Doc. 2 at 73). However, *State v. Kamel*, 12 Ohio St.3d 306 (1984), relied on *State v. Kulig*, 37 Ohio St.2d 157 (1974), for the proposition for which Mr. Kinley cites *Kamel*. *Kulig* was overruled by *Jenks, supra*. Mr. Kinley does not take issue with the fact that *Kulig*, and therefore its progeny, was overruled by *Jenks*.[4] In addition, Mr. Kinley has not raised in his Petition the *Youngblood* claim which he raised in state court. (Doc. 2 at 70-73).

In order to obtain an aggravated murder conviction against Mr. Kinley under O.R.C. § 2903.01(B), the state was required to establish that he committed aggravated robbery. O.R.C. § 2929.91 defines aggravated robbery as follows:

> (a) No person, in attempting or committing a theft offense, as defined in Section 2012.02 of the Revised Code, of in fleeing immediately after such attempt or offense, shall do either of the following:
>
> (1) Have a deadly weapon or dangerous ordnance, as defined in Section 2323.11 of the Revised Code, on or about his person or under his control;
>
> (2) Inflict or attempt to inflict serious physical harm on another.

O.R.C. § 2929.91.

One of the underlying elements of aggravated robbery that the state had to prove was that Mr. Kinley committed or attempted to commit a theft offense. With respect to theft, the

[4] Although Mr. Kinley's citation to *Kamel* suggests that he has relied on it in a previous claim in his Petition, this Court is unable to locate any such citation.

Revised Code provides that:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without consent of the owner or person authorized to give consent;
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
>
> (3) By deception;
>
> (4) By threat.

O.R.C. § 2913.02

Mark Spencer testified that he was the manager of the Rax restaurant where Ms. Miller, who was his sister, was employed. Tr. Vol. I at 126. Mr. Spencer also testified that on January 8, 1989, he saw that Ms. Miller had one hundred twenty-one dollars in an envelope that looked like a bank deposit envelope and that he had counted the money himself. *Id.* at 140-42; Tr. Vol. IV at 709. Mr. Spencer identified state's exhibit 101 as the envelope in which Ms. Miller carried her money. *Id.*

Elaine Szulewski testified that Ms. Miller had been cleaning her (Ms. Szulewski's) home since the autumn of 1983. *Id.* at 161. Ms. Szulewski testified further that it was her practice to leave Ms. Miller's twenty-five dollar payment for services under a Kleenex box in the master bedroom and that she did so before she went to work on January 10, 1989. *Id.* at 171. Ms. Szulewski also testified that in addition to the twenty-five dollars for Ms. Miller, on January 10, 1989, she and her husband had about three hundred or three hundred-twenty dollars in cash in predominantly twenty dollar bills hidden in a highboy in their home. *Id.* at 172, 174. Ms. Szulewski

testified that when she got back into her home after the killings, neither the twenty-five dollars which was Ms. Miller's payment nor the money in the highboy was there. *Id.* 172, 174.

Victor Bishop testified that he saw Mr. Kinley on the morning of January 10, 1989, at which time he did not see Mr. Kinley with any money. *Id.* at 698. Mr. Bishop testified further that he saw Mr. Kinley in the afternoon of January 10, 1989. *Id.* at 699. Mr. Bishop testified that when he was Mr. Kinley in the afternoon, Mr. Kinley showed him and his (Mr. Bishop's) brother that he had money and that his brother asked him "where did he get all that money from". *Id.* Mr. Bishop also testified that Mr. Kinley had a bank envelope with money in it and he (Mr. Bishop) identified state's exhibit 101 as the envelope he saw in Mr. Kinley's possession. *Id.* at 699-700. Mr. Bishop testified further that on the afternoon of January 10, 1989, he went with Mr. Kinley to buy marijuana. *Id.* at 705.

Detective Ron Rude testified that during the investigation of the killings, he and Detective Sullivan went to the Northridge IGA where they viewed a surveillance videotape. Tr. Vol. II at 516-17. Detective Rude testified further that he observed on the tape that on January 10, 1989, at about 1:48 a.m., Ms. Miller came into the store, went through and picked up various items, and checked out. *Id.* at 517.[5] Detective Rude testified further that the tape showed that when she prepared to pay for the items she had picked up, Ms. Miller took an envelope out of her purse and took money out of the envelope. *Id.* Detective Rude testified that he later went to Ms. Miller's apartment and found in it the items he had seen her pick up in the IGA. *Id.* at 518. Detective Rude testified further Ms. Miller's purse was never recovered. *Id.* at 519. Detective Rude also testified

---

[5] In his Petition, Mr. Kinley alleges that the IGA tape shows Mr. Kinley's mother at the store at 1:48 a.m. on January 10, 1989, arguing, in part that the evidence is both irrelevant and inflammatory because the purchase was made before the murders. (Doc. 2 at 72). However, Detective Rude's testimony clearly relates to Ms. Miller and not to Ms. Kinley.

that he could not tell from the tape how much money was in Ms. Miller's envelope. *Id.* at 522.

On January 10, 1989, Mr. Kinley gave Detective Sullivan a written statement which was followed by a taped interview both of which were introduced at trial. *Id.* at 409; 411-39. In the statement and interview, Mr. Kinley said that on the morning of January 10, 1989, he had borrowed forty dollars from Ms. Miller to pay a thirty-one dollar court fine and that he paid the fine on January 10, 1989. *Id.*

Detective Sullivan testified that on the evening of January 12, 1989, pursuant to a warrant, he was involved in a search of Mr. Kinley's home. *Id.* at 465. Detective Sullivan also testified that during that search, he found money inside a black and white striped shirt inside the closet in Mr. Kinley's bedroom. *Id.* at 466. Detective Sullivan testified further that the sum of money was two hundred ninety-one dollars and fifty cents, that two hundred dollars of the money was in bills and one dollar and fifty cents was in change, and that the bills were all twenty dollar bills with the exception of one ten dollar bill. *Id.* at 466.

The state introduced sufficient evidence upon which any rational trier of fact could base its verdict that Mr. Kinley was guilty of aggravated robbery beyond a reasonable doubt. Specifically, the state established:

(1) On January 8, 1989, Ms. Miller had a bank envelope, identified by Mr. Spencer as state's exhibit 101, in which she had one hundred twenty-one dollars;

(2) At about 1:48 a.m. on January 10, 1989, Ms. Miller had money in an envelope with which she made a purchase at the IGA;

(3) On January 10, 1989, before she went to work Ms. Szulewski put twenty-five dollars under a Kleenex box in the master bedroom for Ms. Miller to take as payment for her

January 10, 1989, services and which was not there when Ms. Szulewski returned to her home after the murders;

(4)  On January 10, 1989, Ms. Szulewski and her husband had between three hundred and three hundred-twenty dollars in mostly twenty-dollar bills hidden in a highboy in their home which was not there when she returned to her home after the murders;

(5)  On the morning of January 10, 1989, Mr. Kinley did not have any money;

(6)  On the afternoon of January 10, 1989, Mr. Kinley showed Mr. Bishop and Mr. Bishop's brother money he had in his possession which was in a bank envelope, identified by Mr. Bishop as state's exhibit 101;

(7)  On the afternoon of January 10, 1989, Mr. Kinley, who had no money in the morning, paid a court fine and bought some marijuana;

(8)  During a search of Mr. Kinley's home on January 12, 1989, the police found two hundred ninety-one dollars and fifty cents in a black and white striped shirt inside the closet in Mr. Kinley's bedroom;

(9)  The money which the police found in Mr. Kinley's bedroom closet consisted of two hundred dollars in bills and one dollar and fifty cents in change, and the bills were all twenty dollar bills with the exception of one ten dollar bill essentially the same denominations about which Ms. Szulewski testified.

This evidence is sufficient to prove to the standard required by *Jackson v. Virginia*, 443 U.S. 307 (1979)**,** all the elements of aggravated robbery as well as support a verdict that Mr. Kinley committed that offense.

The state court's findings and conclusions are not contrary to or an unreasonable

application of clearly established federal law. Mr. Kinley's Fourteenth Ground for Relief should be rejected.

**FIFTEENTH GROUND FOR RELIEF**

Petitioner's constitutional right to trial by jury was compromised by a deal whereby petitioner waived his right to a jury in return for funding to hire a mental health expert for the mitigation phase of trial.

In his Fifteenth Ground for Relief, Mr. Kinley claims that his right to a trial by jury was compromised because, as the result of an agreement with the trial judge, he waived his jury trial right in exchange for the judge's authorization of funding for a mental health expert who would testify on Mr. Kinley's behalf during the mitigation phase. Respondent essentially argues in response that the evidence introduced during the hearing on Mr. Kinley's post-conviction petition does not support Mr. Kinley's argument. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley raised this argument in post-conviction and the court of appeals rejected it as follows:

> Kinley first argues that he was compelled to waive his right to a jury trial in order to receive funding to obtain a psychologist to testify at the sentencing phase of his trial. To support this claim, Kinley called his former defense attorney John Butz to testify at the hearing. Butz testified to the following. Kinley's defense attorneys, Butz and Noel Kaech, filed a motion requesting funding for a mitigation specialist and a psychologist on November 5, 1990. The prosecution filed a memorandum in opposition to the funding request. A hearing was held on the issue on January 14, 1991, at which the defense attorneys continued to argue the necessity of the two expert witnesses. Additional memoranda were filed by both parties on January 17. Eventually, on January 23, the trial judge, Gerald Lorig, overruled the motion.
>
> The state eventually agreed to the funding of a mitigation specialist, and Judge Lorig then approved the funding. However, defense counsel continued to argue for funding for a psychologist. Sometime in early 1991, at least one meeting was held in Judge Lorig's

chambers to discuss this issue. Butz testified that he had suggested that Kinley might be willing to waive his right to a jury trial, and that, by the end of the meeting, the prosecution had ceased their opposition. Kinley waived his right to a jury trial on February 19, 1991, and the trial court granted his request for funding for a psychologist on February 20. According to Butz's testimony, the parties had agreed that Kinley would waive his right to a jury trial in exchange for the state's agreement to cease opposition to the funding of a psychologist. Butz further testified that he had suggested the jury trial waiver because he had believed it was the only way to get the state to agree to the funding request. Kinley also introduced an affidavit from former defense counsel James Doughty, which stated essentially the same things as Butz's testimony.

The state called several witnesses. Judge Lorig testified and denied that the jury waiver had been the reason he granted the request for funding of the psychologist. He stated that he had granted the funding request because he had become convinced of its necessity. Stephen Schumaker, one of the prosecutors on the case, testified that the prosecutors had withdrawn their opposition to the funding request because they had wanted to eliminate a potential appellate issue and because Butz had agreed to give them a copy of the psychologist's report. He testified that the state had initially opposed the funding because it had wanted a copy of the report. Schumaker also testified that he would have preferred to try the case to a jury because he had had a bad result in trying a different case, *State v. Sodders*, to a three-judge panel. The other prosecutor on the case, David Smith, also testified that the state had withdrawn its opposition for the two reasons stated above. Like Schumaker, Smith testified that he would have preferred to try the case to a jury.

Smith also testified that Doughty had discussed with him three factors in favor of waiving a jury trial. These were (1) the gruesome nature of the case, (2) the fact that Kinley was black and the Millers were white, and (3) the age of David Miller. Judge Lorig's bailiff, Dora Gibson, testified that Butz had told her after the trial that they had waived a jury "because of the nature of the photographs." Stephen Collins, a prosecutor who was not on the case, testified that he had discussed the case with Butz after the supreme court's affirmance, at which time Butz had told him: "There wasn't any way that they could take that to a jury given the gruesome nature of that offense and that their only shot really that they felt in avoiding the death sentence was with a three-judge panel."

In this appeal, Kinley attempts to undermine the credibility of the state's witnesses. He quotes the following from Judge Lorig's 1996 affidavit:

> When defense counsel originally moved for a court appointed mitigation specialist and court appointed psychologist for investigation, and the State opposed these requests, I overruled the motions. * * * Subsequently, during a meeting with counsel in chambers, defense counsel again requested funds for the psychologist for mitigation and counsel for the State indicated that the State was not opposed to the appointment. I granted the motion.

Kinley further argues that, even though Schumaker now contends that the state opposed funding because it wanted a copy of the psychologist's report, there was no mention of that reason in their 1991 opposition to the funding. He notes that affidavits from Judge Lorig and from David Smith in 1996 made no mention of this reason. With regard to Schumaker's stated preference for a jury, Kinley argues that the *Sodders* case, in which Schumaker allegedly had a bad result with a three-judge panel, was a case in which the defendant pled guilty and in which there was no trial. Finally, Kinley argues that the testimony of Stephen Collins, Dora Gibson, and David Smith was not credible. He asserts that, because Gibson was Judge Lorig's bailiff throughout the case and Collins worked with Schumaker and Smith in a small prosecutor's office, it is incredible that neither of them ever brought the alleged conversations with Butz to the attention of the prosecutors on the case. He further asserts that Smith said nothing about his alleged conversation with Doughty until Doughty was incapacitated and unable to contradict him. Butz also testified that he had taken other gruesome cases to a jury and could have taken this one.

With regard to Schumaker's stated preference for a jury, the state agrees that the *Sodders* case was one in which the defendant pled guilty. However, the state points out that, when a defendant pleads guilty in a capital case, the state must still present evidence to establish that the offense warrants imposition of the death penalty. Furthermore, Schumaker testified that the result favorable to the defendant in the Sodders case was another reason why Kinley might have wanted a three-judge panel.

As stated above, we find that the trial court's decision in favor of the state was not against the manifest weight of the evidence. Kinley's argument essentially relies on 1) Butz's testimony and 2) the

suspicious timing of the jury waiver and the order granting funding for a psychologist. However, the state presented ample evidence that there was no trade. Schumaker and Smith both testified that they opposed the funding for other reasons and that they would have preferred a jury trial. Finally, the state presented evidence that the defense had other reasons to waive a jury trial. Kinley's attempts to undermine the credibility of the state's testimony fall short. While we do not know why there is no mention of the state's desire for a copy of the psychologist's report in their 1991 memoranda opposing the funding, the fact that it was an issue can be inferred from the fact that Butz eventually agreed to give the prosecutors a copy. Gibson, Collins, and Smith had no reason to mention Butz's and Doughty's comments regarding why the defense waived a jury until the postconviction hearing because it was not an issue until then. Furthermore, we have reviewed the photographs that were introduced as exhibits at the hearing, and it is plausible that a defense attorney would consider waiving a jury trial based on the atrocity of this case. Finally, as the state noted, when a defendant pleads guilty in a capital case, the state still has to prove that the death penalty is warranted. Clearly the three-judge panel in Schumaker's prior case concluded that the death penalty was not warranted; thus, Schumaker could have felt that in that case he had had a bad result with a three-judge panel.

While we agree with the defense that the timing of Judge Lorig's approval of funding was suspicious, that alone is not sufficient for us to conclude that the state's evidence was not credible. There appears to be a factual issue regarding whether Judge Lorig based his original decision denying funding for a psychologist solely on the state's opposition. If this were the case, that would be error on Judge Lorig's part because the trial court is required to use its discretion to determine whether expert services are reasonably necessary for the proper representation of the defendant, considering the value of the expert assistance to the defense and the availability of alternative devices. R.C. 2929.024; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph four of the syllabus. However, as we have stated previously, we find that the trial court's decision that there was no trade was supported by competent, credible evidence. Because the trial court reasonably found that Kinley was not forced to trade his right to a jury trial for a psychologist and because Kinley did receive funding for a psychologist, any error by Judge Lorig in originally basing his decision to deny funding on the state's opposition-a decision Judge Lorig eventually reconsidered in Kinley's favor-was harmless. Accordingly, we conclude that the trial court did not err in overruling Kinley's petition for postconviction relief on his claim that he was forced to waive a jury trial in order to obtain funding for a

psychologist.

*Kinley*, 2002 WL 538894 at *2-4.

As noted above, trial by jury is fundamental to American criminal jurisprudence, see *Duncan*, 391 U.S. at 149, and the right to a trial by jury may be waived only where the defendant's waiver is voluntary, knowing, and intelligent. See *Patton* , 281 U.S. 276. Mr. Kinley's claim in this Ground for Relief is simply that he did not voluntarily waive his jury trial right.

First, this Court notes that the colloquy which the trial court conducted on February 19, 1991, belies Mr. Kinley's position. See *supra* (discussion of Mr. Kinley's Fifth and Twenty-Sixth Grounds for Relief).

Second, this Court has carefully reviewed the testimony which was introduced during the hearing before the post-conviction court. Tr. XIV at 177-378; 4-65 (Deposition of John R. Butz, Feb. 12, 2001). In doing so, this Court finds that the post-conviction state court of appeals accurately described the testimony which was presented to the post-conviction trial court.

The deferential AEDPA standard applies to the state court's determination of factual issues, particularly when based on credibility determinations of in-court testimony, the determination of factual issues is presumed correct, and Mr. Kinley bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Johnson v. Bell*, 525 F.3d 466, 480 (6th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 1668 (2009), citing *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir.), *cert. denied*, 546 U.S. 1039 (2005). Mr. Kinley has not produced any evidence which tends to rebut the state court's finding of fact or which shows that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court post-conviction proceedings.

Mr. Kinley's Fifteenth Ground for Relief should be rejected.

Mr. Kinley's Sixteenth and Seventeenth Grounds for Relief are related and the Court will therefore address them together.

**SIXTEENTH GROUND FOR RELIEF**

Petitioner' rights to due process and a fair trial were violated because a material witness for the State of Ohio, Donald Merriman, gave false and/or inaccurate testimony against petitioner as follows:

1. Donald Merriman testified that he had a conversation with Petitioner Kinley in the latter part of January, 1989 on Clifton Avenue in the back of the green house across from Springfield South High School, and that they were drinking. Tr. 623-623. This testimony was false. P.C. Ex. D, Para. 5.

2. Merriman further testified that during this conversation with petitioner in January of 1989, that petitioner asked him if he had ever killed anyone. Tr. 624. This testimony was false. P.C. Ex. D, Para. 5.

3. Merriman testified then that petitioner told him that he had killed his girlfriend and her son, Thelma and David Miller. Tr. 625. This testimony was false. P.C. Ex. D, Para. 5.

4. Donald Merriman has admitted by way of an affidavit that he never had *any* conversation with Petitioner Kinley in January of 1989. P.C. Ex. D., Para. 5. In his affidavit, Merriman admits that he had not even seen Petitioner Kinley in years. Merriman states in his affidavit that the first time Merriman saw Kinley was when the two of them were both in jail in March of 1989. P.C. Ex. D, Para. 5.

**SEVENTEENTH GROUND FOR RELIEF**

Petitioner's convictions and sentences are unreliable and in violation of his rights to due process and a fair trial because the State of Ohio elicited false testimony at the trial. (Donald Merriman).

Mr. Kinley argues in his Sixteenth and Seventeenth Grounds for Relief that his rights to due process and a fair trial were violated because Mr. Merriman gave false and/or inaccurate testimony at Mr. Kinley's trial. Mr. Kinley's position is that Mr. Merriman was a key witness against him and that Mr. Merriman gave false testimony in exchange for consideration through plea

bargains in his own cases.  Respondent argues that the state post-conviction court thoroughly considered this claim and determined that Mr. Kinley had failed to prove that Mr. Merriman's original trial testimony was false and that its conclusions are reasonable findings of fact and entitled to a presumption of correctness.  In response, Mr. Kinley essentially argues that during discovery in this Court, he presented clear and convincing evidence which rebuts the state court's factual findings as to Mr. Merriman's testimony.  Specifically, Mr. Kinley points to Mr. Merriman's May 24, 2004, deposition, (Doc. 44),  which counsel took in this case pursuant to the Court's granting Mr. Kinley's Motion for Discovery, (Doc. 29, 40), and which Mr. Kinley filed following the Court's granting his Motion to Expand the Record.  (Doc. 42, 43).

Mr. Merriman testified at Mr. Kinley's trial that in the latter part of January, 1989, he and Mr. Kinley had been drinking wine and beer, were sitting and talking, and that Mr. Kinley asked him (Mr. Merriman) if he had ever killed anyone  Tr. Vol. V at 623-25.  Mr. Merriman testified further that he responded, "No, why?" to Mr. Kinley.  *Id.*  at 625.  Mr. Merriman then testified that Mr. Kinley said that, "his girlfriend and son he fucked them up" and when Mr. Merriman asked Mr. Kinley what he meant, Mr. Kinley said, "Killed them."  *Id.*

During his state post-conviction proceedings, Mr. Kinley provided the court with an affidavit from Mr. Merriman in which Mr. Merriman recanted his trial testimony.  Mr. Merriman testified in his September 4, 1996, affidavit that: he testified on behalf of the state against Mr. Kinley; he testified Mr. Kinley had told him that he killed Thelma and David Miller; his testimony was given "solely to help my own case and to facilitate my receiving a reduced sentence"; and that he and Mr. Kinley did not have a conversation in January, 1989.  App. Vol. VI at 89-91.  The state post-conviction court held a hearing on Mr. Kinley's petition in February, 2001.  Mr. Kinley's

counsel could not locate Mr. Merriman and therefore he did not testify at the hearing. Tr. Vol. XIII at 98-120. However, the post-conviction court admitted Mr. Merriman's affidavit testimony into evidence. Tr. Vol. XIII at 136-140; Tr. Vol. XIV at 176. In addition to admitting Mr. Merriman's affidavit into evidence, the post-conviction trial court heard testimony from prosecutors Stephen Schumaker, David Smith, and Stephen Collins about their meeting with Mr. Merriman at the Warren Correctional Facility. Mr. Schumaker testified that during that meeting, Mr. Merriman told him that his trial testimony had been truthful and his affidavit testimony was not. Tr. Vol. XIV at 227-28; 229. Mr. Smith testified that he was present at the meeting with Mr. Merriman at the Warren Facility and that Mr. Merriman said that he had testified truthfully at Mr. Kinley's trial and that his affidavit testimony was false. *Id.* at 294-95; 296-97. Mr. Collins also testified that he was at the Warren Facility meeting with Mr. Merriman and that Mr. Merriman told those present that the testimony he gave at Mr. Kinley's trial was true and that his affidavit testimony was not true. *Id.* at 356; 363-65. Although Mr. Carter testified at the post-conviction hearing that he was present at the meeting with Mr. Merriman at the Warren Correctional facility, his testimony did not cover the issue of Mr. Merriman's trial testimony in comparison to his affidavit testimony. *Id.* at 339-52.

Subsequently, the post-conviction trial court rejected Mr. Kinley's claim with respect to Mr. Merriman's trial testimony, App. Vol. VII at 497-501, and Mr. Kinley raised the issue of Mr. Merriman's testimony on appeal. The appeals court rejected the claim stating:

> Kinley's second argument is that the trial court erred in not granting him relief on his claim that one of the witnesses, Donald Merriman, committed perjury at Kinley's trial. Merriman testified at Kinley's trial that Kinley had confessed to him that he had killed his girlfriend and her son. Merriman was the only person to whom Kinley allegedly confessed the crime. Kinley argues that Merriman perjured himself at Kinley's trial in exchange for leniency from the state in connection with sentencing on a conviction for grand theft. In support of this

contention, Kinley introduced two affidavits signed by Merriman, in which he stated that he had lied at Kinley's trial and had done so in order to obtain leniency from the state. The affidavits were procured by Assistant State Public Defender Kathryn Sandford, who visited Merriman in prison in connection with the postconviction proceedings. Kinley also notes that Merriman received only sixty days in jail on a charge that carried a maximum of eighteen months and that this was despite his not originally appearing for his sentencing on February 28, 1991. Furthermore, Kinley contends that nothing was done to compel Merriman to appear. It was during this time that Merriman testified at Kinley's trial, but he was not arrested at that time. He was finally brought in for sentencing on May 15, 1991, at which time he was given sixty days when the prosecutor on the case, Darnell Carter, reminded Judge Lorig that Merriman had testified in Kinley's case. Kinley's attorneys were unable to locate Merriman to have him testify at the postconviction relief hearing.

The state, in an affidavit by Smith, one of the prosecutors on Kinley's case, denied that Merriman was promised leniency in exchange for his testimony. Carter testified that he had not known Merriman was going to testify at Kinley's trial and that he had arranged for Merriman to turn himself in when he had seen him at the barber shop. Carter even testified that, due to Merriman's failure to appear for sentencing, he had been inclined to recommend more than the six months he had intended to recommend. However, upon being made aware of Merriman's testimony in Kinley's trial, Carter decided to recommend six months. Judge Lorig then decided to sentence Merriman to sixty days.

Also, in 1997, Schumaker, Smith, Carter, and Collins visited Merriman in prison. Schumaker, Smith, and Collins testified that they had questioned Merriman regarding the two affidavits and that he had told them that his trial testimony had been true and that he had signed the affidavits because Sandford had “played upon his conscience” and so Sandford would leave him alone. Smith and Schumaker also testified that they had told Merriman that he did not have to worry about perjury charges.

As with Kinley's first argument, we are dealing with a credibility determination by the trial court. Kinley's argument relies on 1) Merriman's affidavits and 2) the suspicious nature of Merriman's sentencing. However, the state presented evidence that Merriman had recanted his affidavits. Also, two prosecutors, Carter and Smith, denied that there was a deal. Kinley attempts to impeach the

> credibility of Merriman's statements to the prosecutors, arguing that Merriman would have been afraid of perjury charges when talking to the prosecutors. However, Schumaker and Smith testified that they told him he did not have to worry about perjury charges. Kinley attempts to impeach Carter's credibility by arguing that he allowed Merriman to remain at liberty despite his surfacing to testify in Kinley's trial and despite seeing Merriman at a barber shop. However, Carter testified that he had not known Merriman was going to testify. To impeach Carter's testimony, we have only Kinley's speculation that Carter must have known Merriman was going to testify given the small close-knit nature of the prosecutor's office. However, this is not sufficient for us to second guess the trial court's conclusion that Carter was credible.
>
> As with Kinley's first argument, the trial court could have decided in favor of either side based on the evidence. However, the trial court determined that the state's evidence was more credible. Without being able to observe Merriman on the stand, the trial court was left with weighing Merriman's testimony at trial and his statements to the prosecutors while he was in prison against his affidavits recanting his trial testimony, the admissibility of which is questionable. Even assuming that the affidavits were admissible, we cannot find that the trial court erred in deciding that the evidence presented by Kinley did not prove that Merriman had lied at trial or that the state had promised him leniency. Clearly, Merriman has lied at least once regarding Kinley. However, it is impossible for this court to determine which of Merriman's statements were lies and which were the truth. Furthermore, while there is evidence that Merriman was given a lighter sentence after the fact because of his testimony, there is no evidence of a promise of leniency to Merriman prior to his testimony. The trial court decided that Merriman's affidavits were not credible and concluded that his trial testimony was credible. Such credibility determinations are within the discretion of the trial court. We therefore find that the trial court's decision was not against the manifest weight of the evidence on Kinley's claim that Merriman gave perjured testimony at Kinley's trial.
>
> Kinley's assignment of error is overruled.

*Kinley,* 2002 WL 538894 at *5-6.

As noted above, following the Court’s granting his Motion to Expand the Record Mr. Kinley filed Mr. Merriman’s May 24, 2004, deposition which counsel took in this case. In that

deposition, Mr. Merriman essentially testified, *inter alia*, that he lied when he testified at Mr. Kinley's trial and that his affidavit testimony was true. (Doc. 44 at 8-9; 12; 14; PageID 191-92; 195; 197).

Mr. Kinley's claim in his Sixteenth and Seventeenth Grounds for Relief fall within the purview of 28 U.S.C. § 2254(d)(2). That is, he claims that the judgment of the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."

On April 4, 2011, the United States Supreme Court decided *Cullen v. Pinholster*, 563 U.S. ___, 131 S.Ct. 1388 (2011), a death penalty habeas case. The *Pinholster* Court addressed whether outside evidence obtained at an evidentiary hearing can be considered in determining if habeas relief is warranted under 28 U.S.C. § 2254(d)(1).

> In [*Pinholster*], the petitioner argued that his penalty phase attorney was ineffective because that attorney failed to introduce mitigating evidence of mental disorders. [*Pinholster*,] 131 S.Ct. at 1396. In denying the petition, the Supreme Court held that a federal court's review of a state court decision under 28 U.S.C. § 2254(d)(1) is strictly limited to "review of the state court record," and that evidence acquired through use of an evidentiary hearing may not be considered. *Id.* at 1399. The Supreme Court further stated that section 2254(e)(2) only "continues to have force where Section 2254(d)(1) does not bar federal habeas relief." *Id.* at 1401. The Supreme Court explained this holding, stating that Section 2254(d) only governs claims that were adjudicated on the merits in state court whereas Section 2254(e)(2)'s limit on habeas discovery "restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Id.* [*Pinholster*] indicates that the Court cannot now consider the contents of outside discovery in determining if the decision of the state court was an "unreasonable application of [ ] clearly established federal law," so long as the state court ruling was made on the merits. 28 U.S.C. § 2254(d)(1). FN1
>
> FN1. The plain language of 28 U.S.C. § 2254(d)(2) also

> limits the Court's review to of [sic] "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); [*Cullen*]. 131 S.Ct. at 1400 n. 7. Thus, under both Section[s] of 2254(d), the Court may not consider outside evidence unless the petitioner did not already litigate the issue on the merits.

*Trimble v. Bobby,* No. 5:10-CV-00149, 2011 WL 1527323 at *2 (N.D Ohio, Apr. 19, 2011). Stated differently, pursuant to *Pinholster,* under 28 U.S.C. §§ 2254(d)(1), when addressing a claim that was adjudicated on the merits by the state court, the habeas court's review is limited to the record that was before the state court. *Bray v. Andrews,* ___ F.3d ___, ___, 2011 WL 1544740 at *4 (6th Cir. Apr. 26, 2011). And pursuant to the *Trimble* court's analysis with which this Court agrees, *Cullen* applies with equal force to 28 U.S.C. § 2254(d)(2) claims. *Trimble,* 2011 WL 1527323 at *2 n.1.

With these principles in mind, this Court concludes that while the Court permitted Mr. Kinley to engage in discovery with respect to the issue of Mr. Merriman's trial testimony, it did so long before the United States Supreme Court decided *Cullen*. However, because the state court decided on the merits Mr. Kinley's claims contained in his Sixteenth and Seventeenth grounds for relief, it is clear that in light of *Cullen,* this Court may not now consider any evidence, including Mr. Merriman's May 24, 2006, deposition, which Mr. Kinley gathered during discovery in this Court. The question, then, is whether, based on the record it had before it, the state court's decision as to Mr. Merriman's trial testimony was based on an unreasonable determination of the facts in light of the evidence presented to the state court.

A review of the evidence before the state court reveals the following: (1) Mr. Merriman testified at Mr. Kinley's February, 1991, trial that he had a conversation with Mr. Kinley in February, 1989, during which Mr. Kinley essentially told him that he had killed Thelma Miller and her son David Miller and that he was not receiving any consideration from the state in exchange

for his trial testimony; (2) in a September 4, 1996, affidavit, Mr. Merriman testified that he gave his February, 1991, trial testimony solely to help his own case and to facilitate his receiving a reduced sentence, and that he and Mr. Kinley did not have a conversation in January, 1989, during which Mr. Kinley told him he had killed Thelma and David Miller; (3) Mr. Merriman did not testify at the February, 2001, post-conviction hearing and the trial court admitted his 1996 affidavit into evidence; (4) the post-conviction trial court heard in-court testimony from prosecutors Mr. Schumaker, Mr. Smith, and Mr. Collins about a meeting they had with Mr. Merriman during which Mr. Merriman said that his trial testimony had been truthful and his affidavit testimony was not.

The state court was confronted with a question of credibility. In essence, the court was required to determine which version of Mr. Merriman's testimony to believe. It is clear that Mr. Merriman lied at least once about his testimony at Mr. Kinley's trial; that is, either it was true or not true and that he either did or did not receive consideration from the state for providing that testimony. While the post-conviction court had Mr. Merriman's un-cross-examined affidavit testimony before it, the court also had Mr. Merriman's cross-examined trial testimony as well as the in-court cross-examined testimony of the three prosecutors who met with Mr. Merriman in the Warren Correctional Facility. When assessing witness credibility, a habeas court's review becomes more deferential, as appellate courts are in no position to second guess credibility findings made by the trier-of-fact. See *Seymour v. Walker*, 224 F.3d 542, 551-52 (6th Cir.2000), *cert. denied,* 532 U.S. 989 (2001). In view of the conflicting evidence before the post-conviction court as well as a habeas court's deferential review, this Court cannot say that the state court's decision was based on an unreasonable determination of the facts in light ot the evidence presented in the state court proceeding.

Mr. Kinley's Sixteenth and Seventeenth Grounds for Relief are without merit and should be dismissed.

**EIGHTEENTH GROUND FOR RELIEF**

Petitioner Kinley was denied his right to a fair trial and due process because a conflict existed in his representation.

> Petitioner Kinley was indicted on Aggravated Murder charges on March 16, 1989. Petitioner Kinley was represented by the Clark County Public Defender's Office. At the same time, Donald Merriman was being represented by the Clark County Public Defender's Office on case number 87-CR-100. On March 10, 1989, the court allowed the Clark County Public Defender's Office to withdraw from representing Merriman because Merriman was a potential material witness against Petitioner Kinley. P.C. Ex. F. However, according to Merriman, the Clark County Public Defender's Office remained in contact with Merriman throughout his case and in fact worked out the deal whereby Merriman would testify against Petitioner Kinley in exchange for receiving a reduced sentence. P.C. Ex. E, Paras. 4, 9.

In essence, Mr. Kinley alleges in his Eighteenth Ground for Relief that his constitutional rights were violated because a conflict of interest existed in his representation since at various times the Clark County Public Defender represented both himself and Mr. Merriman.

As noted *supra* Mr. Kinley raised a conflict of interest claim when he appealed the post-conviction trial court's first denial of his post-conviction petition. App. Vol. VIII at 44-112. Although the court of appeals ultimately remanded the matter for a hearing on two of Mr. Kinley's post-conviction claims, the court affirmed the trial court's disposition of the conflict of interest claim. In rejecting the claim, the court of appeals wrote:

> Kinley also contended that he did not knowingly, voluntarily, and intelligently waive the conflict of interest that was created by the Clark County Public Defenders' representation of him and of Merriman. Merriman had several forgery charges pending in early 1989, at which time he was represented by the Public Defender's

> Office. The Public Defender's Office withdrew from its representation of Merriman shortly before the indictment against Kinley was filed, apparently in anticipation of that indictment. This dual representation, if it can even be characterized as that, certainly did not prejudice Kinley.
>
> In October 1990, the Clark County Public Defender's Office withdrew from representing Kinley, and the Public Defender's Office apparently agreed to represent Merriman on a new charge in November 1990. Someone from the Public Defender's Office later cross examined a DNA expert on behalf of Kinley at trial. On this occasion, the record demonstrates that the court informed Kinley of the potential conflict with the Public Defender's representation of Merriman and obtained Kinley's consent to the Public Defender's limited participation at trial. Because Kinley's affidavit claiming that he was unaware of the public defender's representation of Merriman is refuted by the record, the trial court was not required to conduct a hearing on this claim.

*Kinley*, 136 Ohio App.3d at 19-20.

Although Mr. Kinley raises this claim as a "fair trial and due process" claim, it is best defined as a Sixth Amendment ineffective assistance of counsel claim. See *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir. 2006), *cert. denied*, 549 U.S. 1264 (2007)("[petitioner] has a Sixth Amendment right to conflict-free representation by his counsel").

Defense attorneys owe their clients a duty of loyalty including the duty to avoid conflicts of interest. *Strickland*, 466 U.S. at 688, *citing*, *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980). Courts apply a slightly altered *Strickland* test to conflict of interest ineffectiveness claims. Where a criminal defendant can prove that his attorney actively represented actual conflicting interests, ineffectiveness will be found and there is no need to show prejudice resulting from the conflict. *Cuyler*, 446 U.S. at 349-50. However, the court will presume prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 687,

*quoting*, *Cuyler*, 446 U.S. at 348. The burden of proof of actual conflict is on the petitioner, see *Id.* at 334-35, and the conflict must be actual and significant. *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.), *cert. denied*, 484 U.S. 870 (1987). The presumed prejudice standard of *Cuyler* is clearly established only when the conflict is due to multiple concurrent representations. *Mickens v. Taylor*, 535 U.S. 162, 175 (2002).

Although the right to counsel encompasses a "correlative right to representation that is free from conflicts of interest," *Wood v. Georgia*, 450 U.S. 261, 271 (1981), a defendant may knowingly, intelligently and voluntarily waive his right to conflict-free counsel. *United States v. Straughter*, 950 F.2d 1223, 1234 (6th Cir. 1991), *cert. denied*, 503 U.S. 948 (1992). A waiver's validity depends upon the particular facts and circumstances of a case, including the background, experience, and conduct of the accused. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)(citations omitted).

On March 10, 1989, Assistant Clark County Public Defender Ronald E. Morris filed a Motion to Withdraw in the case of *State v. Merriman*, No. 87-CR-100 (Clark Cnty. Ct. C.P). App. Vol. VI at 96. In that motion, Mr. Morris sought permission from the court to withdraw as counsel for Mr. Merriman on the basis that Mr. Merriman was a potential material witness for the state concerning Mr. Kinley's case and that the Clark County Public Defender's Office was representing Mr. Kinley. *Id.* On that same date, Judge Richard Cole granted Mr. Morris' motion and appointed Andrew Elder to represent Mr. Merriman. *Id.* at 98, 97.

As noted above, on or about March 13, 1989, the Clark County Grand Jury indicted Mr. Kinley on the charges related to this case and on March 16, 1989, Mr. Kinley entered a plea of not guilty to the Indictment. App. Vol. I at 16-17; Tr. Vol. I, Tab 1 at 1. At that time, the court

appointed Mr. Kaech of the Clark County Public Defender's Office to represent Mr. Kinley. App. Vol. I at 21. On May 23, 1989, the court appointed Mr. Kaech lead counsel and attorney John Butz as co-counsel for Mr. Kinley. *Id.* at 29. On October 12, 1990, the trial court appointed James Doughty as lead co-counsel with Mr. Kaech as counsel for Mr. Kinley. App. Vol. I at 4, 113. Messrs. Butz, Doughty, and Kaech represented Mr. Kinley until October 25, 1990, when Mr. Kaech filed a Motion to Withdraw due to health reasons which the court granted on that same date. *Id.* at 5, 125, 126.

On November 6, 1990, the Clark County Grand Jury indicted Mr. Merriman in case number 90-CR-362 on a theft offense unrelated to Mr. Kinley's matter and on November 21, 1990, Mr. Merriman entered a plea of not guilty to that Indictment. App. Vol. VI at 99, 100. At that time, Mr. Merriman was represented by the Clark County Public Defender's Office. *Id.* On November 26, 1990, Mr. Butz wrote a letter to Mr. Kaech asking for the names and contact information for the DNA experts that Mr. Kaech had engaged for Mr. Kinley's case. *Id.* at 101.

During Mr. Kinley's trial on March 4, 1991, Mr. Butz moved the court to allow Mr. Kaech to appear on behalf of Mr. Kinley for the limited purpose of examining the DNA witnesses. The following exchanges took place in open court:

> JUDGE LORIG: Mr. Butz, you've indicated that for the expert witness to be called by the Defendant that you request Mr. Kaech to assist on the presentation.
>
> MR. BUTZ: That is correct, Your Honor. We'd request that attorney Noel Kaech, who was in this case and then left for heath reasons, be permitted to appear as counsel for the Defendant for the limited purpose of examining witnesses called by the State as to the so-called DNA tests and conduct the examination of the two witnesses we intend to call concerning DNA. We've discussed this with the Defendant and his is quite agreeable to the request that I'm making.

> JUDGE LORIG: Is this only in regard to the Defense witness, not in regard to the State's witness?
>
> MR. BUTZ: We would propose he cross-examine the Defense or the State's witnesses as well as present the Defendant's DNA witness.
>
> JUDGE LORIG: Mr. Kinley, the request is made Mr. Kaech return as your counsel for the presentation of evidence in regard to the DNA testing. As you recall, Mr. Kaech was permitted to withdraw as counsel and at that time the Court consulted with the, you've indicated that at that time that Mr. Kaech would no longer represent you and that was agreeable to you.
>
> Do you understand the request is now made Mr. Kaech reappear as your attorney in this case?
>
> DEFENDANT KINLEY: Yes, I do.
>
> JUDGE LORIG: Do you agree to that?
>
> DEFENDANT KINLEY: Yes, I do.
>
> JUDGE LORIG: Does the state want to comment on that?
>
> MR. SMITH: We wish to oppose that request. Mr. Kaech was removed as this counsel in this case back, whenever that was, after a lengthy delay of the trial proceedings and we think it would be inappropriate to put him back here at this time for this limited purpose. So, we wish to state our objection.
>
> JUDGE LORIG: Any further comment from Defense counsel?
>
> MR. BUTZ: No.
>
> JUDGE LORIG: Okay. The Court will allow Mr. Kaech to examine the witness presented by the Defense in regard to the DNA blood testing testimony and to cross-examine the State's expert. That will be the only purpose for which he will appear.

Tr. Vol. III at 223-25.

Later during Mr. Kinley's trial, specifically on March 8, 1991, the following dialogues took place:

> JUDGE LORIG: Mr. Kinley, your attorney Mr. Noel Kaech, reentered this case, I think that was with your consent that he entered the case to examine and cross-examine the expert witnesses with respect to the DNA testimony in this case. You understand that?
>
> DEFENDANT KINLEY: Yes, I do.
>
> JUDGE LORIG: Now, Mr. Kaech has indicated that his office, the Public [D]efender for Clark County, Ohio, his office has represented Donald Merriman who was a witness in this case. Do you understand that?
>
> DEFENDANT KINLEY: Yes, I do.
>
> JUDGE LORIG: Okay. Do you have any objection to Mr. Kaech continuing to proceed as your counsel?
>
> MR. KAECH: On the DNA.
>
> JUDGE LORIG: On this DNA question?
>
> DEFENDANT KINLEY: No.
>
> JUDGE LORIG: And you're waiving any possible conflict of interest with his office or he might have with respect to representing Donald Merriman?
>
> DEFENDANT KINLEY: Yes.
>
> JUDGE LORIG: Okay. Anything further from the State or–
>
> MR. SCHUMAKER: Nothing from the State.

Tr. Vol. VI at 819-20.

First, this Court cannot say that there was an actual conflict of interest in Mr. Kinley's representation by the Clark County Public Defender. As noted above, Mr. Morris of the Public Defender's office withdrew from representing Mr. Merriman on March 10, 1989, some three days before the grand jury indicted Mr. Kinley and six days before Mr. Kinley entered his plea to the Indictment at which time the court appointed Mr. Kaech of the Public Defender's office to

represent Mr. Kinley. Mr. Kaech then withdrew from representing Mr. Kinley and subsequently, the Public Defender represented Mr. Merriman in an unrelated theft matter. The record clearly establishes that at no time did the Clark County Public Defender represent Mr. Kinley and Mr. Merriman simultaneously. In other words, there was no concurrent representation. *Mickens, supra.*

Moreover, a review of the trial transcript reveals that Mr. Kaech's later trial representation of Mr. Kinley was, indeed, for the very limited purposes of examining the DNA expert witnesses in the case. Indeed, Mr. Kaech painstakingly cross-examined Tony McNeil, a state's DNA expert, a cross-examination that is no fewer than one hundred forty transcript pages in length. Tr. Vol. VI at 735-875. Mr. Kaech also cross-examined state's DNA witness Lisa Forman, an examination that is no fewer than one hundred sixty transcript pages. Tr. Vol. VII at 946-1107. A review of Mr. Kaech's examinations fails to reveal that Mr. Kaech's representation of Mr. Kinley on the DNA issue was adversely affected by any alleged conflict of interest. The record, of course, refutes Mr. Kinley's claim that he was unaware that the Clark County Public Defender had represented Mr. Merriman.

At this juncture, the Court notes that it is questionable, at best, as to whether Mr. Kinley raised before the state court the claim he raised here that while he admittedly waived the conflict of interest, his waiver was not knowing, intelligent and, voluntary. Indeed, Mr. Kinley's claim in the state court was related to his allegedly being unaware of the Public Defender's representation of Mr. Merriman, a claim that is very clearly not supported by the record. It is arguable, then, that the specific claim as to the validity of his waiver that Mr. Kinley has raised in his Eighteenth Ground for Relief in this Court is procedurally defaulted. However, the Respondent has not raised that defense and therefore this Court will review that claim on the merits.

Even assuming that there was a conflict of interest in Mr. Kinley's representation, the trial court made Mr. Kinley aware of that possibility and Mr. Kinley waived any possible conflict. The question, then, is whether Mr. Kinley's waiver was knowing, intelligent and, voluntary. This Court concludes that it was.

As noted above, Mr. Kinley advised the trial court on two occasions that he agreed to have Mr. Kaech represent him for the limited purpose of examining the DNA witnesses in the case. In addition, Mr. Kinley waived any possible conflict of interest that the Clark County Public Defender's Office might have had in view of its prior representations of Mr. Merriman in unrelated matters. There is nothing in the record, nor has Mr. Kinley pointed to anything, which would raise a question as to Mr. Kinley's ability to knowingly, intelligently, and voluntarily waive any conflict of interest. There is absolutely nothing in the record which suggests, let alone establishes, that Mr. Kinley is unable to communicate with others. In fact, Mr. Kinley articulately answered the questions the trial court asked him about Mr. Kaech's representation. Moreover, there is nothing which points to Mr. Kinley functioning at an intellectual level that would prevent him from understanding what the trial judge explained to him or which would prevent him from intelligently waiving a right. Mr. Kinley has never even made a claim or argument, either in state court or in this Court, that he is incompetent, mentally ill, or incapable of understanding written or spoken language. A review of the trial transcript reveals that Mr. Kinley was present throughout his entire trial and was able to cooperate with his counsel and participate in his defense. Psychologist Dr. James Eisenberg testified at the mitigation hearing that test results showed that Mr. Kinley is functioning in the low average range of intelligence. Tr. Vol. XII at 119. Further, the record reveals that prior to his conviction, Mr. Kinley had held a job, was able to drive, handled money, and socialized with

others. Finally, as noted in the Court's discussion of Mr. Kinley's Fifth and Twenty-Sixth Grounds for Relief which are related to his jury trial right waiver, *supra*, Mr. Kinley had advised the trial court that he was 23 years old, had earned a GED and attended Sinclair College where he earned a certificate in tool and die, and he was able to read and write.

This Court concludes that the state court's findings and conclusions are not contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Mr. Kinley's Eighteenth Ground for Relief should be rejected.

Mr. Kinley's Nineteenth and Twentieth Grounds for Relief are related and accordingly, the Court will address them together.

**NINETEENTH GROUND FOR RELIEF**

> Petitioner Kinley's trial attorneys rendered ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution because evidence that should have been adduced at trial and is material to petitioner's case was not presented. (blood spatter evidence).

**TWENTIETH GROUND FOR RELIEF**

> Petitioner Kinley's constitutional rights to due process, a fair trial, and the effective assistance of counsel were violated by his trial counsel's failure to seek the services of a blood spatter expert.

In his Nineteenth and Twentieth Grounds for Relief, Mr. Kinley essentially argues that his counsel were ineffective for failing to present the testimony of a "bloodspatter expert". Mr. Kinley raised this claim in his post-conviction petition and the court of appeals rejected it as follows:

> Kinley claimed that his attorneys were ineffective in not requesting funds for a blood splatter expert.... In the postconviction proceedings, Kinley hired a blood splatter expert who opined, with virtual certainty, that the killer of Thelma and David Miller "would have had substantial blood splatter deposited on his clothing." The expert based this conclusion upon his examination of the trial record and

> upon "experimental tests" purportedly simulating the machete attack on the Millers with a blood-soaked mannequin. Pictures from the experimental tests that were attached to the expert's affidavit showed the mock-attacker speckled with, but not drenched in, blood. Presumably, expert testimony of this nature would have helped to establish reasonable doubt when considered along with Victor Bishop's claim at trial that he had seen Kinley twice on the day of the murder (likely before and after the time of the murders), that Kinley had seemed to be wearing the same clothing on both occasions, and that Bishop had not seen any blood on Kinley.
>
> In our judgment, when viewed in light of the other evidence offered in Kinley's case, expert testimony on blood splatter would have been marginally helpful at best. Overwhelming evidence of the gruesome nature of the crime was presented at trial. This evidence included pictures and descriptions of the victims' wounds and the condition of the garage in which they were killed. The trial court could have had little doubt that the murderer was bloodied by the attack. Thus, counsels' performance did not fall below an objective standard of reasonableness for failing to seek funding for a blood splatter expert. Moreover, notwithstanding Bishop's testimony, there was strong physical evidence that Kinley had been at the scene of the crime. The police found blood stains on the steering wheel, brake handle, and driver's arm rest of the car that Kinley had been driving the day of the murders, and the driver's floor mat of the car was missing. Although the quantity of blood in the car was insufficient for blood typing, the blood on the steering wheel was determined to be human blood. Blood found on a jacket Kinley was wearing a few days after the murders matched the blood of David Miller in DNA testing. In light of this evidence, it is highly unlikely that an expert's assertion that the murderer would have been covered in blood would have helped Kinley's case. Because Kinley did not present substantive evidence that his attorneys had been ineffective in failing to request funding for a blood splatter expert, the trial court did not err in dismissing this claim without a hearing.

*Kinley*, 136 Ohio App.3d at 8-9.

In addressing Mr. Kinley's Thirteenth Ground for Relief, this Court cited to and analyzed the law applicable to ineffective assistance of counsel claims. Those citations and analysis are incorporated herein by reference.

Mr. Kinley's argues that a bloodspatter expert would have testified that, considering the circumstances of the killings, the perpetrator would have had a substantial amount of blood on his or her clothing. Mr. Kinley's position is that the expert's proffered testimony would have raised reasonable doubt that he was the person responsible for the killings when such testimony was considered in conjunction with Mr. Bishop's testimony that he had seen Mr. Kinley twice on the day of the killings, that he (Mr. Kinley) was wearing the same clothes on both occasions, and that he (Mr. Bishop) did not see any blood on Mr. Kinley's clothes.

Mr. Kinley's counsel cross-examined Dr. Smith, the medical doctor and deputy coroner who performed the autopsies in this case. Tr. Vol. IV at 264-69. During that examination, Dr. Smith testified that some wounds to the body, such as the ones inflicted on Ms. Miller, would cause blood to spurt out, that he would expect there to be "blood everywhere" including within the area of the assailant striking the blows. *Id.*

As noted above, Detective Sullivan testified that he had obtained state's exhibit 32, Mr. Kinley's jacket, from Mr. Kinley when Mr. Kinley was at the sheriff's office. Detective Sullivan also testified that when Mr. Kinley had put the jacket on a chair, he (Detective Sullivan) noticed some specks on the jacket that Detective Sullivan thought could have been blood. Mr. Bishop testified that he saw Mr. Kinley twice on January 10, 1989, the day of the killings, once at about nine o'clock in the morning and again at about a quarter to twelve. Tr. Vol IV at 696-97; 698. Mr. Bishop also testified that at Mr. Kinley was wearing the same pants both times but that he did not notice his shirt. *Id.* at 702. Mr. Bishop testified further that Mr. Kinley looked the same at quarter to twelve as he did at nine o'clock, he did not have blood all over him, and it looked like he was wearing the same clothes. *Id.* at 704-05.

The above-cited testimony indicates that one would expect an individual who inflicted on Thelma and David Miller the wounds which they sustained would have a significant amount of blood on him or herself. Detective Sullivan described the amount of what he suspected was blood on Mr. Kinley's jacket as "specks". Mr. Bishop saw Mr. Kinley twice on the day of the killings, noticed that Mr. Kinley was wearing the same clothes both times, and did not notice any blood on the clothes Mr. Kinley was wearing. The three judge panel had all of this evidence before it. The testimony of a bloodspatter expert as to those same facts would not have added anything to Mr. Kinley's defense. That is true particularly in light of the fact that the evidence as to the lack of blood on Mr. Kinley's clothes was provided by the state's own witnesses. In other words, Mr. Kinley was not prejudiced by the failure of his counsel to engage the services and provide testimony from a bloodspatter expert because such testimony would have been essentially cumulative to the expert testimony already in the record that the area where the assailant would have stood would have been substantially blood-spattered.

Mr. Kinley's Nineteenth and Twentieth Grounds for Relief are without merit and should be dismissed.

Mr. Kinley's Twenty-First and Twenty-Second Grounds for Relief are related and therefore the Court will address them together.

**TWENTY-FIRST GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to due process and a fair trial were violated because the alleged murder weapon, Trial Ex. Number thirty-nine (39)(hereinafter referred to as the "machete"), has been lost by the state courts. thus depriving petitioner of the opportunity to have testing performed on the item.

**TWENTY-SECOND GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to the effective assistance of counsel, due process, and a fair trial were violated by his trial

counsel's failure to have an expert test the alleged murder weapon.

Mr. Kinley argues in support of his Twenty-First Ground for Relief that his constitutional rights have been violated because the State has lost[6] the machete thereby, depriving him of having it tested by a "metal expert".  In support of his Twenty-Second Ground for Relief, Mr. Kinley argues that his counsel were ineffective for failing to have the machete tested by a "metal expert" during trial.

Mr. Kinley raised the machete claim in his state post-conviction proceedings.  The court of appeals rejected the claim stating:

> Kinley also claimed that his attorneys should have hired a metallurgist to conduct tests upon the machete that was introduced at trial. Kinley was unable to have the machete tested in the postconviction proceedings because it had been misplaced subsequent to trial. His argument is based on speculation that, if the weapon had been tested by a metallurgist, the tests would have helped in his defense.
>
> In support of his claim, Kinley presented the affidavit of an expert in materials science and engineering stating that he had been asked to conduct tests on and provide an opinion about the machete introduced at Kinley's trial, but that he had been unable to do so without access to the weapon itself. The affidavit did not discuss what kind of tests the expert would have conducted or for what purpose. Furthermore, the affidavit did not discuss the likelihood that the expert could have determined anything about the weapon that would have been pertinent to the crime. Without some indication of the likelihood that the proposed tests would have provided evidence bearing on Kinley's guilt or innocence, we cannot conclude that trial counsel acted ineffectively in failing to obtain these tests.
>
> It is unfortunate that the alleged murder weapon has been misplaced and was unavailable for testing during these postconviction proceedings. Nonetheless, we recognize that Kinley's claims that tests might have proven that the machete was not the weapon used in the

---

[6] There is no evidence suggesting spoliation.

> crime are highly speculative. Even if Kinley had found an expert to testify that the machete found near Kinley's home was not the murder weapon, the trial court would have been entitled to weigh the credibility of this testimony against the circumstantial evidence connecting the weapon with Kinley and the other evidence of his guilt, which was substantial. For example, Richard Szulewski testified that the machete, which had been found in the springs of a couch in the alley behind Kinley's house, had the same distinctive handle markings as the machete that had hung in his garage prior to the day of the murders. Szulewski had had no doubt that it was, in fact, the same machete. Thus, even if we were to assume that helpful evidence might have been uncovered by a metallurgist and that counsel should have sought out such evidence, we would not be inclined to conclude that, but for the omission, there was a reasonable probability that the outcome of Kinley's trial would have been different. Thus, Kinley's due process rights were not violated, and the trial court did not err in dismissing this claim without a hearing.

*Kinley,* 136 Ohio App.3d at 9-10.

As he did in state court, Mr. Kinley bases his arguments in support of his Twenty-First and Twenty-Second Grounds for Relief on speculations. Mr. Kinley's position seems to be that there is a question as to whether the machete that was introduced at trial was actually used in the murders in this case. However, Mr. Kinley does not explain what tests a metal expert would perform to support his contention. Rather, he simply argues that, "[t]he metallurgist's testing could support a meritorious claim concerning the machete that was admitted at trial". (Doc. 2 at 97 ¶ 8). In addition, although Mr. Kinley alleges that "... a potentially meritorious issue exists concerning the machete...", *Id.* at 98 ¶ 11, he fails to explain or describe the how any testing of the machete would support the alleged meritorious claim.

Even assuming that a metallurgist had performed some unidentified tests on the machete on behalf of Mr. Kinley and testified that the machete admitted into evidence at the trial was not the murder weapon, the three-judge panel who tried Mr. Kinley would have been in a

position to weigh that testimony against other testimony that was admitted at trial which, as the state court noted, connected the machete to Mr. Kinley.

As this Court noted in addressing Mr. Kinley's Seventh Ground for Relief, Richard Szulewski testified that state's exhibit 39 was his machete that had been hanging in his garage, that he was able to identify it because it had certain distinctive markings, specifically a decorative black and silver decal, and that he first noticed that his machete was missing from his garage after Ms. Miller's and David Miller's bodies were discovered. Tr. Vol. V at 602-03. William Scott testified that while he was playing with friends and looking for a dime his friend had dropped, he found the machete, state's exhibit 39, jammed into the springs of a couch that had been abandoned in an alley near where he lived. *Id.* at 543-45. Leon Howard testified that he saw William and other children playing with the machete, that he (Leon) took it to his mother, and that his mother called the police. *Id.* at 554. Leon also testified that he had William show him and the police where he had found the machete and that William brought them to an alley catty-corner from the back of Mr. Kinley's house. *Id.* at 555-56. This testimony reasonably connects Mr. Kinley to the machete.

Mr. Kinley has failed to show how the outcome of his trial would have been different had a metal expert tested the machete. Because Mr. Kinley's claim with respect to a metal expert testing the machete is without merit, it follows that his claim that counsel were ineffective for failing to have an expert test the machete is also meritless. Mr. Kinley's Twenty-First and Twenty-Second Grounds for Relief are meritless and should be dismissed.

Mr. Kinley's Twenty-Third and Twenty-Fifth Grounds for Relief are related and the Court will address those Grounds together.

**<u>TWENTY-THIRD GROUND FOR RELIEF</u>**

Petitioner Kinley's trial counsel were ineffective by the failure to

investigate, prepare for, and present testimony favorable to petitioner in violation of his constitutional rights to due process, a fair trial, and the effective assistance of counsel. (Dawn Mitchell)

**TWENTY-FIFTH GROUND FOR RELIEF**

Petitioner Kinley's constitutional rights to a fair trial, due process, and the effective assistance of counsel were violated because his trial attorneys were ineffective in their representation of him. (Richard Howard)

In these Grounds for Relief, Mr. Kinley alleges that his counsel were ineffective for failing to present testimony from Dawn Mitchell and Richard Howard. However, Mr. Kinley has not explained how Ms. Mitchell's or Mr. Howard's testimony would have benefitted him.

Mr. Kinley raised these claims in post-conviction and the appellate court rejected them as follows:

> Next we turn to Kinley's contention that his attorneys were ineffective in failing to call Dawn Mitchell and Richard Howard as witnesses during the guilt phase of his trial because they would have testified that they had seen Thelma Miller with another man on the morning of her murder. Kinley presented affidavits from Mitchell and Howard in support of this claim. According to Kinley, this omission demonstrates a lack of due diligence on the part of his attorneys, rather than a strategic choice, because his "sole defense was that someone [else] committed the crime." Kinley's argument ignores one important aspect of these witnesses' statements: each claimed to have seem Thelma Miller *at Kinley's house* with another man on the morning of the murders. The state presented substantial evidence that Kinley had a violent temper, that he had been very jealous and possessive regarding Miller, and that he had threatened to kill her and her sons in the days preceding the murders after he found her with another man. Under these circumstances, Kinley's attorneys certainly could have made a strategic choice that the potential benefit of Mitchell's and Howard's testimony was outweighed by the risk that it would have established a motive for Kinley to commit the murders. The trial court was not required to conduct a hearing on this claim.

*Kinley*, 136 Ohio App.3d at 10.

Presumably, Mr. Kinley's position in this Court is the same as it was in state court.

That is, that Ms. Mitchell's and Mr. Howard's testimony would have established that Ms. Miller and her son David were with another man the morning they were killed thereby raising the inference that the other man could have been the killer.

In addressing Mr. Kinley's Thirteenth Ground for Relief, this Court cited to and analyzed the law applicable to ineffective assistance of counsel claims. Those citations and analysis are incorporated herein by reference.

In arguing that counsel was constitutionally ineffective, counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994). Indeed, strategic choices by defense counsel are "virtually unchallengeable." *Buell,* 274 F.3d at 359, quoting *Meeks v. Bergen*, 749 F. 2d 322, 328 (6th Cir. 1984).

> A trial lawyer accused of constitutional ineffectiveness for failing to act where action is ordinarily indicated will almost always have a reason for declining to act. The reason will usually be called the lawyer's "strategy". But the noun "strategy" is not an accused lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness. The strategy, which means a "plan, method, or series of maneuvers or stratagems for obtaining a specific goal or result," Random House Dictionary 1298 (Rev. ed. 1975), must be reasonable. It need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney handling a death penalty case would assess as reasonable to achieve a "specific goal."

*Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001), *rev'd on other grounds,* 535 U.S. 685 (2002).

In support of his post-conviction petition, Mr. Kinley submitted Dawn Mitchell's April 12, 1988, affidavit. App. Vol. VI at 170-72. In that affidavit Ms. Mitchell testified: (1) in January, 1989, she lived next door to Mr. Kinley; (2) in the early morning of January 10, 1989, she saw Ms. Miller drive her car over to Mr. Kinley's home; (3) at that time, Ms. Miller had an adult white male passenger in the front seat of her car and her son David was in the back seat of the car;

(4) she (Ms. Mitchell) saw Mr. Kinley and Ms. Miller talking outside the car; (5) she never saw Mr. Kinley and Ms. Miller fighting; (6) she thought that Mr. Kinley was a docile and happy person; (7) she asked Mr. Kinley to watch her children several times; and (8) she did not think that Mr. Kinley killed Ms. Miller and her son David.  *Id.*

Mr. Kinley also submitted Richard Howard's April 12, 1998, affidavit in support of his post-conviction petition.  *Id.* at 173.  In that affidavit, Mr. Howard testified: (1) he knew Mr. Kinley because they grew up in the same neighborhood; (2) on January 10, 1989, he saw Ms. Miller at Mr. Kinley's house in the early morning; (3) Ms. Miller got out of her car to speak with Mr. Kinley while a man and David Miller stayed in the car; and (4) Mr. Kinley came to his (Mr. Howard's) house sometime about 9:00 or 10:00 in the morning on January 10, 1989, at which time Mr. Kinley had approximately eight hundred dollars in his pocket which he pulled out to "flash". *Id.*

While it is true that both Ms. Mitchell and Mr. Howard provided affidavit testimony that they saw Ms. Miller and David Miller in Ms. Miller's car with an unidentified man, they both also testified that they saw Ms. Miller, David, and the unidentified man at Mr. Kinley's house.  In addition, both Ms. Mitchell and Mr. Howard testified that they saw Ms. Miller and Mr. Kinley talking outside of Ms. Miller's car.

In addressing Mr. Kinley's Eighth Ground for Relief, this Court noted the following properly admitted testimony.  Ms. McKeachie testified that she had seen Mr. Kinley hit Ms. Miller with his fist.  Ms. Lynn testified that she had seen Mr. Kinley hit Ms. Miller in the face and also had heard him threaten to kill Ms. Miller.  Ms. Spencer testified that when she was at Ms. Miller's apartment with Ms. Miller and Ms. Miller's boyfriend Mr. Hildebrand, Mr. Kinley pushed his way

into the apartment and called Ms. Miller "white trash, a bitch and a slut" and told her he "was going to get her and her boys." Mr. Hildebrand's testimony corroborated Ms. Spencer's testimony. Mr. Spencer testified that a day after he noticed that Ms. Miller had injuries on her face and arm, Mr. Kinley told him that he had seen Ms. Miller at the movies with another man and that he (Mr. Kinley) "went off" and beat her. Mr. Fisher testified that the day before the killings, Mr. Kinley told him that Ms. Miller had done something that "made him mad and he felt like killing her." Mr. Roberts testified that the day before the killings, he heard Mr. Kinley remark about Ms. Miller, "Well, if I can't have her, no one will, or can....". Mr. Swanson testified that he heard Mr. Kinley say to Ms. Miller something to the effect of, "If you give anybody rides home from work and I see you, I'll run you off the road" and "If I catch you with somebody I'll kill you."

This testimony makes it clear that there was significant evidence about Mr. Kinley's temper, his physical abuse of Ms. Miller, and his threats to Ms. Miller particularly related to his being jealous of Ms. Miller's involvement with other men. While Ms. Mitchell's and Mr. Howard's testimony would put Ms. Miller and her son David in the company of an unidentified man on the morning of the killings, their testimony would also put Ms. Miller at Mr. Kinley's house and engaged in a conversation with Mr. Kinley *while another man was in her car*. In light of the evidence of Mr. Kinley's temper, his physical abuse of Ms Miller, and his threats to Ms. Miller, it would be a reasonable strategic decision for counsel to not call either Ms. Mitchell or Mr. Howard as witnesses. Their testimony about Ms. Miller being with another man would arguably provide a motive for Mr. Kinley to kill Ms. Miller and David

The state court's findings and decision as to Mr. Kinley's Twenty-Third and Twenty-Fifth Grounds for Relief are not contrary to or an unreasonable application of clearly established

federal law. Accordingly, Mr. Kinley's Twenty-Third and Twenty-Fifth Grounds for Relief should be rejected.

**TWENTY-NINTH GROUND FOR RELIEF**

> Petitioner Kinley's constitutional rights to due process, equal protection, and a fair trial were violated because the death penalty is applied in a racially discriminatory manner in Clark County, Ohio. Consideration of race in the administration of capital punishment is a violation of the Constitution.

In his Twenty-Ninth Ground for Relief, Mr. Kinley alleges that the death penalty is applied in a racially discriminatory manner in Clark County, Ohio, and as a result, his sentence is unconstitutional. In support of his argument, Mr. Kinley cites various statistics indicating the disproportionate imposition of the death penalty on African Americans in the State of Ohio. For example, Mr. Kinley points out that the 1990 Census found that African Americans make up 10.6% of Ohio's population while 49% of Ohio's death row inmates are African American. In addition, Mr. Kinley points to statistics with respect to Clark County which show that African Americans account for 8.8% of the county's population while the only death sentence imposed in Clark County was imposed against an African American. Respondent argues that in order to be successful on this claim, Mr. Kinley must demonstrate that the death penalty was applied inconsistently in his particular case, something which he has failed to do. Mr. Kinley has not countered Respondent's argument.

Mr. Kinley's argument and accompanying statistics is strikingly similar to those the petitioner in *Coleman v. Mitchell,* 268 F.3d 417 (6th Cir. 2001), *cert. denied sub nom., Coleman v. Bagley*, 535 U.S. 1031 (2002), raised.

> ... Petitioner highlights the disproportionate imposition of the death penalty on African-Americans in the State of Ohio as indicating an abuse of discretion by prosecutors in seeking the death penalty, as

well as an arbitrary application of the death penalty in violation of the Eighth Amendment under *Furman v. Georgia*, 408 U.S. 238 ... (1972). Specifically, Petitioner notes the striking racial discrepancy between African American representation in the Ohio population generally (9%), and such representation on Ohio's death row (49%). [footnote omitted].

However, any statistically-based argument, like Petitioner's concerning racial disparities in the application of the death penalty, must confront *McCleskey v. Kemp,* 481 U.S. 279 ... (1987). The Supreme Court in *McCleskey* established a demanding evidentiary standard for finding prosecutorial abuse of discretion in seeking the death penalty: "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297 .... The proof not meeting this standard in *McCleskey* was a statistical study on the imposition of the death sentence in Georgia that found, among other racial disparities, that "prosecutors seek the death penalty for 70% of black defendants with white victims, but for only ... 19% of white defendants with black victims." *Id.* at 327 ... (Brennan, J., dissenting)(citation omitted).

As noted by four dissenting Justices in *McCleskey*, such racial disparities in the capital sentencing system cast doubt on whether capital sentencing determinations have been, in practice, particularized as required by the Eighth Amendment: "[c]onsidering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with [the] concern that an individual be evaluated as a unique human being." *McCleskey*, 481 U.S. at 336 ... (Brennan, J., dissenting). Subsequent Supreme Court decisions "have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty." *Penry v. Lyhaugh*, 492 U.S. 302, 317 ,,, (1989).

Nevertheless, *McCleskey* remains controlling law on the ability of statistically-based arguments concerning racial disparity to establish an unconstitutional application of the death penalty. Although the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than statistical disparities considered and rejected by the Supreme Court in *McCleskey* as insufficient to "demonstrate a constitutionally significant risk of racial bias affecting the ... capital sentencing process." *McCleskey,* 481 U.S. at 313 ... . And though the racial imbalance is, to say the least, extremely troubling, we find that the prosecutorial discretion

> under the Ohio death penalty scheme, and the disconcerting racial imbalance accompanying such discretion, nevertheless fall, under current Supreme Court law, within the "constitutionally permissible range of discretion in imposing the death penalty." *Id.* at 305 ... .

*Coleman*, 268 at 441-42.

Based on the authority of *Coleman*, and, of course, *McCleskey*, Mr. Kinley's Twenty-Ninth Ground for relief should be rejected.

**Conclusion**

It is therefore recommended that Petitioner Juan Kinley's Petition for Writ of Habeas Corpus be denied.

June 29, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it

as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

J:\Death Penalty\Kinley v. Bradshaw\Kinley Merits R&R.wpd